1 | **BOHM, MATSEN, KEGEL & AGUILERA, LLP**
2 | Lee A. Wood – Of Counsel (SBN 58676)
  | Jonyson A. Pierce, Esq. (SBN 199354)
3 | 695 Town Center Drive, Suite 700
4 | Costa Mesa, CA 92626
  | Telephone: (714) 384-6500
5 | Facsimile: (714) 384-6501
6 |
7 | Attorneys for defendants
  | CITY OF MAYWOOD, MAYWOOD POLICE DEPARTMENT, ANDREW
8 | SERRATA and FRANK GARCIA
9 |

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARITZA SANCHEZ MARTINEZ, an individual, by and through her mother and guardian ad litem, BERTHA MARTINEZ, BERTHA MARTINEZ, an individual, and WENDY SANCHEZ, an individual | Case No. CV09-06734 SJO (RCx) Assigned For All Purposes To: Hon. S. James Otero |
| Plaintiff, | **DECLARATION OF JONYSON A. PIERCE IN SUPPORT OF DEFENDANTS MOTION FOR SUMMARY JUDGMENT, OR ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT** |
| vs. | |
| CITY OF MAYWOOD, MAYWOOD POLICE DEPARTMENT, COUNTY OF LOS ANGELES, ANDREW SERRATA, MAYWOOD OFFICER GARCIA, DAVID ISHIBASHI and DOES 1 through 10, Inclusive, | **DATE: August 30, 2010** **TIME: 10:00 am** **CTRM: 1, 2nd Floor (Spring Street)** |
| Defendants. | Trial Date: October 19, 2010 |

1

## DECLARATION OF JONYSON A. PIERCE

I, Jonyson A. Pierce, hereby declare as follows:

1.     I am an attorney at law duly licensed to practice before all courts of the State of California and the United States District, Central District of California.  I am an associate attorney with the law firm of Bohm, Matsen, Kegel & Aguilera, LLP, which represents the Defendants in this matter.  I make this Declaration based upon my own personal knowledge.  If called and sworn as a witness, I could and would competently testify to the following.

2.     The subject motion was made following the conference of all counsel and pursuant to Local Rule of Court 7-3, which took place on July 27, 2010.

3.     Attached as Exhibit A are true and correct copies of excerpts from the deposition transcript of Andrew Serrata.

4.     Attached as Exhibit B are true and correct copies of excerpts from the deposition transcript of Frank Garcia.

5.     Attached as Exhibit C are true and correct copies of excerpts from the deposition transcript of Bertha Martinez.

6.     Attached as Exhibit D are true and correct copies of excerpts from the deposition transcript of Wendy Sanchez.

7.     Attached as Exhibit E are true and correct copies of excerpts from plaintiffs' complaint.

8.     Attached as Exhibit F are true and correct copies of excerpts from the deposition transcript of David Ishibashi.

9.     Attached as Exhibit G are true and correct copies of excerpts from Wendy Sanchez' Responses to Andrew Serrata's Special Interrogatories, Set 1.

10.     Attached as Exhibit H are true and correct copies of excerpts from Bertha Martinez' Responses to Andrew Serrata's Special Interrogatories, Set 1.

11.     Attached as Exhibit I are true and correct copies of excerpts from Bertha Martinez' Responses to Frank Garcia's Special Interrogatories, Set 1.

12.     Attached as Exhibit J are true and correct copies of excerpts from Wendy Sanchez' Responses to Frank Garcia's Special Interrogatories, Set 1.

13.     Attached as Exhibit K are true and correct copies of excerpts from the deposition transcript of Patricia Bravo.

14.     Attached as Exhibit L are true and correct copies of excerpts from the deposition transcript of Jimmy Rubio.

15.     Attached as Exhibit M is a true and correct copy of an ABC News article dated June 28, 2010, regarding the disbanding of the Maywood-Cudahy Police Department as of midnight July 1, 2010.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed this 26th day of July at Costa Mesa, California.


