# EXHIBIT C

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

MARITZA SANCHEZ MARTINEZ, etc.,  )
et al.,                          )
                                 )
            Plaintiffs,          )
                                 ) Case No.
        VS.                      ) CV09-0795 ABC(JWJx)
                                 )
CITY OF MAYWOOD, etc., et al.,   )
                                 )
            Defendants.          )
                                 )
_____  )

INTERPRETED DEPOSITION OF BERTHA MARTINEZ

Thursday, April 29, 2010, 10:02 a.m.

Reported by:

Debra R. Bautista

CSR No. 5766

BERTHA MARTINEZ  4/29/2010

1  was the next thing that happened?

2      A.  Then they left.

3      Q.  The officers left?

4      A.  Some of them had already left.  But since they

5  had brought us in --

6          THE INTERPRETER:  May the interpreter clarify.

7          THE WITNESS:  Oh, once they had brought us

8  inside, there were still some people outside, but I

9  didn't see how many there were.

10 BY MR. PIERCE:

11     Q.  What time did all of the officers leave?

12     A.  About 7:00 or 7:30.

13     Q.  Anything else that occurred that you can recall

14 before all of the officers had left?

15     A.  No, just what they had done and then they left.

16 That's all.

17     Q.  Did the officers question you?

18         MS. ANDERSON-BARKER:  Objection; vague.  At

19 what point in time?

20 BY MR. PIERCE:

21     Q.  Before they left on the first incident.

22     A.  Before they left?

23     Q.  Yes.

24     A.  When we were in the living room, the

25 investigator from Los Angeles and someone who spoke

74

1    Spanish took me into one of the rooms.  There they asked

2    me some questions.  And my daughter Wendy stayed with

3    Maritza in the living room.

4         Q.  Okay.  How long did they ask you questions for?

5         A.  About 15 minutes.

6         Q.  Who was it that asked you questions?

7         A.  The investigator from Los Angeles.

8         Q.  The same one that you talked about earlier?

9         A.  Yes.

10        Q.  What questions were you asked?

11        A.  They were asking me several questions, how much

12   rent did I pay there, if I was the owner.

13        Q.  Anything else you can recall?

14        A.  How long ago the owner of the gun that they had

15   found there had left, how long ago he had gone to Texas.

16        Q.  Anything else they asked you?

17        A.  They took me outside and then they -- after

18   they were done asking me questions, they took me outside

19   and then they brought in Wendy to ask her questions.

20        Q.  Who was present during the questioning of you,

21   was it just the investigator, or was it the investigator

22   and someone else?

23        A.  It was the investigator and then someone who

24   spoke Spanish.

25        Q.  Now, just regarding you, the investigator who

75

BERTHA MARTINEZ   4/29/2010

1   officers touch you in any way?

2       A.  No.

3       Q.  Did any of the officers touch Wendy in any way?

4       A.  No.

5       Q.  Did any of the officers touch Maritza in any

6   way?

7       A.  No.

8       Q.  Did the officers show you a copy of the search

9   warrant -- or did anyone show you a copy of the search

10  warrant?

11      A.  They showed it when they were leaving.

12      Q.  Did they give you a copy of that?

13      A.  Yes.

14      Q.  Do you still have that?

15      A.  Yes.

16      Q.  Now, going to the second incident, do you

17  recall that?

18      A.  Yes.

19      Q.  When did you first see any police officer

20  during the second incident?

21      A.  Can you repeat the question?

22      Q.  Yeah.  What time was it during the second

23  incident that you first saw a police officer, you know,

24  on your property, at your house?

25      A.  It was about 10:00 or 11:00 in the morning.

84

BERTHA MARTINEZ  4/29/2010

1    Q.   Who was it that you saw?

2    A.   The investigator from Los Angeles had come and

3    also the officer from Maywood and another person from

4    Los Angeles.

5    Q.   When you say the investigator from Los Angeles,

6    do you mean the Filipino guy that you were talking about

7    earlier?

8    A.   Yes.

9    Q.   And the officer from Maywood, was it the same

10   officer that was there during the first incident?

11   A.   Yes.

12   Q.   Do you know that officer's name from Maywood?

13   A.   Officer Serrata.  Serrara.  I don't know.

14   Q.   The investigator from L.A., do you know that

15   officer's name?

16   A.   I don't remember right now.

17   Q.   How about the other officer from L.A., do you

18   know that person's name?

19   A.   No.  But he spoke Spanish.

20   Q.   Okay.  Were there any other officers other than

21   these three during the second incident?

22   A.   When they came in, it was those three.

23   Q.   But later did more officers show up?

24   A.   Yes.  Several.

25   Q.   Where were those officers from?

85

BERTHA MARTINEZ   4/29/2010

1    A.   From Los Angeles.

2    Q.   Anywhere else?

3    A.   Yes.   Another person from Maywood also came.

4    Q.   Do you know that officer's name from Maywood,

5    the other officer?

6    A.   Garcia.

7    Q.   Do you know the officer's first name?

8    A.   No, I can't remember right now.   I only know

9    his last name was Garcia.

10   Q.   Do you know any of the officers from L.A. who

11   showed up, do you know their names?

12   A.   No.

13   Q.   Where were you when you first saw any officer

14   during the second incident?

15   A.   I was in my garage.

16   Q.   What were you doing in the garage?

17   A.   Well, I was in there doing things with my

18   daughter, with Maritza.

19   Q.   What were you doing?

20   A.   Putting things away.

21   Q.   What were you putting away?

22   A.   Well, clothing, diaper boxes.

23   Q.   Who did you first see?   What officer did you

24   first see?

25   A.   The one from Los Angeles was in front.

86

BERTHA MARTINEZ   4/29/2010

1    spoke Spanish.

2         Q.  Who else was there in the living room?

3         A.  There were also some other officers, but they

4    were just going around checking the house.

5         Q.  Okay.  Then they take you outside; correct?

6         A.  Uh-huh.

7         Q.  In Spanish, not "uh-huh."

8         A.  Yes.

9         Q.  Who took you outside?

10        A.  The investigator took us out front.

11        Q.  From L.A.?

12        A.  Yes.

13        Q.  Was that the one -- the Filipino?

14        A.  Yes.

15        Q.  Did he take you and Maritza outside?

16        A.  Yes.

17        Q.  Where was the Maywood officer when you were

18   taken outside?

