**<u>EXHIBIT K</u>**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CERTIFIED COPY**

| | |
|---|---|
| MARITZA SANCHEZ MARTINEZ, an | ) |
| individual, by and through, her | ) |
| Guardian Ad Litem, BERTHA MARTINEZ; | ) |
| et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) CV 09-06734 SJO |
| | ) (RCx) |
| CITY OF MAYWOOD, a public entity; | ) |
| et al., | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

DEPOSITION OF

PATRICIA BRAVO-VALDEZ

LOS ANGELES, CALIFORNIA

MAY 13, 2010

1    reviewing that?

2         A    No, not at this time.

3         Q    Did you review any police department policies

4    in preparation for your deposition?

5         A    No.

6         MR. STRUGAR:   I will introduce this as

7    Exhibit 1.  I will introduce the Amended Notice of

8    Deposition for the city of Maywood under Federal Rule

9    30(B)(6), a four-page document.

10              (Deposition Exhibit 1 was marked for

11         identification by the Certified Shorthand

12         Reporter and is attached hereto.)

13   BY MR. STRUGAR:

14        Q    Ms. Bravo, does this appear to be the

15   deposition notice that you reviewed in preparation

16   for your deposition today?

17        A    Yes.

18        Q    And are you the person most knowledgeable

19   on topics 1 through 8?

20        A    Yes.

21             MR. STRUGAR:   Off the record for one

22   second.

23             (Pause in the proceedings)

24             MR. STRUGAR:   We can go back on.

25

PATRICIA BRAVO-VALDEZ  --  05/13/2010

1      A      No.

2      Q      Where did you work before that?

3      A      I worked at a university.

4      Q      What did you do there?

5      A      I was a student worker.

6      Q      Does the city of Maywood have a department

7   on disability?

8      A      A department on disability?

9             No.

10      Q      Does the city have an ADA coordinator?

11      A      No.

12      Q      Does the city have someone who's

13   responsible for providing accommodations to people

14   who request them for City Council meetings?

15      A      For City Council meetings, yes, I am

16   responsible for that.

17      Q      Okay.

18             What about other requests from the public

19   for accommodations from the city, do those go to

20   somebody in particular or is it more a subject

21   matter thing?

22             If it is City Council, it goes to you; if

23   it is something else, it goes to someone else?

24      A      Right.  It depends on every department.

25   But generally they would come to me for the city.  We

1   do -- for example, for job announcements we always

2   have that.  The finance department is in charge of

3   that.  So it just depends on every department.

4        Q    What about if a city employee requested

5   accommodation for their work for their employment;

6   do those requests come to you or to someone else?

7        A    They would come either to me or to the

8   finance director.

9        Q    And is there any sort of procedure as to

10  whether it goes to you or the finance director?

11       A    Hilda Flores would be the best person to

12  know that.

13       Q    Do you personally have any role in

14  overseeing Maywood Police Department policies for

15  interacting with the public?

16       A    Can you repeat that one more time?

17       Q    Sure.

18            Do you personally review in any way

19  policies that are promulgated regarding the Maywood

20  Police Department's interactions with the public?

21       A    No, the department is in charge.

22       Q    The police department?

23       A    Yes.

24       Q    I want to start talking about -- off the

25  record.

```
 1            (Deposition Exhibit 4 was marked for

 2        identification by the Certified Shorthand

 3        Reporter and is attached hereto.)

 4   BY MR. STRUGAR:

 5        Q    Ms. Bravo, do Exhibits 2, 3 and 4 appear

 6   to be the job postings and agenda that you said you

 7   reviewed in preparation for your deposition today?

 8        A    Yes.

 9        Q    Looking at the first page, Exhibit 2, the

10   top right-hand corner "City Council Agenda

11   February 23, 2010, Page 3," at the bottom of this

12   page it gives instructions on how a member of the

13   public can request an accommodation for a City

14   Council meeting.

15            Is that a fair characterization?

16        A    Yes.

17        Q    Other than that, does this exhibit address

18   accommodations for people with disabilities in any

19   way?

20        A    Other than this section?

21        Q    Other than the piece about requesting

22   accommodations for a City Council meeting, does it

23   address people with disabilities in any other way,

24   other than that section?

25        A    No.
```

1    Q    Turning to Exhibit 3.

2         What is this?

3    A    This is a copy of our Internet -- our

4    website and this reflects also for individuals

5    navigating through our website that if they need

6    special assistance to attend meetings, they can

7    contact me.

8    Q    Oh, I see.

9         This is the city of Maywood's actual

10   webpage?

11   A    Right.

12   Q    CityOfMaywood.com on the top.

13        And this reflects the same information

14   that's on the City Council agenda, but it's just on

15   the website, how individuals who need accommodations

16   for City Council meetings can request and receive

17   those; correct?

18   A    Yes.

19   Q    Does this show accommodations for people

20   with disabilities in any other way?

21   A    No.

22   Q    Exhibit 4, is it fair to say this is a job

23   posting for part-time police clerk dispatcher?