/s/ Jonyson A. Pierce
**Jonyson A. Pierce, Declarant**

DECLARATION OF JONYSON A. PIERCE IN SUPPORT OF DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT, OR ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT

# EXHIBIT A

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

MARITZA SANCHEZ MARTINEZ, an )
individual, by and through, her )
Guardian Ad Litem, BERTHA MARTINEZ; )
et al., )
 )
 )
        Plaintiffs, )
 )
   vs. )  CV 09-06734 SJO
 )  (RCx)
CITY OF MAYWOOD, a public entity; )
et al., )
 )
 )
        Defendants. )
_____ )

**ORIGINAL**

DEPOSITION OF

OFFICER ANDREW SERRATA

LOS ANGELES, CALIFORNIA

MAY 19, 2010

M E R R I L L   C O R P O R A T I O N

www.merrillcorp.com   20750 Ventura Blvd., Suite 205
Woodland Hills, CA 91364                    818.593.2300 Off

1          MR. PIERCE:  Vague and ambiguous.

2          THE WITNESS:  I don't remember.

3     BY MR. STRUGAR:

4          Q     Do you recall any policies from when you

5     first joined the force in 2004 specifically regarding

6     people with developmental disabilities?

7          A.    I don't remember.

8          Q     Does the Maywood Police Department

9     currently have any written policies directly

10    addressing accommodations for people with mental

11    disabilities?

12         A     With mental disabilities?

13              There may be some as far as, like, maybe

14    5150s.  There are sections.  I don't recall which ones

15    they are that mention things, like a special narrative

16    for mental -- I don't know if it's mental disability, but

17    schizophrenia or people who are a danger to themselves.

18         Q     I think I know what it is, but can you

19    describe 5150 for me?

20         A     That is someone who is a danger to

21    themselves or others and they usually have to be

22    detained or have a 72-hour evaluation.

23         Q     5150 is a method by which somebody could be

24    civilly committed; is that correct?

25         A     Yes, sir.

OFFICER ANDREW SERRATA - 05/19/2010

Page 25

1   Q    So your understanding is that the Maywood

2   Police Department has a written policy pursuant to

3   5150?

4   A    It may not say "5150," but it does have

5   something to do with that, yes.

6   Q    Does the Maywood Police Department have any

7   specific policies related to people with

8   developmental disabilities?

9        MR. PIERCE:  Objection.  Vague and

10  ambiguous.

11       THE WITNESS:  I don't remember.

12  BY MR. STRUGAR:

13  Q    Other than the written policy regarding

14  5150 and civil commitments generally, are you

15  familiar with any written Maywood-Cudahy Police

16  Department policies addressing accommodations for

17  people with mental and developmental disabilities?

18  A    I don't recall.

19  Q    We talked a few minutes ago about the --

20  you called it a briefing, is that right; is sort of

21  a daily briefing an okay way to describe it?

22  A    That's fine.

23  Q    In your time with the Maywood Police

24  Department, have you ever had any daily briefing that

25  addressed accommodations for people with

OFFICER ANDREW SERRATA - 05/19/2010

Page 26

1   disabilities?

2       A    I believe so, yes.

3       Q    When was the last time?

4       A    Maybe two or three weeks ago.

5       Q    And what was the subject matter?

6       A    There was two different subjects.  It

7   started with excited delirium and people with mental

8   disabilities.  We also got into the area of 5150

9   holds as well.

10      Q    Did that briefing two or three weeks ago

11  on excited delirium and 5150 holds, did any of it

12  address the policies or procedures for providing

13  reasonable accommodations?

14      A    I don't remember whether they went over the

15  whole policies and procedures.  It was actually a

16  briefing for the shift after mine.  So I didn't stay

17  for the entire thing.  But I was there for maybe

18  20 minutes or so.  So I don't know whether they

19  covered anything or not.

20      Q    Other than two or three weeks ago, have

21  you been present for any daily briefings with the

22  Maywood Police Department relating to accommodations

23  for people with mental disabilities?

24      A    I don't remember.  Usually stuff like that

25  comes up if something happens.  So if somebody had an

1    biannual, but sometimes that means twice a year.

2            So that annual training or every other

3    year training, is required by POST?

4        A    Yes, sir.

5        Q    And when that annual or every other year

6    training takes place, how long is it?

7        A    It depends on what it is exactly.  It would

8    be arrest and control, some cover driving.  So

9    they're different.  But usually either one is maybe

10   eight hours.