19        A.  He was outside.  They came in and went out.

20        Q.  No.  I want to know where was the Maywood

21   officer when the L.A. officer took you outside.

22        A.  Inside the living room.

23        Q.  When you went outside, was it just you,

24   Maritza, and the L.A. officer?

25        A.  No.  Also my nephew Joaquin.

                                                              92

BERTHA MARTINEZ  4/29/2010

1    Q.  When did you first see Joaquin?

2    A.  He was there for a little while.  He was at my

3  house for about a week.

4    Q.  No.  I mean during the second incident where

5  was Joaquin when the police showed up?

6    A.  He was there in front of the house.

7    Q.  All right.  So the L.A. officer took you,

8  Maritza, and Joaquin out to the front?

9    A.  Yes.

10    Q.  Remember to make sure to let her translate the

11  question completely.  You're jumping ahead a little bit.

12        Then what happened after you were taken

13  outside -- out front; correct?

14    A.  Yes.

15    Q.  What happened after you were taken out front?

16    A.  Out front we were standing outside for about

17  half an hour.

18    Q.  When you say "we," you mean you and Maritza and

19  Joaquin?

20    A.  Yes.

21    Q.  What did you see during that half an hour?

22    A.  I didn't see anything.  They were all inside.

23  Outside there were a couple who were watching us, but

24  everybody else was walking around inside.

25    Q.  You say "they" were inside, you mean the

93

1    Q.  When you say "stay here," where exactly?

2    A.  Well, they didn't let her go in.

3    Q.  I know.  But where was it that you said "stay

4  here"?  Where was it?  Was it by the car, was it on the

5  porch?  Where was it that you told her to stay?

6    A.  When they told me to go inside, I grabbed my

7  daughter.  I grabbed her by the hand.  And at the

8  entrance where the door is, they told me, "No, your

9  daughter can't go in, only you."

10    Q.  Who told you that at the door entrance?

11    A.  The person who spoke Spanish.

12    Q.  And then what happened after that?

13    A.  Well, I told them to let me take her in, I

14  can't leave her alone, she doesn't know anybody.  She

15  was crying and nervous.  I went to leave her alone

16  there, but she wouldn't let go of me.  She was pulling

17  me.

18    Q.  Then you said with some effort you told your

19  daughter to stay there.

20    A.  I told the officers that "I want to take my

21  daughter with me.  Ask me whatever you want, but I want

22  my daughter here."

23    Q.  Okay.  And then what happens?

24    A.  Well, from there they took me out back.

25    Q.  Who took you?

99

BERTHA MARTINEZ   4/29/2010

1   A.   The officers.

2   Q.   Which officers?

3   A.   From Los Angeles and Maywood.

4   Q.   Where was Joaquin at this time?

5   A.   They had him separated from us.

6   Q.   Where, though, do you know where?

7   A.   He was never in contact with my daughter.

8   Q.   I know.  But do you know where he was?

9   A.   Well, when I was with my daughter, they had him

10  over in the corner by the fence.

11  Q.   How far away was he when you were with your

12  daughter?

13  A.   From my daughter, was pretty far.  My daughter

14  stayed on the stairs and he was pretty far away from

15  her.

16  Q.   I know.  How far, your best estimate, how far

17  away was he?

18  A.   Seven or eight meters.

19  Q.   Okay.  Then what happened after the officers

20  took you to the back?

21  A.   In the back they started to threaten me.

22  Q.   How?

23  A.   That if I didn't give them the weapons, they

24  were going to take my daughter.

25  Q.   Who threatened you?

100

DOKICH COURT REPORTERS, INC.
800-720-9679

BERTHA MARTINEZ  4/29/2010

1    Q.  Take who away?

2    A.  Maritza.

3    Q.  Okay.  Who was telling you this stuff?

4    A.  The officer from Maywood and Officer Serrata

5    told me that they were going to take my daughter.  And

6    they told me like as if they were making fun of me.

7    Q.  Okay.  You keep say "they."  So can you be

8    specific and tell me who was saying these things?

9        MS. ANDERSON-BARKER:  Well, just ask her,

10   Jonyson, directly who said this.

11       MR. PIERCE:  I am.

12   Q.  I'm asking if you could just be a little more

13   clear and identify who you mean when you say "they."

14   A.  The one from Maywood and from Los Angeles.

15   Q.  Okay.  What else did they say to you while you

16   were back there for those three to four hours?

17   Specifically say what officer said what.

18   A.  The other officer from Maywood arrived, Officer

19   Garcia.  He came directly to me out back.  Officer

20   Serrata from Maywood was watching me.  The officer from

21   Maywood, Officer Garcia, told me "We're going to take

22   your daughter away from you.  And that a van was going

23   to come and take her away.  Tell me where your

24   daughter's clothes are.  And if she is on her menstrual

25   cycle, tell me where her sanitary products are because

                                                        102

BERTHA MARTINEZ   4/29/2010

1   we're going to take your daughter, we're going to take

2   her away from you."

3       Q.  And this was Officer Garcia?

4       A.  Yes.

5       Q.  Who else was present when Officer Garcia said

6   this?

7       A.  Officer Serrata and also some other officers

8   from Los Angeles.  But since they were coming in and

9   going out --

10      Q.  How long had you been in the back before you

11  saw Officer Garcia?

12      A.  About an hour, more or less.

13      Q.  Anything else that Officer Garcia said to you

14  while you were out back?

15      A.  He told me, "If you had a weapon, where would

16  you hide it"?

17          And I told him, "Why are you asking me this?"

18          And he told me, "No, I want you to answer."

19          And I told him, "No, I don't have anything."

20          Garcia and Serrata were there, but they went a

21  little bit further away from me where I was in the back.

22  And I overheard them saying that they were pressuring me

23  with Maritza so that I would talk.