24   A    Yes.

25   Q    The second paragraph from the bottom, it

1     says,

2                    "Please notify the personnel

3             department 72 hours in advance of a

4             test date if you have a disability which

5             requires accommodation for the testing

6             process."

7             Does this job posting address

8     accommodations for people with disabilities in any

9     other way, other than that they can request an

10    accommodation for the testing process?

11            MR. PIERCE:  Objection.  Vague and

12    ambiguous.  The document speaks for itself.

13            But you can answer.

14            THE WITNESS:  Yes.  Other than that, there

15    isn't anything else.

16            MR. STRUGAR:  I will correct my

17    characterization.

18    BY MR. STRUGAR:

19       Q    It also says people with disabilities are

20    encouraged to apply as well.

21       A    Correct.

22       Q    Okay.  Thank you.

23            Other than documents that we've just

24    reviewed, are you aware of any other written policies

25    or procedures that the city has for addressing

1  accommodations for people with disabilities?

2      A    We do have the Personnel Employees' Rules

3  and Regulations and there might be something in

4  there as well regarding disabilities.

5      Q    Would that address, sort of,

6  accommodations for employees of the city of Maywood

7  or would it address, sort of, the broader public?

8      A    I'm not sure.

9      Q    Could you tell me what that document is

10  one more time?

11      A    Employees' Personnel Rules and

12  Regulations.

13      Q    And what is your understanding about the

14  Employees' Personnel Rules and Regulations, how it

15  addresses people with disabilities?

16      A    At this time I'm not sure.

17      Q    Are you aware of any written policies or

18  procedures the city has for providing accommodations

19  for people with mental disabilities?

20      A    No.

21      Q    When was the last time a member of the

22  public made a request for an accommodation at a City

23  Council meeting?

24      A    I'd say about four or five months ago.

25      Q    Do you recall what that request was?

1      A     The request was informing me that they

2   needed to get into the building, how do they get into

3   the building because our council chambers are on the

4   second floor.

5      Q     Is this an individual who used a

6   wheelchair or had a mobility impairment?

7      A     Yes.

8      Q     Used a walker?

9      A     Yes.

10      Q     Approximately how often do you get

11   requests from the public for accommodations to City

12   Council meetings?

13            MR. PIERCE:   Vague and ambiguous.

14            But go ahead.

15            THE WITNESS:   Two or three times a year.

16   BY MR. STRUGAR:

17      Q     Have you ever had a request for a sign

18   language interpreter for a City Council meeting?

19      A     Sign language?

20            No.

21      Q     Do city employees, outside of the police

22   department -- excluding members of the police department

23   for this question -- do city employees have any role in

24   reviewing Maywood Police Department policies and

25   procedures?

1   this litigation, on behalf of individuals with

2   mental or developmental disabilities regarding the

3   provision of accommodations or failure to provide

4   accommodations by the city of Maywood?

5        A    I'm not familiar with it.

6        Q    Who at the city reviews or tracks

7   complaints from the public?

8        A    Hilda Flores.

9        Q    Do you have any role in that process of

10  investigating complaints or anything like that?

11       A    Investigating complaints, no.

12       Q    Do you know if the city has received any

13  complaints, other than the plaintiffs in this

14  litigation, regarding failure to provide

15  accommodations for people with any disability since

16  January of 2008?

17       A    I'm not familiar with any.

18       Q    Are you aware of the process of how an

19  individual who wishes to file a complaint against

20  the city, an individual from the public wishes to

21  file a complaint against the city, do you have any

22  idea of how that process starts; is there a

23  complaint packet or anything like that that the city

24  has that the person can fill out?

25       A    We have a complaint form, yes.

1  ratification, implementation, oversight or

2  monitoring of police department policies for

3  providing accommodations for people with mental or

4  development disabilities in the execution of search

5  warrants?

6        MR. PIERCE:  Same objection.  Compound.

7        THE WITNESS:  Other than what I already

8  said, no.

9        MR. STRUGAR:  I will try to break it up a

10  little bit because Counsel objected as compound.

11  BY MR. STRUGAR:

12     Q    Other than what you've already testified

13  to today, are you aware of the city of Maywood

14  overseeing Maywood Police Department policies

15  regarding accommodations for people with

16  developmental disabilities?

17        MR. PIERCE:  Vague and ambiguous.

18        You can answer.

19        THE WITNESS:  Other than what I have said,

20  no.

21  BY MR. STRUGAR:

22     Q    Other than what you've already testified

23  to today, are you aware of any city of Maywood

24  oversight over Maywood Police Department policies

25  regarding compliance with the Americans with

1    Disabilities Act?

2             MR. PIERCE:  Same objection.

3             THE WITNESS:  Other than what we have

4    said, no.

5    BY MR. STRUGAR:

6        Q    And other than what you've already

7    testified to today, are you aware of any city of

8    Maywood oversight over Maywood Police Department

9    policies regarding provisions of accommodations for

10   people with disabilities?

11            MR. PIERCE:  Same objections.

12            THE WITNESS:  Other than what we have

13   said, no.