11       Q    Is it fair to say that those eight-hour

12   trainings cover just a single topic?

13       A    No.

14       Q    They cover multiple topics?

15       A    Yes.

16       Q    Does one topic take eight hours or the

17   entire group of topics take eight hours?

18       A    The entire group of topics.

19       Q    In connection with your employment with the

20   Maywood Police Department, have any of those annual or

21   every-other-year trainings that you have attended ever

22   addressed the issue of people with disabilities?

23       A    Those specific trainings?

24       Q    Yes, sir.

25       A    I believe during the -- maybe during

1  handcuffing it's brought up -- actually, people

2  mostly with physical disabilities.

3      Q    Just so I'm clear, at one of these

4  required POST trainings dealing with the issue of

5  handcuffing individuals, there has been some

6  discussion of handcuffing policy as it relates to

7  people with physical disabilities?

8      A    Yes, sir.  It may also be in our

9  handcuffing policy, but I don't remember.

10     Q    And other than the discussion of people

11  with physical disabilities and the handcuffing

12  policy, have any of the other refresher trainings

13  that you have participated in in connection with your

14  employment with the Maywood Police Department

15  addressed the issue of people with disabilities?

16     A    I've gone through so much training, I can't

17  even -- I believe so, yes.

18     Q    Do you have a recollection of any of that

19  training here today?

20     A    Yes.  I went through a juvenile

21  intervention instructor's course.  It came up in

22  there.

23          I also attended a California Narcotic Officers

24  Association seminar in 2007, I believe it was, maybe

25  2008 -- I can't remember -- where it was brought up.  One

1   of the speakers was actually -- was a former police

2   officer who was blind and he brought up the issue during

3   the seminar.

4           And there may have been more.  If the

5   department doesn't send me to training, I put myself

6   through quite a bit of training on my own.  So in any

7   given year, I probably have maybe 160 hours of

8   training at least.

9       Q   I want to go back to the annual refresher

10  trainings really quickly.

11          Apart from the handcuffing policy related

12  to people with physical disabilities, can you recall

13  any of the annual refresher trainings addressing

14  people with disabilities?

15      A   No, sir.

16      Q   The juvenile intervention instructor's

17  course that you just spoke to, can you summarize what

18  part of that course addressed people with

19  disabilities?

20      A   Yes.

21          It was brought up -- I don't know if one

22  of the instructors brought it up or one of the

23  students, but officers work with leaders from high

24  school or junior high school.  It was brought up,

25  both physical disabilities and mental disabilities,

 1    mistaken.

 2              MR. STRUGAR:  My question was, Did it come up?

 3              And I think his answer was responsive to that,

 4    but I will ask that same question.

 5    BY MR. STRUGAR:

 6        Q    What is your understanding of the process of

 7    providing reasonable accommodation for people with

 8    disabilities?

 9              MR. PIERCE:  Vague and ambiguous.

10              Go ahead and answer.

11              THE WITNESS:  I'm not sure of the process.

12    BY MR. STRUGAR:

13        Q    Do you understand the process of reasonable

14    accommodations to modify police policies and

15    procedures that apply generally when it comes to

16    people with disabilities?

17              MR. PIERCE:  I object as to vague and

18    ambiguous.  Incomplete hypothetical.

19              You can answer.

20              THE WITNESS:  Yes.

21    BY MR. STRUGAR:

22        Q    To the extent that there's what we might call a

23    neutral policy that applies generally in the field, are

24    you familiar that providing accommodations sometimes

25    trumps that policy or modifies those neutral policies

1    when it comes to accommodating people with disabilities?

2         MR. PIERCE:  Objection.  Vague and

3    ambiguous.

4         You can answer if you understand.

5         THE WITNESS:  I understand.

6         I don't know -- you are asking me about

7    policies in general or Maywood police policy?

8         MR. STRUGAR:  Let's do Maywood police

9    policy.

10        THE WITNESS:  I don't know for certain that

11   there's anything in regards to that, but, again, it's

12   taught in the academy that when you come across

13   somebody -- you brought up bipolar/schizophrenia.  We

14   come up with that quite a bit.