24      Q.  Anything else you recall Officer Garcia saying

25  or Officer Serrata saying when they were in the back

                                                        103

DOKICH COURT REPORTERS, INC.
800-720-9679

BERTHA MARTINEZ  4/29/2010

1    BY MR. LEE:

2        Q.  I'm talking about --

3            MS. ANDERSON-BARKER:  Before we waste a lot of

4    time on this questioning --

5            MR. STRUGAR:  To the extent that it helps, we

6    can stipulate that we're not claiming damages for -- the

7    first incident is relevant as to notice and knowledge.

8    But you can ask her all day who violated her rights the

9    first day.  This Complaint doesn't have any allegations

10   for damages for the first incident.

11   BY MR. LEE:

12       Q.  Okay.  Do you agree with everything your lawyer

13   said?

14           THE INTERPRETER:  I'm sorry.  The interpreter

15   did not get everything that you said.

16           MS. ANDERSON-BARKER:  It's okay.  That was a

17   lot.

18           Do you want to say that again, Matthew?

19           MR. STRUGAR:  Sure.

20           MS. ANDERSON-BARKER:  Slowly.

21           MR. STRUGAR:  Sure.

22           We aren't claiming damages in this lawsuit from

23   the first incident.  The first incident is relevant as

24   to the officers' knowledge of Maritza's disability.  But

25   at least as far as this lawsuit is concerned, we aren't

                                                       150

BERTHA MARTINEZ   4/29/2010

1    claiming damages from the first incident or a failure to

2    accommodate, or for damages, not injunctive relief.  The

3    focus is on the second incident.

4    BY MR. LEE:

5        Q.  Are you in agreement with what your lawyers

6    stated?

7        A.  Yes.

8        Q.  Now, going to the second day, how many law

9    enforcement officers from the County of Los Angeles do

10   you claim violated your rights?

11       A.  The ones that I saw, there were like five, but

12   some more came later that I didn't know.

13       Q.  For the ones that came later, what did they do

14   that violated your rights?

15           MS. ANDERSON-BARKER:  You know, objection;

16   calls for a legal conclusion.  She's not a lawyer.

17           MR. LEE:  I'm not asking for a legal

18   conclusion.  I want her to specify on the record what it

19   is that they did to her.

20           MS. ANDERSON-BARKER:  The guys with the dogs,

21   then say that, "what did the people that came with the

22   dogs do to you that was bad."

23           MR. LEE:  I'm not asking for a legal

24   conclusion.  But I'm entitled to just know what it is

25   that she's claiming about these guys.

                                              151

**EXHIBIT D**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

MARITZA SANCHEZ MARTINEZ, etc.,  )

et al.,  )

  )

              Plaintiffs,  )

  ) Case No.

          VS.  ) CV09-0795 ABC(JWJx)

  )

CITY OF MAYWOOD, etc., et al.,  )

  )

         Defendants.  )

  )

_____)

DEPOSITION OF WENDY SANCHEZ

Wednesday, April 21, 2010, 10:05 a.m.

Reported by:

Debra R. Bautista

CSR No. 5766

1  Q.  And this is the same residence where you lived

2  at the time of the incident?

3  A.  Yes.

4  Q.  When I say "incident," you understand what I

5  mean, meaning the incident where a couple -- I guess a

6  couple search warrants were served at your house?

7  A.  Yes.

8  Q.  At the time of the incident, who lived with you

9  at that address?

10  A.  My mother Bertha Martinez, my sister Maritza

11  Sanchez, and my father Gaudencio Lopez.

12      MR. STRUGAR:  I'm going to object.  I think

13  there's two incidents, one preceding the other by a few

14  days.

15      MR. PIERCE:  Well, I'm assuming that since they

16  were so close in time.

17      MR. STRUGAR:  Sure.  The father wasn't there by

18  the second incident, obviously, because there was an

19  arrest.

20      MR. PIERCE:  Sure.  Okay.  That makes sense.

21  Q.  What about a person named Joaquin Olvera, did

22  he live with you during either one of the incidents?

23  A.  He was staying at the time because he came from

24  vacation from Mexico.

25  Q.  How do you spell that person's name?

15

WENDY SANCHEZ   4/21/2010

1    A.   Joaquin?

2    Q.   Yes.

3    A.   I don't know how to spell his name.

4    Q.   Was it Joaquin Olvera?

5    A.   Joaquin Olvera.

6    Q.   Kind of like Joaquin Phoenix, kind of the same?

7    A.   Kind of, yeah.

8    Q.   Do you know where Joaquin Olvera lives?

9    A.   He's in Mexico.

10    Q.   Oh, he went back?

11    A.   Yes.

12    Q.   So at the time he was at your residence at the

13 time of the incidents, he was at your residence visiting

14 from Mexico?

15    A.   Correct.

16    Q.   And then when did he go back to Mexico?

17    A.   Well, he didn't stay that long after.  You

18 could say approximately like a week after 'til he left.

19    Q.   Do you know where he lives in Mexico?

20    A.   Queretaro.

21    Q.   How do you spell that?

22    A.   Q-u-e-r-r-e-t-e-t-a-r-o.

23    Q.   That's a long name.  Queretaro, Mexico?

24    A.   Uh-huh.  Correct.

25    Q.   Has he been back since the accident --

16

WENDY SANCHEZ   4/21/2010

1   pointing the gun at my sister.  He was telling her to

2   get up.  And he used the word "Get the fuck up."

3        And I told him that she was -- that she didn't

4   understand, she was disabled, that she -- she had

5   autism.  And he just told me, "Okay.  Get her up."

6        Q.  When you say "they were pointing rifles like

7   that," you kind of have to describe what you --

8        A.  They were pointing --

9        Q.  Hold on a second.  Let me finish.  Let's try

10  not to talk over one another.

11        When you say things like "that" and "this," I

12  mean, I kind of see what you're doing, but when we're

13  looking at the transcript a month from now, "this" and

14  "that," it doesn't mean anything because it's not

15  something that's illustrated on the paper.

16        A.  Okay.

17        Q.  So when you say "they were pointing rifles like

18  that," what do you mean by "that"?

19        A.  They were pointing the rifle directly at my

20  sister and myself and at my father.

21        Q.  When you say "they," who were "they"?

22        A.  It was some officers in -- dressed in black.  I

23  don't know if they were -- I don't know where they were

24  from, the LAPD or -- or from the SWAT.  But they were

25  all dressed in black.