14   BY MR. STRUGAR:

15       Q    And other than what you have already

16   testified to today, are you aware of any training

17   provided by the city of Maywood to Maywood Police

18   Department employees regarding accommodations for

19   people with developmental disabilities?

20            MR. PIERCE:  Same objections.

21            THE WITNESS:  Other than what we have

22   said, no.

23            MR. STRUGAR:  That's all the questions I

24   have.

25            MR. PIERCE:  I have just one.

PATRICIA BRAVO-VALDEZ  --  05/13/2010

```
 1                    EXAMINATION

 2   BY MR. PIERCE:

 3       Q    These three documents that you've been provided

 4   today, Exhibits 2, 3 and 4, Bates stamped 199, 200 and

 5   201, I believe, are these documents --

 6            Are there other documents similar to these?

 7       A    Similar?

 8       Q    Meaning are there other documents, since

 9   you've been working with the city -- have you seen

10   other documents such as job postings, such as agenda for

11   meetings, that have the same language regarding

12   compliance with the ADA?

13       A    Yes.

14       Q    Do you have an estimate as to how many

15   documents there could be that are similar to these

16   that we've brought here today?

17       A    Hundreds.

18            MR. PIERCE:  Okay.

19

20                    EXAMINATION

21   BY MR. STRUGAR:

22       Q    Is it fair to say that all Maywood job

23   postings include this language about accommodations

24   for people with disabilities?

25       A    Yes, including notices for public meetings
```

1    as well.

2         Q    And the job postings also include the

3    language about how women, minorities, and people

4    with disabilities are encouraged to apply?

5         A    Yes.

6         Q    And I believe you just said it, but the

7    language about requesting accommodations for City

8    Council meetings is on every agenda for the City

9    Council; is that correct?

10        A    Yes.

11             (Deposition Exhibit 5 was marked for

12        identification by the Certified Shorthand

13        Reporter and is attached hereto.)

14             MR. STRUGAR:  That's all I have.

15             I just want to say for the record that I

16    think Ms. Flores or the city manager -- we reserve

17    the right to call them at this time.

18             Do you have anything?

19             MR. LEE:  No.

20             MR. STRUGAR:  Okay.

21             I propose that the original deposition

22    transcript be forwarded to Mr. Pierce's office, who

23    will make it available to Ms. Bravo for her review

24    and signature;

25             He can let our office know of any changes

**<u>EXHIBIT L</u>**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CERTIFIED COPY**

| | |
|---|---|
| MARITZA SANCHEZ MARTINEZ, an individual, by and through, her Guardian Ad Litem, BERTHA MARTINEZ; et al., | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) CV 09-06734 SJO ) (RCx) |
| CITY OF MAYWOOD, a public entity; et al., | ) ) ) |
| Defendants. | ) ) ) |

DEPOSITION OF

JIMMY R. RUBIO

LOS ANGELES, CALIFORNIA

MAY 13, 2010

1    Maywood?

2          A     I believe this is the third one.  Uh-huh.

3                MR. PIERCE:  Be sure to use "yes."

4                THE WITNESS:  Yes.  I'm sorry.

5    BY MR. STRUGAR:

6          Q     Do you recall the names of the plaintiffs

7    or the names of the cases in either of the other two

8    depositions you've given in connection with your

9    employment with the city of Maywood?

10         A     No, I don't, not off the top of my head.

11         Q     Do you understand you are here today as a

12   witness designated under the Rule 30(B)(6) as a

13   person most knowledgeable on certain topics within

14   the Maywood Police Department?

15         A     Yes, sir.

16         Q     Those other two depositions that you gave

17   in connection with your employment with the city of

18   Maywood, were those also as a person most

19   knowledgeable on certain topics?

20         A     Yes.

21         Q     Let's go back to -- I don't really know

22   how to separate the other two you've given.  Let's

23   go back to the most recent one.

24               Do you recall generally what those topics

25   were that you were the person most knowledgeable for?

JIMMY R. RUBIO  --  05/13/2010

1            (Pause in the proceedings)

2            MR. STRUGAR:   We can go back on.

3    BY MR. STRUGAR:

4        Q    Mr. Rubio, are you currently the

5    professional standards manager -- is that at the city

6    or is that considered with the police department

7    itself?

8        A    With the police department, sir.

9        Q    Okay.

10           How long have you had that position?

11       A    Since around -- it's hard to say.  I was a

12   contractor initially.

13       Q    Well, how long has it been a permanent gig?

14       A    Since May of 2009.

15       Q    Okay.

16           And for what period of time was the

17   contract position also professional standards

18   manager?

19       A    No, I didn't come in as a professional

20   standards manager.

21       Q    So since May of 2009, you've been professional

22   standards manager.

23           Can you describe your position, your

24   duties in that position?

25       A    I have complete oversight of the background

1    investigations, internal affairs investigations, work

2    comp-related issues, training, custodian of records,

3    policies and procedures, risk management issues.  That's

4    it.

5        Q    As you can tell from the deposition notice,

6    we're here today mostly to talk about policies and

7    procedures.