15        Obviously someone who is schizophrenic or

16   bipolar, just by nature of their mental disability,

17   you have to treat them different.  It depends on the

18   level that they're at, whether they're angry or

19   calm.  Usually family members call.

20   BY MR. STRUGAR:

21     Q    The plaintiffs in this case are three

22   individuals who resided at 3589 East 54th Street in

23   Maywood who interacted with you on August 20th and

24   August 26th, 2008.

25        Are you familiar with that address

OFFICER ANDREW SERRATA - 05/19/2010

Page 36

1    generally?

2           MR. PIERCE:  I object that the question

3    assumes facts not in evidence.

4           You can go ahead and answer the latter part

5    of it.

6           THE WITNESS:  Yes, I am very familiar with

7    that address.

8    BY MR. STRUGAR:

9       Q    And are you familiar with the plaintiffs in

10   the lawsuit -- I will break them up one by one.

11          Are you familiar with the mother in that

12   household, Bertha Martinez?

13      A    Yes.

14      Q    And she has two daughters, one of whom has

15   a developmental disability.

16          Are you familiar with her?

17      A    Yes, sir.

18      Q    And she has another daughter who is in her

19   twenties who does not have a developmental

20   disability.

21          Are you familiar with her as well?

22      A    Yes, sir.

23      Q    And prior to August 20, 2008, you were

24   familiar with this address; correct?

25      A    Absolutely.

1      Q    How did it come to be that you were

2  searching the residence that day?

3      A    Dave Ishibashi had contacted me.  Usually

4  when he does search warrants in that area or he needs

5  a gang expert, he usually calls me.

6           And depending on the gang, I get

7  anything -- point out anything that's of the gang's

8  to take pictures of it or collect it as evidence.

9      Q    So it's fairly common for Dave Ishibashi to

10  contact you when he is carrying out a search in

11  Maywood?

12      A    Yes, sir.

13      Q    Prior to August 20, 2008, how many times

14  had you conducted a search with Dave Ishibashi?

15           MR. PIERCE:  I'm just going to object as

16  vague and ambiguous.

17           You can go ahead and answer.

18           Assumes facts not in evidence.

19           THE WITNESS:  Maybe four or five times,

20  possibly more.  I just can't remember for sure.

21  BY MR. STRUGAR:

22      Q    And for the August 20th search, when did

23  you receive the call from Mr. Ishibashi?

24      A    I don't remember.

25      Q    Was it a day in advance of the search, the

OFFICER ANDREW SERRATA - 05/19/2010

Page 45

1    day of; do you remember?

2        A    I don't remember.

3        Q    In the normal course, in other searches you

4    have conducted with Mr. Ishibashi, does he call you in

5    advance of the search and sort of tell you when it's

6    going to happen?

7        A    It depends on the search.  Sometimes it

8    could be hours before or even minutes before.  Other

9    times, yes, I have a day's notice.

10       Q    And you don't remember for the August 20th

11   search whether it was minutes, hours or days

12   beforehand that you got notice?

13       A    Correct.  I don't remember.

14       Q    My understanding is Mr. Ishibashi works

15   for the bureau of investigation at the district

16   attorney's office; is that your understanding as

17   well?

18       A    Yes, sir.

19       Q    Was it his office executing the search

20   warrant or a different agency?

21       A    I believe it was his task force group.

22       Q    Can you explain or describe his task force

23   group for me?

24       A    It was a U.S. Marshals task force.

25       Q    And what does that task force do?

1      A    They are a fugitive apprehension team.

2  They go after mostly people who are, like, violent

3  felons, I believe.  I'm sure they do other stuff.  I

4  don't know.  I've never been on the team and never

5  discussed in detail what they do.

6      Q    Are you familiar with any of the officers

7  on that task force?

8      A    Just David Ishibashi.

9      Q    And apart from Mr. Ishibashi, do you have

10  an understanding of who those task force officers,

11  who their employer is?

12      A    No.

13      Q    Are they U.S. Marshals?

14      A    There are some that are and others that

15  are just from respective law enforcement agencies;

16  could be from the sheriff's department or any other

17  municipality.

18      Q    So your understanding of the task force

19  is that it's comprised of officers from various law

20  enforcement agencies, including municipalities,

21  Marshals, and the L.A. County Sheriff's Department?

22      A    Yes.  I believe also the Department of

23  Corrections as well.  There's several agencies.  I

24  wouldn't know what they are upfront.