59

DOKICH COURT REPORTERS, INC.
800-720-9679

1   A.  Visual, no.

2   Q.  What do you mean by that "visual, no"?  Is

3  there some other way that you could tell what he was

4  doing, like maybe you heard him doing something or --

5   A.  Well, I just heard him speaking to them, but I

6  couldn't hear what they were speaking about.

7   Q.  How did you know it was him talking?

8   A.  Because they said, "Oh, yeah" -- they were

9  asking him, "Oh, so you're from the Maywood Police

10  Department?"

11      And he said, "Yes."

12      They said, "They sent you here?"

13      He said, "Yes."

14   Q.  Anything else you could overhear them talking

15  about?

16   A.  No.

17   Q.  So after you get inside the house, what's the

18  next thing that happens?

19   A.  Well, they started questioning my mom.

20   Q.  Were you present?

21   A.  No.

22   Q.  Did they take her aside?  Where did they take

23  her when they were questioning her?

24   A.  In my room.

25   Q.  Could you overhear them asking her questions?

69

1    A.   No.   They closed the door.

2    Q.   So when your mom left, you were with your

3  sister?

4    A.   My sister was trying to go towards her, but she

5  started crying, so I had to held her down.   So, yes, I

6  was.

7    Q.   At any point in time up to this point, were any

8  of you handcuffed?

9    A.   At the -- at that time, no.

10    Q.   What about your dad, was he handcuffed up to

11  this point at any point in time?

12    A.   At that point, no.

13    Q.   So they take your mom in for questioning.   How

14  long was your mom gone during this time when she was

15  being questioned?

16    A.   Probably like ten or 15 minutes.

17    Q.   What happened after that ten or 15 minutes?

18    A.   She was released to go out with us.

19    Q.   After she was released, what's the next thing

20  that happened?

21    A.   They questioned me.

22    Q.   Where did they question you at?

23    A.   At the porch.

24    Q.   Outside?

25    A.   Yes.                                            70

WENDY SANCHEZ  4/21/2010

1    A.   Uh-huh.

2    Q.   At that point Serrata is in the living room?

3    A.   I believe so.

4    Q.   And what was he doing?

5    A.   I couldn't have a visual of him.  Well, I

6    couldn't hear what he was saying.

7    Q.   Was he with any of your family members at that

8    point?

9    A.   Well, my mom and my sister were in the living

10   room.

11   Q.   But was he with them, like talking with them,

12   doing anything with them, or was he just in the

13   vicinity?

14   A.   I -- I didn't have a visual of that, so I can't

15   say that was the situation.

16   Q.   And then you said at some point Ishibashi took

17   you to the backyard?

18   A.   Yes.

19   Q.   What did he do?  Why did he do that, if you

20   know?

21   A.   I don't know.  He just told me that they were

22   going to leave -- "We're about to leave in a bit.  And,

23   unfortunately, we're taking your dad in."  And they

24   left, they took him.

25   Q.   So this conversation with Ishibashi, did this

                                                          81

DOKICH COURT REPORTERS, INC.
800-720-9679

1   happen in the backyard or in the living room?

2       A.   In the backyard.

3       Q.   So at some point Ishibashi, did he say, "Come

4   with me to the backyard.   I need to tell you something"?

5       A.   Yes.

6       Q.   And then that's when you had this conversation

7   about him arresting your father?

8       A.   Yes.

9       Q.   Was anyone else present when that conversation

10  was occurring?

11      A.   Not that I could recall, no.

12      Q.   Did Ishibashi tell your mother first that they

13  were arresting your father or did he come to you first?

14      A.   He came to me first.

15      Q.   Then after you spoke with Ishibashi in the

16  backyard area, what's the next thing that happened after

17  that?

18      A.   It took a couple of minutes -- I don't know

19  exactly around how many minutes -- and then they proceed

20  to leave.

21      Q.   Did you stay in the backyard area after you had

22  this conversation with Ishibashi, or did you go back to

23  where your mom and your sister were?

24      A.   I went back to my mom and my sister.

25      Q.   And then what happened after you went back to

82

WENDY SANCHEZ   4/21/2010

1      Q.   What I was kind of getting at is, I guess, just

2  between you and your mom.  Did you and your mom talk

3  about the incident?

4      A.   Between me and my mom, yes.

5      Q.   What did you talk about?

6      A.   We talked about, basically, what -- you know,

7  how my sister -- we're having problems putting her to

8  sleep, that, you know, the next day after that incident.

9      Q.   Anything else?

10     A.   That I can recall, no.

11     Q.   Did you talk with your dad after he was

12  arrested but before this second search warrant?

13     A.   No.  We weren't able to communicate with him.

14     Q.   Any contact with the Maywood PD or any of the

15  officers who were at the scene between the two search

16  warrants?

17     A.   The second search warrant?

18     Q.   But before that.  Did you like maybe go to the

19  Maywood PD and ask them, hey -- you know, talk to them

20  about the first search, if you had any complaints?  Did

21  you try to contact who David Ishibashi worked for,

22  complain about that search, anything like that?

23     A.   No.

24     Q.   So then the second search warrant, when did

25  that occur?

91

1      A.   It was a couple days after that one, but I'm

2   not exact on the date.   But I know it was still in

3   August.

4      Q.   What time was that search warrant served?

5      A.   I wasn't present when the search warrant was

6   performed.

7      Q.   Did you come to learn from your mom or anything

8   what time they showed up during that second search

9   warrant?

10     A.   I believe she said around either 10:00 or

11  11:00, but I'm not sure.

12     Q.   11:00 a.m.?

13     A.   Yeah, a.m.   In the morning.

14     Q.   Where were you at that time?

15     A.   Working.

16     Q.   At Western Dental?

17     A.   Yes.

18     Q.   What time did you work that day?

19     A.   From 9:00 to 6:00.

20     Q.   When did you first learn that there was a

21  second search warrant being performed, being executed?