8            So can you explain your role with regard to

9    Maywood Police Department policies and procedures?

10       A    I have oversight in the -- currently the

11    department, the policy that they utilize right now

12    is Lexipol policies and procedures, which is a

13    document that is being worked on daily.  There are

14    various changes due to the attorney general's report

15    that we have.

16           I am responsible for what they call the

17    daily training bulletins.  What happens is Lexipol

18    will monthly generate a series of questions that they

19    feel relate to the policies and procedures that we

20    have in place that is geared towards training the

21    officers on various aspects of the policies and

22    procedures.

23           So what I do is I go over those questions,

24    verify that they fit the needs of the department, confirm

25    them, and then put them out for publication for the

1    officers to use.  During training, these officers will

2    review the questions on a daily basis.

3         Q    Does that training take place --

4              Does that daily training, does that take place

5    during roll call or some other time?

6         A    Roll call or whenever the officer has time

7    to go on the computer and access them.

8         Q    You said in response to the attorney

9    general's investigation.

10             Is it fair to say that the policies and

11   procedures manual itself is sort of being revamped;

12   is that fair to say?

13        A    Yes.

14        Q    How long has that process been going on

15   for?

16             MR. PIERCE:  Object.  Outside the scope.

17             Go ahead and answer.

18             THE WITNESS:  It's been going on since they

19   got the system actually, which was in the latter part

20   of 2007.

21             MR. STRUGAR:  Okay.

22   BY MR. STRUGAR:

23        Q    Q    Is that when they started

24   subscribing to Lexipol?

25        A    Yes, sir.

1          To your knowledge what other policies does

2     the Maywood Police Department have that specifically

3     address issues with people with disabilities?

4          A    There is none.

5          MR. PIERCE:   You mean other than what's

6     been identified in the discovery responses that you

7     can think of?

8          THE WITNESS:   Yes, sir.

9     BY MR. STRUGAR:

10         Q    Fair to say that there's no -- that's

11    already a poor phrasing of a question.

12              Is there any M.P.D. policy specifically

13    addressing accommodations for people with mental

14    disabilities?

15         A    It touches in the section of handling

16    people that fall under the categories of a 5150,

17    W & I 5150.   It talks about somebody who has the

18    inability to care for themselves or are a danger or

19    threat to others.   It talks about how to handle them

20    appropriately.

21         Q    I think I know what 5150 is.

22              If you can just explain it for me.

23         A    Welfare and Institutions Code for people

24    who are unable to care for themselves, for people

25    who are suicidal or have any or kind of mental

1   disability that they can't function and take care of

2   themself basically.

3        Q    So other than this policy that addresses the

4   procedures for 5150, are there any other M.P.D. policies

5   that deal with people with mental disabilities?

6        A    No, sir.

7        Q    This is policy 418 of the Maywood --

8             Help me out here.  Cudahy?

9        A    Yeah, Maywood Cudahy Police Department.

10       Q    -- Maywood Cudahy Police Department mental

11   illness commitments, stamped Martinez -05

12   through -07.

13            (Deposition Exhibit 2 was marked for

14        identification by the Certified Shorthand

15        Reporter and is attached hereto.)

16   BY MR. STRUGAR:

17       Q    Mr. Rubio, is this the Maywood Cudahy policy

18   that we were speaking of concerning commitments under

19   Welfare and Institutions Code 5150?

20       A    Yes, sir.

21       Q    Do you know when this policy went into

22   effect, this version of this policy?

23       A    Yes, sir.

24       Q    When was that?

25       A    8/28 of 2009.

1       Q    And you base that, I take it, on the date

2  stamp at the bottom left-hand side of the first page,

3  bottom left-hand side of each page?

4       A    Yes, sir.

5       Q    And that date looks like the date that the

6  Maywood Cudahy Police Department adopted this policy.

7            Is that right?

8            MR. PIERCE:  I'm going to object that it

9  assumes facts not in evidence and possibly misstates

10  his testimony.

11           THE WITNESS:  No.

12  BY MR. STRUGAR:

13      Q    Okay.

14           So I don't misstate your testimony, what

15  does the August 28, 2009 date represent?

16      A    Again, Lexipol policy is a policy that you

17  can continuously make modified changes that are

18  either internally or suggested by Lexipol itself.

19           This date actually indicates the day that

20  it was published and made published to the officers.

21  This policy may have been in effect in the same

22  format without any changes in the previous version,

23  which would have been whenever they published it

24  before that.

25      Q    Fair to say that that date reflects the

1    most recent revision to the policy?

2            MR. PIERCE:  Objection.  Assumes facts not

3    in evidence.

4            But go ahead and answer.

5            THE WITNESS:  I can't say that there were any

6    revisions because there may not be any revisions.  This

7    may be the same identical, word-for-word, policy that was

8    in place beforehand, unless we made changes or unless

9    Lexipol made changes.

10   BY MR. STRUGAR:

11       Q    Okay.  I'm sorry.  I may just not be

12   understanding.

13           If no changes were made, why would that

14   date be reflected there on the bottom?