25      Q    Fair to say they are from a collection of

1     law enforcement agencies?

2        A    Correct.

3        Q    You were called to assist.

4         Why were you called to assist?

5        A    To identify any Maywood Locos gang

6     paraphernalia.

7        Q    And they called you because in connection

8     with your employment with the Maywood Police

9     Department, you have familiarity with the

10    Maywood Locos gang paraphernalia and such; correct?

11        A    Yes, sir.

12        Q    Were you working a shift; were you on duty

13     when you received the call?

14        A    I don't remember when I received the call.

15        Q    Do you recall if you were on duty though?

16        A    No.

17        Q    On August 20, 2008, approximately what time

18     did you arrive at the residence?

19        A    I don't remember.  I know it was in the

20     morning, but I don't remember what time.

21        Q    Was the sun up?

22        A    I don't remember.

23        Q    On August 20, 2008, when you -- did you

24     arrive at the residence alone or were you with the

25     task force officers?

OFFICER ANDREW SERRATA - 05/19/2010

Page 59

1          In any event, I was contacted by Dave and

2    went to the address where he was serving the warrant.

3          Q    Were you contacted the day of the search

4    or --

5          A    I don't remember.

6          Q    You said that you may be getting the two

7    confused.

8          But during one of the incidences you were there

9    before?

10         A    I was there a little earlier than the other,

11   yes.

12         Q    When you say "earlier than the other" for one

13   of the two, were you there when the task force officers

14   first approached the residence?

15         A    I believe so, yes.

16         Q    Do you know what you were wearing that day?

17         A    I believe I was wearing a regular uniform,

18   a full uniform. But, again, I don't remember which

19   day it was. I believe I was in full uniform.

20         Q    And, again, on August 26, 2008, it was the task

21   force officers who were executing the warrant; is that

22   correct?

23         A    Correct.

24         Q    And it was their warrant?

25         A    Yes, sir.

1    arrived at the beginning of those searches, were

2    there any other Maywood police officers present?

3         A    No, sir.

4         Q    On August 26th, for the entirety of the

5    search that day, were there any other Maywood Police

6    Department officers there?

7         A    I don't believe so.

8         Q    And on August 26th, what was your role in

9    the search that day?

10         A    Same thing, to point out gang

11   paraphernalia.

12         Q    How long were you there that day?

13         A    I don't remember.  Probably at least a

14   couple of hours.

15         Q    I believe in your internal affairs

16   interview with Mr. Patterson said you were there on

17   August 26th for an hour or less.

18              Your current recollection is that you were

19   there for at least a couple of hours on August 26th?

20              MR. PIERCE:  Asked and answered.

21              You can answer again.

22              THE WITNESS:  I'm not certain.  I believe

23   I may have been in uniform that day and it would be

24   in the dispatcher's CAD entry.

25

OFFICER ANDREW SERRATA - 05/19/2010

1           LOS ANGELES, CALIFORNIA; WEDNESDAY, MAY 19, 2010

2                         ---oOo---

3

4           MR. STRUGAR:  Back on.

5     BY MR. STRUGAR:

6         Q    Officer Serrata, you wanted to supplement

7     some earlier testimony?

8         A    Just in regards to training in regard to

9     treatment of persons with disabilities.

10             During the -- I don't know if it's every

11    two years that we get it.  It might be every other

12    year, the sexual harassment training.  The attorney

13    giving the class brought up over and over not to

14    discriminate with gender, age, and disability was

15    brought up several times during the training.

16             And I believe in our search warrant policy,

17    it talked about treating people with respect in

18    general in the search warrant policy.  So it's just

19    in general.  It's generalized, not specific.

20        Q    You mean the search warrant policy doesn't

21    say anything specifically with disabilities; it just

22    says to generally treat people with respect?

23        A    Correct.

24        Q    In regard to the sexual harassment

25    training, it's every year or every two years?

1      A      It might be every two years.  I'm not

2  certain.

3      Q      And that training is given by an attorney?

4      A      Yes, by someone who is contracted or

5  subcontracted.