22     A.   They called -- my aunt called my work.

23     Q.   What aunt?   What's her name?

24     A.   My aunt, her name is Horalea.

25     Q.   Spell it.

                                                    92

WENDY SANCHEZ  4/21/2010

1     A.  That was my mom's.

2     Q.  What kind of car was that?

3     A.  A Nissan Maxima.

4     Q.  What officer was searching that?

5     A.  I don't know his name.  It was just an officer.

6     Q.  What was he wearing?

7         Was it a he?

8     A.  It was a he.  He was wearing black.

9     Q.  The same black that you saw on the first night?

10    A.  Yes.

11    Q.  Anything else you can recall about the uniform

12 that officer was wearing?

13    A.  I can't recall anything at this time.  Like I

14 don't remember like a badge or anything.

15    Q.  What else did you see when you showed up at

16 your house that day?

17    A.  There was a Maywood cop.

18    Q.  Where was that Maywood officer at?

19    A.  He was standing by a tree in front of my house,

20 inside the location of my house.

21    Q.  Do you know that officer's name?

22    A.  I just know his last name was Garcia.

23    Q.  How did you know that?

24    A.  Because he said it was Garcia.

25    Q.  You asked the officer what his name was and he

                                                    95

WENDY SANCHEZ   4/21/2010

Q.   Any other conversation you had with that

cer?

A.   At that time, no.

Q.   So I presume you pulled up to a front area.

you just park your car in the street?  Did you park

the driveway?

A.   In the street.

Q.   You parked in the street.  You got out of your

ar; correct?

A.   Correct.

Q.   Did you walk up to the officer first thing?

A.   No.  I just went straight to my sister.

Q.   Okay.  So is there a gate or something that you

have to go through?

A.   It's a gate.

Q.   So you get out of your car, you walk through

the gate, and you went straight to your sister?

A.   Yes.

Q.   What did you do when you got to your sister?

A.   Well, she just grabbed my hand and she wouldn't

let me go.  And she was just crying and screaming and

shaking.

Q.   And at that moment when you go to your sister,

the officer is still by the tree, the Maywood officer is

still by the tree?

97

WENDY SANCHEZ   4/21/2010

1    Q.  So you left to get help.  Where did you go?

2    A.  Well, before I left to go get help, like

3    there's a thing that I forgot to tell you.  Since you

4    didn't ask me, I thought I wasn't supposed to say it.

5    But when I got there, my sister -- you know, I was -- my

6    sister was holding me.  And there was a cop that was

7    searching the car.  And then my sister was crying, like

8    she wouldn't want to let me go.  That's when the police,

9    you know, he asked me "What are you doing here" and I

10   asked him "What are you doing here."  And my sister

11   had -- she had urinated on herself and --

12           MR. STRUGAR:  Take your time.

13           THE WITNESS:  I asked if I could go inside and

14   change her, and they said no.

15   BY MR. PIERCE:

16   Q.  You asked who?

17   A.  The police officer in black.

18   Q.  And he said no?

19   A.  Yes.  He said no.

20           And then after, Garcia approached me and he

21   said "You need to pack your sister's stuff."

22   Q.  Okay.  Anything else?

23   A.  "If she's menstruating, put her sanitary

24   napkins in the bag."

25   Q.  Okay.  Anything else that he said?

                                                        101

WENDY SANCHEZ  4/21/2010

1      A.   "Because we're taking her away."

2      Q.   Anything else that was said?

3      A.   Then I tried to go to the back to see if my mom

4   was okay.  And they told me that I couldn't go back

5   there.

6      Q.   When you say "they," who told you?

7      A.   The police officer in black.

8      Q.   How did you know that your sister had urinated

9   on herself?

10      A.   Because she was practically soaked.

11      Q.   How could you tell?

12      A.   'Cause when she got up, all her pants were wet.

13      Q.   What was she wearing?

14      A.   Some sweatpants.

15      Q.   What else was she wearing?

16      A.   And a T-shirt.

17      Q.   Anything else?

18      A.   She was just carrying her little toys that she

19   carries.

20      Q.   Did she have any shoes on?

21      A.   She just had some socks.

22      Q.   Does she wear diapers?

23      A.   Yeah.

24      Q.   At that time she wore diapers?

25      A.   Only in school 'cause we try to potty train her

102

WENDY SANCHEZ  4/21/2010

1    Q.  Anything else the officer in black said to you

2  up until this point?

3    A.  He didn't mention none of that, no.

4    Q.  I mean anything else that -- you said that the

5  officer in black said some things here --

6    A.  After, yeah.

7    Q.  -- and I'm trying to find out if there's

8  anything else he said to you.

9    A.  No, just after when he said that, you know, my

10  family was in the hands of Ishibashi, that he was the

11  only one calling -- he uses a word like "shots," if they

12  were going to take them away or not.

13    Q.  And the police officer in black said you

14  couldn't go back there?

15    A.  Yes.

16    Q.  Anything else you recall that Officer Garcia

17  said to you up until this point?

18    A.  That he said to me, just at this time that.

19    Q.  Anything else you can recall the officer in

20  black said to you up until this point?

21    A.  Just to -- just what I mentioned earlier.

22    Q.  And when you say she was soaked, I mean, how

23  could you tell she was soaked?

24    A.  Because when she got -- she -- her toys fell

25  and she got up to get them and she was wet, all her

104

DOKICH COURT REPORTERS, INC.
800-720-9679

WENDY SANCHEZ  4/21/2010

1   pants.  And then I was asking them if I could please go

2   inside and change her, and they said no.

3       Q.  When you say "they said no," who said no?

4       A.  The police officer in black.

5       Q.  And then after that, you left?

6       A.  Yes.

7       Q.  And then where did you go?

8       A.  To this -- this club in Maywood.  It's like an

9   organization for the community.  It's called Pro-Uno.

10      Q.  Spell it.

11      A.  Pro-Uno, P-r-o.

12      Q.  Uno, U-n-o?

13      A.  Yeah.

14      Q.  Why did you go there?

15      A.  I know that most of the time the mayor is

16   there.  I was hoping that he would be there and that he

17   could help me.

18      Q.  So you went to Pro-Uno by yourself?

19      A.  Yes.

20      Q.  And how long would you say that you were at

21   your house the first time -- from the time you first got

22   there until the time that you left?

23      A.  Probably like approximately 20 or something

24   minutes.