15       A    That stamp goes on the entire policy once

16   we republish it.  So, for instance, Lexipol on an

17   annual basis will do whatever kind of updates that

18   they feel are necessary and they suggest them.

19           It is up to each individual department to

20   go through those different updates that they're

21   requesting or that they would like to see put into

22   policy, agree upon -- either accept or deny them.

23           Once they accept or deny all these different

24   changes that are suggested or if they want to make

25   internal changes on their own, they then resubmit that.

1          It goes back to their server or what-have-you,

2   puts in all the modifications and stuff, and then a new

3   version of the policies and procedures will come out with

4   the new changes in it.

5          It may not affect this particular policy.

6   The new version will come out and they will stamp

7   every page on that to say that this is the version

8   that is now effective that date.

9      Q    I think I understand.

10         Is it fair to say that on August 28, 2009,

11   the entire policies and procedures manual was

12   published or republished?

13      A    Yeah, updated.  Yes.

14      Q    So it could very well be that this -- that

15   these three pages existed word for word prior to

16   August 28, 2009, or they could have changed?

17      A    Yes, sir.

18      Q    Prior to August 28, 2009, was the Maywood

19   Police Department operating off a policies and

20   procedures manual from Lexipol?

21      A    Yes.

22      Q    When did -- when was the --

23         If you know, approximately when was the first

24   publication of a policies and procedures manual based on

25   Lexipol's templates?

JIMMY R. RUBIO -- 05/13/2010

1   A   It was sometime in 2008.  I just don't

2   remember a specific date.

3   Q   Do you remember if it was early 2008 or

4   late 2008?

5   A   To be honest with you, I don't know.

6   Q   When the policies and procedures manual is

7   updated, like it appears it was on August 28, 2009,

8   does the Maywood Police Department keep records of

9   the previous iteration of the policies and

10  procedures manual?

11  A   Yes, we do.

12  Q   And do you keep those as the custodian of

13  records?

14  A   They are on the Internet within the

15  department.

16  Q   If someone were to request a version of a

17  policy in effect on a certain day, say, May 5, 2007,

18  would someone in the Maywood Police Department be

19  able to access the version of the policies that were

20  in place on that day?

21  A   Yes.

22  Q   Fair to say that this policy 418 that we're

23  looking at deals specifically with procedures to be

24  followed when committing someone to a mental health

25  unit pursuant to a 5150?

 1            MR. PIERCE:  Objection.  The document

 2   speaks for itself.

 3            You can answer.

 4            THE WITNESS:  Yes.

 5   BY MR. STRUGAR:

 6      Q    Fair to say policy 418 doesn't address law

 7   enforcement interactions with people with mental

 8   health conditions that don't involve sort of

 9   commitment under 5150; is that fair to say?

10            MR. PIERCE:  Same objection.

11            Go ahead and answer.

12            THE WITNESS:  I didn't hear the first part

13   of the question.  I'm sorry.  I apologize.

14            MR. STRUGAR:  Sure.

15   BY MR. STRUGAR:

16      Q    Does policy 418 address officer

17   interactions with people with mental health

18   conditions outside of the situation of committing

19   someone under 5150?

20      A    Yes, it does.

21      Q    Okay.

22            And how does it do that?

23      A    418.6, training, says,

24            "As a part of advanced officer

25            training programs, this agency will

```
 1              endeavor to include POST-approved

 2              training on interaction with mentally

 3              disabled persons as provided by Penal

 4              Code Section 13515.25."

 5         Q    Do you know if the training evidenced in

 6    418.6 has happened?

 7         A    No, sir.

 8         Q    You don't know or it has not?

 9         A    It has not happened.

10         Q    Is that training scheduled?

11         A    No, sir, not in the immediate future.

12         Q    Were any changes made to the policies and

13    procedures manual, like it appears it was on August 28,

14    2009?

15              For instance, how are police department

16    officers -- police officers made aware of those changes?

17         A    Generally an e-mail would come out and police

18    officers have access to the department Internet; and the

19    original will be placed on the department Internet for

20    their review.

21         Q    Are police officers required to read and

22    review the entire policies and procedures manual or

23    are they cued into where the changes are made?

24         A    That's why we have daily training

25    bulletins.  Those are reflected on recent changes
```

JIMMY R. RUBIO  --  05/13/2010

Page 43

1    that Lexipol has implemented or certain changes

2    arising throughout the country that reflect upon the

3    policy.

4         Q    We've talked about two ways officers are made

5    aware, both through the daily training bulletins and the

6    department-wide e-mail that goes out.

7              Are there any other ways that police

8    officers are made aware of changes?

9         A    Yes, there are.  If we have any critical

10   issues that are part of the department policy that

11   has been modified, that would then be trained upon

12   during briefings by the sergeants.

13        Q    And the briefings are different than the

14   briefings that happen in connection with the daily

15   training training bulletins?

16        A    Well, it's done during preservice

17   briefing.  They go in there and they talk about

18   whatever events are taking place.  And if we have any

19   specific training that we would want them to have, we

20   would do -- we would then give them the policy and

21   ensure that the department members will receive a

22   copy of the new policy and procedure;

23             They will discuss it; they will also sign

24   for it.  Then that will be placed in their personnel

25   file.