6      Q      Do you receive any materials in connection

7  with that sexual harassment training?

8      A      I believe so.  I'm not sure, but I believe

9  we may have.

10     Q      When you say "we," you mean the police

11  department or you personally?

12     A      The people who are in attendance in the

13  class.

14     Q      Okay.

15            Do you know if you still have any of the

16  documentation from any of the sexual harassment

17  trainings?

18     A      I don't know.

19     Q      As part of that sexual harassment

20  training -- I'm sorry -- withdrawn.

21            Typically how long are those trainings?

22     A      I believe it was a full day.  It's maybe

23  six or eight hours.

24     Q      And you say it touches on, among other

25  things, not to discriminate against people with

1    disabilities?

2        A    That's correct.

3        Q    Does any of that training deal with the

4    process or policy of providing reasonable

5    accommodations?

6        A    I don't believe so, but I'm not certain.   I

7    don't believe so.

8        Q    Is there any part of that training that

9    deals with, say, obtaining sign language interpreters

10   for people who are deaf or hard of hearing or

11   anything like that?

12       A    No, but I believe that may be in our

13   policy.   There's a number that our dispatchers call

14   for that if we need it.

15       Q    It is not part of the sexual harassment

16   training, that specific?

17       A    Not with regards to that, no.

18       Q    I believe before we took the last break we

19   were talking about Sergeant Garcia's presence during

20   the search of August 26, 2008.

21            Do you recall that?

22       A    Yes, sir.

23       Q    I believe you said that you believed Sergeant

24   Garcia was there for some period of time less than

25   30 minutes.

## **EXHIBIT B**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

# ORIGINAL

| | |
|---|---|
| MARITZA SANCHEZ MARTINEZ, an individual, by and through her Guardian Ad Litem, BERTHA MARTINEZ; et al., | ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) ) |
| CITY OF MAYWOOD, a public entity; et al., | ) Case No. ) CV 09-06734 ) SJO (RCx) ) |
| Defendants. | ) ) |

DEPOSITION OF SERGEANT FRANK GARCIA
FRIDAY, JUNE 4, 2010
10:07 A.M. to 1:22 P.M.

Donna S. Baker,
RPR, CSR No. 7760

**MERRILL CORPORATION**

www.merrillcorp.com    20750 Ventura Blvd., Suite 205
Woodland Hills, CA 91364                           818.593.2300 Office

1    a period of time at 3589 East 54th Street on August

2    26, 2008 while David Ishibashi and members of his

3    task force were carrying out a search warrant?

4        A    Yes.

5        Q    My understanding is that Mr. Ishibashi and

6    members of his task force carried out a previous

7    search and an arrest of one of the residents within

8    a week prior.

9             Am I right that you were not present for a

10   previous search by Mr. Ishibashi and his task force

11   prior to August 26, 2008?

12       A    You are correct.  I was not there.

13       Q    How did you come to be at the residence on

14   August 26, 2008?

15       A    I was made aware that there was a search

16   warrant that had been executed, and I responded to

17   the scene.

18       Q    Was your presence requested?

19       A    No, I don't believe so.

20       Q    How were you made aware that a search

21   warrant had been executed?

22       A    It was either by listening to the radio or

23   speaking to the dispatcher.  I don't remember.

24       Q    So why did you go to the residence?  I

25   understand you were made aware that a search

SERGEANT FRANK GARCIA - 06/04/2010

Page 63

1    Dispatch in responding to a call?

2        A    Yes.

3        Q    What are those circumstances?

4        A    Exigent circumstances where you have to

5    get out of the car and you don't have time to do

6    it.

7        Q    Any other circumstances?

8        A    When you do it on the MDC because you

9    don't want to put it out over the air.

10       Q    What is the MDC?

11       A    The in-vehicle computer, Mobile Data

12   Computer.

13       Q    Am I correct that on -- in responding to

14   the call on August 26, 2008, was not exigent

15   circumstances?

16       A    You're correct.

17       Q    And was there any reason to use the MDC

18   instead of putting it out over the air?

19       A    No.

20       Q    Were you on duty at the time when you got

21   the call or when you responded to the call?

22       A    Yes.

23       Q    And were you in uniform?

24       A    Yes.

25       Q    Can you describe the uniform you were

1   utilizing on August 26, 2008?