25      Q.  How long did it take you to get to Pro-Uno?

                                                      105

1    Q.   That's why you parked a little further down the

2    street?

3    A.   Yes.

4    Q.   So you get out of your vehicle.   Did

5    Mr. Aguirre get out with you?

6    A.   Yeah.   He got off and he just stood there

7    making some call.

8    Q.   Okay.   He stood by your car?

9    A.   Yes.

10   Q.   And then what did you do?

11   A.   I got off and I went back to my house.

12   Q.   There's a fence with a gate; correct?

13   A.   Yes.

14   Q.   What's the first thing you see when you see the

15   front of your house?   What do you see?

16   A.   The officer still standing -- Garcia still

17   standing by the tree.   And my sister's -- at that time

18   she was by herself sitting down at the same place where

19   I left her.

20   Q.   What about this other officer in black, was he

21   out front?

22   A.   I guess he was in the back 'cause I didn't see

23   him in the front anymore.

24   Q.   It's just Officer Garcia by the tree?

25   A.   Yes.

109

1    Q.  Any other officers out front there when you

2  first get there?

3    A.  When I first get there, no.  After I enter,

4  then that's when they started coming to the front.

5    Q.  Let me get this.  What's the distance between

6  that tree and where your sister was sitting?

7    A.  Probably the tree is there in the corner, and

8  then my sister was right there.  There's not that much

9  of a distance.

10    Q.  Pointing to where the co-defense counsel is

11  sitting?

12    A.  Yes.

13    Q.  So the tree is in this corner and your sister

14  is standing approximately the distance where co-defense

15  counsel is sitting.  So I'd estimate that to be about,

16  what, like 15 feet?

17      MR. STRUGAR:  Fifteen to 20 I'd say.

18      MR. PIERCE:  Fifteen to 20 feet.  Okay.

19    Q.  So you walked through the front gate; correct?

20    A.  Correct.

21    Q.  And then where did you go after you walked

22  through the front gate?

23    A.  Straight to my sister.

24    Q.  Then what happened after that?

25    A.  Then there was also this reporter that went

                                           110

1     A.   That she was the reporter from a newspaper.   I

2  don't recall the name.   "Hoy" or something.

3     Q.   What is it?

4     A.   "Hoy."

5          MS. ANDERSON-BARKER:   H-o-y.

6          THE WITNESS:   Yeah.   I'm not quite sure.   But

7  I -- I can't remember that.   And that's when they -- he

8  escorted her out.   He said, "You can't be in here."

9  BY MR. PIERCE:

10    Q.   The officer in black?

11    A.   Yeah.

12    Q.   Do you know the name of the reporter?

13    A.   No.   I don't remember the name.

14    Q.   So then what happened after the officer in

15 black escorted the reporter out?   When you say "out,"

16 you mean outside the gate?

17    A.   Yeah, outside the gate.   She couldn't be inside

18 the gate.

19    Q.   What happened after that?

20    A.   After that, uh, I was still concerned about my

21 mom, so I wanted to go see, you know, how she was doing

22 and she was okay, and like to find out if there's any

23 way that I could change my sister or something.   They

24 wouldn't let me.

25    Q.   When you're saying "they," can you do me a

                                                      112

WENDY SANCHEZ  4/21/2010

1   favor and just say exactly who it was.

2       A.  Well, I don't know who he was, but it was just

3   an officer in black.  I don't remember his name.  But he

4   was the police officer in black.  I was like -- I'm

5   asking "Where's my mom?"  So I didn't want to even talk

6   to her, because he was laughing, just like -- I don't

7   even know why he was there.  And he's like, "Well, you

8   can't go back there.  I'm sorry.  You need to speak to

9   Ishibashi."

10          And I told him, "Okay, then let me speak to

11   him."

12          At that time they weren't aware that the mayor

13   was there.  I guess they called Ishibashi to come speak

14   with me.

15      Q.  When you say "they," who do you mean?

16      A.  The officer in black.

17      Q.  Okay.

18      A.  I informed them that I already went to go get

19   help and I went to go get the mayor and that he was here

20   and there's no way they were going to it, you know, take

21   my mom and my sister away.

22      Q.  When you say you "informed them," you informed

23   who?

24      A.  I informed Ishibashi.

25      Q.  What did you tell Ishibashi?

113

DOKICH COURT REPORTERS, INC.
800-720-9679

1    officer in black up until this point that you haven't

2    told us about already?

3        A.   That I could recall at this time, no.

4        Q.   And what about with Ishibashi, any other

5    conversation you had with Ishibashi up until this point

6    that you haven't told us about?

7        A.   No.

8        Q.   Any other conduct that you observed with regard

9    to Ishibashi up until this point that you haven't told

10   us about?

11       A.   Not at this time.

12       Q.   Then after Ishibashi says this thing about your

13   diplomas and stuff like that and about your family,

14   what's the next thing that happens?

15       A.   He gives me permission to go to the back to

16   check on my mom.

17       Q.   What did he say in that regard, just "You can

18   go back there and see your mom"?  What were the words?

19       A.   He's like -- he's like -- Ishibashi said, "Your

20   mom's back there.  You go take a look at her."

21            So I -- I -- I did that.  And then my mom was

22   sitting in a chair.  And in front of her was the Officer

23   Serrata.

24       Q.   Uh-huh.

25       A.   The same one that was at the first search.  He

                                                        117

DOKICH COURT REPORTERS, INC.
800-720-9679

WENDY SANCHEZ  4/21/2010

1   was standing right in front of her.  And my mom was

2   having difficulty breathing.

3       Q.  Okay.  Did you have any conversations with your

4   mom before you noticed she was having difficulty

5   breathing?

6       A.  The only thing she was able to ask me was

7   "Where's your little sister?  Is she okay?"

8       Q.  Your mom asked you that?

9       A.  Yes.

10      Q.  Any other conversation you had with your mom

11  prior to you noticing that she had difficulty breathing?

12      A.  I just told her, "Everything's fine.  The

13  mayor's outside.  Don't worry about nothing."

14      Q.  Did you ask your mom at any point in time if

15  she was okay?

16      A.  I kind of noticed she was having problems

17  breathing.  And I asked her, "Are you okay?"