1   BY MR. STRUGAR:

2        Q    Mr. Rubio, have you had a chance to review

3   this document?

4        A    Yes, sir.

5        Q    And what is it?

6             MR. PIERCE:   Object.   The document speaks

7   for itself.

8             You can go ahead and answer.

9             THE WITNESS:   It is policy 370, has to do

10  with hearing impaired/disabled communications.   It

11  was published August 28, 2009.

12  BY MR. STRUGAR:

13       Q    Is it fair to say that with people with

14  hearing impairments --

15       A    Yes, sir.

16       Q    -- is it fair to say that this policy does

17  not deal with any disabilities outside of hearing

18  impairments?

19             MR. PIERCE:   I object.   The document speaks

20  for itself.

21             MR. STRUGAR:   I will withdraw that.   It

22  does make some reference to blindness.   I

23  apologize.

24  BY MR. STRUGAR:

25       Q    Is it fair to say this policy only

1      Q    Do you have any knowledge of how the

2   Maywood Police Department provides sign language

3   interpreters when needed?

4      A    No, I do not.

5      Q    I will introduce as 4, Exhibit 4, policy 404,

6   briefing training.

7           (Deposition Exhibit 4 was marked for

8           identification by the Certified Shorthand

9           Reporter and is attached hereto.)

10   BY MR. STRUGAR:

11      Q    Mr. Rubio, are you familiar with this

12   document?

13      A    Yes.

14      Q    This was produced to us in this litigation

15   as a Maywood Police Department training addressing

16   accomodations to people with disabilities.

17           To the extent that you can, can you tell

18   me how this policy addresses providing accommodations

19   for people with disabilities?

20      A    Well, as you can see, it says "Briefing of

21   officers and information regarding daily patrol."  It

22   also says "Providing training on a variety of subjects."

23           If there is something that comes up in regards

24   to any specifics, incidents -- sometimes we get alerts

25   from various associations that are involved with law

1    enforcement -- we will then disseminate that at training

2    so that they will train up on it.

3         We can get alerts as to new trends, stuff like

4    that that are out there.  So we will then share that with

5    the officers so that they can train up on it.

6    Q    So if I understand correctly, this policy

7    is relevant to providing accommodations to people

8    with disabilities to the extent that an alert went

9    out to provide training to officers about

10   accomodations?

11   A    Yes.

12   Q    Are you aware of any alerts on the topic of

13   people with disabilities and accommodations?

14   A    Not off the top of my head.  Recently

15   there was something that came out that had to do with the

16   dealings and there were publications that were shared,

17   again, that had to do with ADA  I can't tell you

18   specifically what they were.

19        There were various different publications

20   that come across and then they would then be

21   disseminated to the officers.

22   Q    Do you recall -- you said recently there

23   were some alerts.  I assume there was a couple.

24        Are you aware of generally what

25   disabilities those alerts entailed, if they were

JIMMY R. RUBIO   --   05/13/2010

Page 54

1   hearing, if they were blindness, or anything else?

2        A     There was various types of mental

3   disabilities they were addressing, people with

4   Alzheimer's, autism, stuff like that.  There were

5   various mental disabilities that these type of

6   alerts --

7             Again, they come in some kind of a

8   publication that are either from law enforcement

9   agencies or private entities that alert police

10  officers of various changes.  They went out

11  throughout the land.

12       Q     Officers receive briefings on those alerts,

13  but those alerts don't affect the actual policy;

14  correct?

15       A     The only time they would affect the actual

16  policy is if the chief of police either receives or

17  sees something that is of importance.  Then what

18  we'll do is put that on a training bulletin which will

19  ultimately, then, be put into -- somehow be put into

20  policy at a later time.

21       Q     Are you aware of any alerts on ADA issues that

22  have been received and then turned into training

23  bulletins in that process that you've just described?

24       A     No, sir.

25       Q     Do you recall when these alerts on mental

1    can help accommodate if it's somebody other than a

2    mental health 5150.

3         Q    Is that process of calling mental health,

4    is that formalizing a policy or just officer common

5    sense or something else?

6         A    Officer common sense.

7         Q    And does the Maywood Police Department

8    have any written policies specifically regarding

9    accommodating people with developmental disabilities?

10        A    No.

11        Q    Do you have any knowledge of the Maywood

12   Police Department ever providing an accommodation for

13   anyone with a developmental disability?

14        A    No.

15             MR. STRUGAR:  Take five minutes.

16             (Pause in the proceedings)

17             MR. PIERCE:  Back on.

18   BY MR. STRUGAR:

19        Q    Go ahead.

20        A    I'd like to clarify.

21             A couple of questions prior to going on break,

22   you had asked about dealing with people with

23   wheelchairs.  In our handcuff policy -- I don't have the

24   handcuff policy with me -- but in our handcuff policy, it

25   does talk about dealing with disabled persons and how the

1    officers are to use discretion as to how they are going

2    to handcuff them.