2       A    Dark blue police uniform with Maywood

3   Cudahy patches on either shoulder, a badge over my

4   left breast, name tag over my right breast, Sam

5   Browne, dark trousers and dark boots.

6       Q    Were you in a marked vehicle that day?

7       A    Yes.

8       Q    When you first arrived at the residence,

9   what did you first see?

10      A    Maritza either sitting on the porch steps

11  or a chair in front of the residence and a male

12  U.S. marshal standing next to her.

13      Q    This is in front of the house in the gated

14  front yard area?

15      A    Yes.

16      Q    Did you see any other law enforcement

17  officers other than the U.S. marshal sitting next

18  to Maritza?

19           I'm sorry.  When you first arrived, did

20  you see any other law enforcement officers?

21      A    I don't think so.  I think Dave Ishibashi

22  walked out shortly after I arrived.

23      Q    Your understanding was that Dave Ishibashi

24  was the one serving the warrant that day?

25      A    Yes.  I don't know if I learned it from

SERGEANT FRANK GARCIA - 06/04/2010

Page 68

1     A   No, sir.

2     Q   You arrived at the house solo; is that

3.  correct?

4     A   Yes, I arrived alone.

5     Q   Did you see Officer Serrata that day at

6   the residence?

7     A   I don't remember.  I don't believe I did,

8   though.

9     Q   Do you have any knowledge of how long the

10  task force officers had been at the residence by

11  the time you got there?

12    A   No.

13    Q   Did you have any understanding as to

14  whether or not they had arrived just minutes

15  earlier or whether they had been at the house for

16  more than a half an hour or so?

17    A   No, I don't know.

18    Q   How long were you at 3589 East 54th Street

19  on August 26, 2008?

20    A   My best estimation, somewhere between 10,

21  15 minutes, maybe 20 minutes, and that's stretching

22  it.

23    Q   When you first arrived, I believe you said

24  that you saw Maritza sitting either on the front

25  porch or somewhere else but sitting in the front

SERGEANT FRANK GARCIA - 06/04/2010

Page 69

1   yard with a U.S. marshal standing next to her; is

2   that correct?

3          MR. PIERCE:   Asked and answered.

4          Go ahead.

5          THE WITNESS:   Yes.

6      Q   BY MR. STRUGAR:   What happened next?   What

7   did you do?

8      A   I stood under a tree in the front yard.

9      Q   You entered the gated front yard; correct?

10     A   Yes.

11     Q   And then you stood under a tree.   Why did

12   you stand under a tree?

13     A   I didn't want to interfere with their

14   investigation or their search.

15     Q   Why not?

16     A   As a detective, I don't like other folks

17   coming into my crime scene or into -- interfering

18   with my investigation if they're not participating

19   in it, so if there's someone that is not requested

20   there, then I don't want them there.

21     Q   I guess what I'm confused about is if you

22   weren't going to enter while they were searching,

23   why did you respond to the call in the first place?

24     A   Because there was Maywood personnel there.

25     Q   So what did you -- when you were

SERGEANT FRANK GARCIA - 06/04/2010

Page 72

1    warrant and they were looking for an assault rifle

2    of some sort.

3            And I told him, "Hey, I'm just going to

4    stand back. You guys do your thing, and I'll hang

5    out here if you need me."

6            He said, "Okay," and he walked back in.

7        Q    At that point he walked into the house?

8        A    No. I think he walked through the

9    driveway because Maritza was sitting on the porch,

10   so he would have to go around Maritza so I think he

11   we went around to the back, but I'm not sure.

12       Q    During that time you were standing under

13   the tree, did Maritza appear to be in any distress?

14       A    No. I don't know what their policy is,

15   but our policy normally gives us the discretion to

16   handcuff or not handcuff someone that is mentally

17   disabled. And when I saw her, she was not

18   handcuffed. She was just sitting on the porch.

19   She did not appear to be in any distress.

20       Q    Did she appear to have urinated herself?

21       A    No. I wasn't close enough to see.

22       Q    If you can, approximately how many feet

23   away is the tree from the porch in the front yard?

24       A    I don't know.

25       Q    So Dave Ishibashi goes around to the back