18          And she's like -- she couldn't speak.  She was

19  like really red.

20      Q.  Anything else about your mom that you noticed?

21      A.  She was just with her eyes closed.

22      Q.  Anything else?

23      A.  And then I just told them, "Can you guys call

24  an ambulance?  I don't think she feels good."

25          And Serrata's like, "She's just faking it.  She

                                                        118

1    A.  It was like this cardboard.

2    Q.  So you were fanning your mom?

3    A.  Yes.

4    Q.  You were doing your hands up and down like

5  this?

6    A.  Yes.

7    Q.  You were fanning her with the cardboard; is

8  that correct?

9    A.  Correct.

10   Q.  Then what happened?

11   A.  And then the ambulance arrived.

12   Q.  How long after?  Let's say after you had this

13  conversation with Serrata, how long after did the

14  ambulance arrive?

15   A.  Approximately either ten or 15 minutes.

16   Q.  Was it paramedics? fire department?

17   A.  It was paramedics.

18   Q.  How many paramedics arrived?

19   A.  In the back it was two.

20   Q.  Just prior to the paramedics arriving, any

21  other conversations between you and Serrata?

22   A.  At that time, no.

23   Q.  Any conversations between you and anyone else

24  back there?

25   A.  At that time, no.                          122

WENDY SANCHEZ  4/21/2010

1    that you said to him at that point?

2        A.  At that point, no, I don't recall.

3        Q.  So, then, two paramedics arrived?

4        A.  Yes.  In the back.  Yes, two.

5        Q.  What did they do?

6        A.  They put some patches on my mom.  They were

7    checking her -- I don't know if it was her blood

8    pressure.  And they told her that they had to take her

9    in 'cause she wasn't -- she wasn't fine.  She refused.

10       Q.  Did they say what was wrong with your mother?

11       A.  They -- from what I recall, they said that how

12   her -- her -- her blood pressure, something was at the

13   rate that she could get a heart attack.

14       Q.  Anything else they said about her condition?

15       A.  That it was best for her to get hospitalized.

16       Q.  And you said your mom refused to go?

17       A.  My mom refused to go because she didn't want to

18   leave my sister alone.

19       Q.  And at this point your sister was out front

20   still?

21       A.  She was in the front.

22       Q.  As far as you know, she was still out front?

23       A.  She was in the front.  And the reporter was --

24   I told her if she could take a look at her.  She was

25   outside the gate.

                                                    124

DOKICH COURT REPORTERS, INC.
800-720-9679

```
 1        You said there was Officer Serrata, you noticed
 2   him because he had a Maywood PD uniform?
 3        A.   Yes.
 4        Q.   And you said there was the same kind of
 5   officers in black; correct?
 6        A.   Yes.
 7        Q.   Were there any other officers wearing different
 8   uniforms that you recall that were there during the
 9   second search warrant?
10        A.   Well, Garcia, but he wasn't dressed in a
11   uniform.  He just had like jeans and a plain shirt.
12        Q.   Okay.  But you know he was with the Maywood PD;
13   correct?
14        A.   Yeah.
15        Q.   Other than Garcia, Serrata, and the officer in
16   black, and then Ishibashi, were there any other officers
17   there that you recall?
18        A.   At this time, no, just those.
19        Q.   Any other officers that you recall that were in
20   different uniforms, like, I don't know, gray or
21   something?  I'm trying to see if there's any other --
22        A.   No.  It was just the ones in black and then
23   there was just Serrata and the Maywood officer suit and
24   then it was just Garcia in just plain jeans and a white
25   shirt.
```

127

WENDY SANCHEZ   4/21/2010

1    Q.  Did you speak with the reporter after the

2  officers left?

3    A.  No.  I didn't have to say anything to her

4  'cause she seen what was going on.  She just asked me

5  "Are you okay?"

6        And I responded, "Yes."

7        She said, "Don't worry.  Your mom and your

8  sister, you know, they're fine at this time."

9    Q.  Did she tell you what she saw while you were in

10  the back?  Did she say anything like that?

11    A.  She was just keeping a eye on my sister.  She

12  just told me, "I was keeping an eye on your sister."

13  Meanwhile, she was just sitting there crying.

14    Q.  Was this the first time you had seen this

15  reporter or met this reporter?

16    A.  Yes.

17    Q.  Anything else you talked to this reporter about

18  that you can recall?

19    A.  No.

20    Q.  Did she provide you with any kind of video that

21  she took or pictures that she took?

22    A.  No.

23    Q.  Have you spoken with her at all since the

24  incident other than the time that she was at your house?

25    A.  No, I haven't.

                                              130

## EXHIBIT E

1   PAULA D. PEARLMAN, State Bar No. 109038
    paula.pearlman@lls.edu
2   SHAWNA L. PARKS, State Bar No. 208301
3   shawna.parks@lls.edu
    DEBRA J. PATKIN, State Bar No. 252197
4   debra.patkin@lls.edu
5   MATTHEW D. STRUGAR, State Bar No. 232951
    matthew.strugar@lls.edu
6   DISABILITY RIGHTS LEGAL CENTER
7   919 Albany Street
    Los Angeles, California 90015
8   Tel: (213) 736-1031
9   Fax: (213) 736-1428

10  Attorneys for Plaintiffs (continued on next page)

11

12                  UNITED STATES DISTRICT COURT

13                CENTRAL DISTRICT OF CALIFORNIA

14   MARITZA SANCHEZ MARTINEZ,           CASE NO.
     an individual, by and through her
15   mother and guardian ad litem,       COMPLAINT FOR INJUNCTIVE
     BERTHA MARTINEZ, an individual,     RELIEF, DECLARATORY
16   and WENDY SANCHEZ, an               JUDGMENT AND DAMAGES
     individual
17                                       1. Americans with Disabilities Act,
                    Plaintiffs,             Title II (42 U.S.C. § 12131 et. seq.)
18                                       2. Section 504 of the Rehabilitation
              v.                            Act of 1973 (29 U.S.C. § 794 et.
19                                          seq.)
     CITY OF MAYWOOD, a public           3. Fourteenth Amendment (42 U.S.C.
20   entity, MAYWOOD POLICE                 § 1983)
     DEPARTMENT, a public entity,        4. California Government Code §
21   COUNTY OF LOS ANGELES, a               11135
     public entity, ANDREW SERRATA,      5. Unruh Civil Rights Act (Cal. Civ.
22   an individual, MPD OFFICER             Code § 51 et. seq.)
     GARCIA, an individual, DAVID        6. California Disabled Persons Act
23   ISHIBASHI, an individual, and Does     (Cal. Civ. Code § 54)
     1 through 10, individuals sued in their  7. Infliction of Emotional Distress
24   individual capacities, inclusive    8. Negligent Infliction of Emotional
25                                          Distress
                    Defendants.          9. Negligence
26
                                         DEMAND FOR JURY TRIAL
27