3            Also, in our search warrant policy, it

4    talks about treating people with respect, using good

5    judgment when dealing with people in general in

6    dealing in search warrants.

7            I just wanted to get that out there.

8        Q    Sure.

9            I have seen the handcuff policy and I do

10   recall that as well.

11           Fair to say, I think it deals with people who

12   are hearing impaired, for example.

13           Correct me if I'm wrong, it says that, as a

14   general policy, to handcuff them in the front so they can

15   still sign.

16           Is that what it says?

17       A    Yes, but it also says to use discretion.  I

18   mean if you have someone in a wheelchair, if you have

19   someone who is confined, you know, that doesn't have

20   both hands or what-have-you, there are other ways to

21   handcuff, just use -- at the discretion of the

22   officers.

23       Q    Okay.  Thank you.

24           The search warrant policy, you said it

25   addresses sort of general rules of carrying out

1    search warrants, to have respect; is that fair?

2        A    Yes, sir.

3        Q    To your knowledge, does the search warrant

4    policy have anything specifically addressing people

5    with disability?

6        A    No, just a broad statement of treat people

7    with respect and use common sense when dealing with

8    people.

9        Q    Thank you.

10            To your knowledge, does the Maywood

11   Police Department have any policy or practice of

12   separating occupants of a residence during the

13   execution of a search warrant?

14            MR. PIERCE:  Objection.

15            THE WITNESS:  Do they have any policy or

16   practice?

17            MR. STRUGAR:  Yes.

18            THE WITNESS:  There is no policy.  There

19   is practice.  It is all based on officer safety

20   depending on the type of search warrant that they're

21   executing.  And when the issue of officer safety

22   comes into play, there is a separation that is

23   initiated amongst everybody that is being detained.

24            If they have deemed that the area is safe,

25   then they would do what's necessary to accommodate

JIMMY R. RUBIO  --  05/13/2010

Page 70

1      A      Again, the classes that we send them to

2    fit the criteria for those perishable skills.  So

3    what I will do is I will tell the training

4    coordinator where are we at in hours with our

5    officers.

6           Say, for instance, he says Jim Rubio is

7    lacking eight hours in arrest and control.  Well, I

8    need you to find a class for arrest and control that

9    fits that criteria and send Jimmy Rubio to that

10   class.

11     Q      Are you aware of any classes specific to

12   people with disabilities?

13     A      No, sir.

14     Q      Are you aware of any classes that have --

15   that include components specific to people with

16   disabilities?

17     A      No, sir.

18     Q      Do you know if the Maywood Police

19   Department has conducted any self evaluations of its own,

20   the Maywood Police Department's own compliance with the

21   ADA?

22     A      Recently we received a syllabus from the

23   Rio Hondo academy that -- I don't believe it's being used

24   up there, but it was from a staff member there who

25   received it from LAPD.

1    sustained.  We cannot get into detail about what

2    that is, the type of complaints.

3        Q    Is that --

4            The number of total complaints and the number

5    of unfounded, are those regularly provided to anyone

6    outside of the Maywood Police Department; are they

7    provided to the City Council or anyone else?

8        A    I believe --

9            MR. PIERCE:  Don't speculate.

10            THE WITNESS:  I recall that they were

11    placed -- I don't really remember the component as

12    to how they were delivered -- I mean, how they were

13    written in there, whether they were broken down in

14    categories, but I know we had something in our

15    annual report that's public record.

16    BY MR. STRUGAR:

17        Q    And that's the city's annual report or the

18    police department's annual report?

19        A    The Maywood Police Department's annual

20    report.  The last one we did was 2008.

21        Q    Separate and apart from the plaintiffs in this

22    case, are you aware of any complaints M.P.D. has received

23    in the last two years regarding individuals with

24    disabilities?

25        A    No.

# EXHIBIT M



# American Cities Teeter on Brink of Bankruptcy

**Economic Downturn, Mounting Debt Push Cities to the Brink; Maywood, Calif., Lays Off Everybody**

**By RAY SANCHEZ**

**June 28, 2010—**

Come Thursday, the small, working-class enclave of <u>Maywood,</u> south of downtown Los Angeles, will lay off all its employees, eliminate its police force and contract a neighboring city to run municipal operations.

More than 100 city workers -- the people who keep Maywood's streets paved and parks clean, school crossing guards and police veterans -- will get pink slips. The action is without precedent in the state of California. The police department, which had enjoyed a love-hate relationship with the mostly immigrant city of about 50,000, will account for 70 of those jobs, including 47 sworn officers.

"We've become the extreme example in that the city is now contracting all of its municipal services, absolutely everything, to another city that will now generate revenues off that," Maywood Police Chief Frank Hauptmann told ABCNews.com. "Some ask the question, 'Why even have a city anymore?'" From California to Pennsylvania, cities and towns are being pushed to the brink by the lingering <u>economic downturn</u> and mounting debt. The obligations of state and local governments have doubled to $2.4 trillion in the past decade, according to a recent report by the Federal Reserve.