28

10/24/2009 19:07 IFAX OrangeFax@CARLWARREN.COM → Richard Marque ☑020/060

1  services in light of her disability. Defendants instead provided her with programs,

2  services and activities that were different, separate, and worse than the service

3  provided to other individuals.

4  64.   Through the acts and omissions of Defendants and their agents and employees

5  described herein, Defendants further subjected Plaintiff Maritza to discrimination on

6  the basis of her disability in violation of Title II of the ADA by failing to make

7  reasonable modifications of policies, practices and procedures. Defendants failed to

8  provide Plaintiff Maritza with reasonable accommodations by disallowing her to

9  remain with her mother or another trusted adult.

10  65.   Through the acts and omissions of Defendants and their agents and employees

11  described herein, Defendants intentionally discriminated against Plaintiff Maritza by

12  failing to act upon their knowledge that harm to her federally protected right under

13  the ADA was substantially likely when they isolated her for over two hours.

14  66.   The Code of Federal Regulations states in pertinent part that "a public entity

15  shall not exclude or otherwise deny equal services, programs, or activities to an

16  individual or entity because of the known disability of an individual with whom the

17  individual or entity is known to have a relationship or association." 28 C.F.R. §

18  35.130(g).

19  67.   Plaintiff Bertha is Plaintiff Maritza's mother, and is an individual associated

20  with a qualified individual with a disability within the meaning of the ADA.

21  68.   Plaintiff Wendy is Plaintiff Maritza's sister, and is an individual associated

22  with a qualified individual with a disability within the meaning of the ADA.

23  69.   At all times pertaining to this action, Defendants had knowledge of Plaintiff

24  Maritza's disability and of her familial and dependant relationship with Plaintiffs

25  Bertha and Wendy.

26  70.   Defendants violated the ADA and deprived Plaintiffs Bertha and Wendy of

27  their federally protected rights by failing to provide equal services and reasonable

28

COMPLAINT FOR INJUNCTIVE RELIEF, DECLARATORY RELIEF AND DAMAGES

-15-

accommodations to Plaintiffs based on Plaintiffs' association with Plaintiff Maritza, a qualified individual with a disability.

71.   Through Defendants' use of Plaintiff Maritza's mental disability and dependence on her mother to attempt to coerce information from her mother, Defendants unlawfully and intentionally denied Plaintiffs Bertha and Wendy equal treatment, services and accommodations in clear violation of the ADA.

72.   Plaintiffs Maritza, Bertha and Wendy are informed, believe, and thereon allege that Defendants committed the acts and omissions alleged herein in reckless and/or intentional disregard of Plaintiffs' rights.

73.   As a direct and proximate result of the aforementioned acts, Plaintiffs have suffered and continue to suffer humiliation, hardship, anxiety, indignity, and severe mental and emotional anguish.

74.   Plaintiffs Maritza, Bertha and Wendy are informed, believe, and thereon allege that Defendants and their agents and employees could have reasonably allowed Plaintiff Maritza to remain with her mother or another trusted adult during Plaintiff Bertha's interrogation as a reasonable and equal accommodation.

75.   Plaintiffs are informed, believe, and thereon allege that Defendants and their agents and employees have failed and continue to fail to:

a) Adopt and enforce policies and procedures for providing reasonable accommodations for individuals with mental disabilities, and those associated with individuals with mental disabilities;

b) Train and supervise all officers and employees to provide reasonable accommodations and equal treatment and services to individuals with mental disabilities;

c) Provide all officers and employees with training regarding the behavior and special needs of individuals with mental disabilities, especially autism.

76.   Because Defendants' discriminatory conduct is ongoing, declaratory and injunctive relief are appropriate remedies.

COMPLAINT FOR INJUNCTIVE RELIEF, DECLARATORY RELIEF AND DAMAGES

## <u>EXHIBIT F</u>

CERTIFIED
COPY

# In The Matter Of:

## *MARITZA SANCHEZ MARTINEZ*
### *v.*
## *CITY OF MAYWOOD*

---

## *ISHIBASHI - , DAVID - Vol. 1*
### *June 16, 2010*

---

**MERRILL CORPORATION**
**LegaLink, Inc.**

20750 Ventura Boulevard
Suite 205
Woodland Hills, CA 91364
Phone: 818.593.2300
Fax: 818.593.2301

800.826.0277 Toll Free
818.593.2301 Fax
Woodland Hills, CA 91364
Suite 205
MERRILL CORPORATION

1    Officer Garcia sometime after the interview with

2    Ms. Martinez; or do you have any sense of where in

3    the time frame you encountered Sergeant Garcia?

4         A    No, I don't recall.

5         Q    When you encountered Sergeant Garcia in the

6    front yard, were Maritza and the cousin still in the

7    front yard?

8         A    Yes, I believe so.

9         Q    Was the cousin with Maritza the entire time

10   in the front yard?

11        A    I believe so.

12        MR. LEE:  I just want to object real

13   quickly.  Calls for speculation.

14        He wasn't always in the front yard.  So in

15   all fairness...

16   BY MR. STRUGAR:

17        Q    When you were in the front yard and

18   witnessed Maritza, was the cousin always with her?

19        A    I believe so, yes.

20        Q    When you interviewed Bertha, do you recall

21   what her responses were regarding the firearms?

22        A    Basically, denying knowledge.

23        Q    Was she -- apart from denying knowledge,

24   was she cooperative?

25        A    Yes, she was.