Municipal governments will probably come up $56 billion to $83 billion short between now and 2012, said the Washington D.C.-based <u>National League of Cities.</u> The shortfalls will likely result in more layoffs, service cuts and canceled projects and contracts. Addled by unmanageable debt, municipalities have turned to draconian service cuts and large tax increases. Experts believe some may default on loans because states are too strapped for bailouts; others face bankruptcy filings.

"It may be a real possibility for a few places and we may actually see a few cases of municipal bankruptcy that we haven't seen in previous years," Chris Hoene, director of research for the National League of Cities, which represents the nation's 19,000 municipalities, told ABCNews.com. "But it will still be a rarity." Since 1937, when federal law first allowed municipal bankruptcy, there have been about 600 bankruptcies involving municipal agencies and entities such as housing developments. Local governments face bleaker revenue prospects as the long recession affects tax receipts and pension-funding deficits mount.

"There are a few places that are in dire enough straits that (bankruptcy is) a legitimate consideration on the table," Hoene told ABCNews.com.

The pain spreads across the nation: " Harrisburg, Pennsylvania's capital, owes $68 million in bond interest payments this year, a sum larger than its annual budget. The $68 million is part of $288 million in outstanding debt from an incinerator project. The Harrisburg Authority, the state body that issued the

bonds for construction of the municipal trash incinerator, has been unable to make payments. The county, which picked up the bill last year, is now suing for the funds. In addition to the incinerator debt, Harrisburg must deal with a $9 million deficit in the current budget. The city is considering layoffs in its 537-member workforce. It has assigned AARP volunteers to man police stations in order to have all officers on the streets. Mayor Linda Robinson has said the city won't declare bankruptcy. The city is sifting through assets to see whether anything can be sold, including western artifacts purchased by former Mayor Stephen Reed for nearly $8 million. Bought with public funds, the wagon wheels, rifles and other memorabilia were destined for a Wild West Museum that never opened. "It's unclear whether all of the items are authentic," city spokesman Jim Penna told ABCNews.com.

" Jefferson County, Alabama's most populous county, is saddled with about $5 billion in debt stemming from the overhaul of its sewer system in the mid-1990s. Merit increases for county workers were frozen; building and road repairs halted. A brand new jail sits vacant because there are no funds to hire workers or pay utilities. Officials have said bankruptcy is a possibility.

" The impoverished city of Central Falls, Rhode Island, near Providence, last month agreed for a receiver to take control of its finances and consider the rewriting of contracts and cutting of pension benefits. A city of 19,000, Central Falls has a budget of about $18 million and projects a $3 million deficit this year and a $5 million gap in fiscal 2011. The city also has $4 million in a pension fund that has $35 million in unfunded liabilities.

" Detroit, Michigan, is one of seven American cities assigned junk bond status by the nation's leading debt-rating agencies. The city made up for a 2010 budget deficit of $280 million by issuing $250 million of 20-year municipal notes. Earlier this month, Detroit revealed plans to close 77 public parks in a cost-cutting move by Mayor Dave Bing. Roughly 1,400 acres of parkland will be closed on Thursday. Bing has won concessions from more than half of the public-sector unions but the city council has pushed for deeper cuts. Detroit has closed dozens of schools in recent years and cut other city services, such as busing, as it grapples with population declines. When Bing took over in May 2009, the city had about 13,000 employees and a deficit of more than $300 million. He has let go more than 2,000 people since then and forced roughly 1,500 nonunion workers to take pay cuts. The city also instituted furloughs for employees.

In Maywood, the city is eliminating all positions except the city manager, city attorney and a handful of elected officials. All services would be contracted out. Maywood's $10.1 million general fund budget has a deficit of about $450,000. Compounding the problem, the city can't obtain insurance because of a long history of lawsuits, mostly against the police department.

Left without insurance as of July 1, the Maywood city council decided two weeks ago to lay off nearly all of its employees, disband its police force and pay neighboring Bell to run the city. It's estimated the city will save $164,375 a year. The Los Angeles Sheriff's Department will replace Maywood's police. "This occurred with less than 30 days notice and getting even an emergency plan contract in place with the Sheriff's Department left us with less than 10 days to disband a police department that had been in service for 86 years," Hauptmann said.

Tucked into the heavily industrial southeast part of Los Angeles County, Maywood is predominantly Latino and densely packed into just 1.2 square miles. Officials estimate about half of the city's residents are illegal immigrants. Critics have blamed the city's woes on what they call the ineptitude of local governments. In May, the California Joint Powers Insurance Authority, a government agency made up of more than 120 cities to share costs, advised Maywood officials to end years of "passive administration."

Hauptmann, the police chief, said that at midnight on July 1, his officers will return to police headquarters and hand over Maywood to the Los Angeles County Sheriff's Department. All 911 lines will be transferred to the neighboring jurisdiction.

"You lose your workers comp and general liability insurance and then no one else wants to commercially insure the city because of past decisions that were made that put them in this position," he said. "You can actually lose a police and fire department over something like this. It's probably going to set an example to other communities across the country."

Copyright © 2010 ABC News Internet Ventures