# EXHIBIT D

Case 2:09-cv-06734-SJO-RC Document 88-3 Filed 08/09/10 Page 2 of 55 Page ID #:1346

1    lead to the discovery of admissibility evidence if

2    they are not similar to allegations lodged in this

3    complaint.

4         I instruct him not to answer.

5    BY MR. STRUGAR:

6         Q    Are you going to follow your attorney's advice

7    not to answer that question?

8         A    Yes.

9         MR. STRUGAR:  Just so I'm clear, the basis of

10   the instruction is privacy?

11        MR. PIERCE:  And it's not reasonably

12   calculated to lead to the discovery of admissible

13   evidence.

14   BY MR. STRUGAR:

15        Q    Other than this lawsuit, how many times have

16   you been sued in connection with your employment with the

17   Maywood Police Department?

18        A    I don't know.

19        Q    At least one other time, it seems?

20        A    At least.  Maybe three, three or four times.

21   But my name has been taken out of some of them because I

22   wasn't present.

23        Q    So in some of them you were sued, but later

24   dropped from the case, to your understanding?

25        A    Yes, sir.

```
 1            MR. PIERCE:  Vague and ambiguous.

 2            THE WITNESS:  I don't remember.

 3   BY MR. STRUGAR:

 4       Q    Do you recall any policies from when you

 5   first joined the force in 2004 specifically regarding

 6   people with developmental disabilities?

 7       A    I don't remember.

 8       Q    Does the Maywood Police Department

 9   currently have any written policies directly

10   addressing accommodations for people with mental

11   disabilities?

12       A    With mental disabilities?

13            There may be some as far as, like, maybe

14   5150s.  There are sections.  I don't recall which ones

15   they are that mention things, like a special narrative

16   for mental -- I don't know if it's mental disability, but

17   schizophrenia or people who are a danger to themselves.

18       Q    I think I know what it is, but can you

19   describe 5150 for me?

20       A    That is someone who is a danger to

21   themselves or others and they usually have to be

22   detained or have a 72-hour evaluation.

23       Q    5150 is a method by which somebody could be

24   civilly committed; is that correct?

25       A    Yes, sir.
```

1      Q    So your understanding is that the Maywood

2    Police Department has a written policy pursuant to

3    5150?

4      A    It may not say "5150," but it does have

5    something to do with that, yes.

6      Q    Does the Maywood Police Department have any

7    specific policies related to people with

8    developmental disabilities?

9            MR. PIERCE:   Objection.  Vague and

10   ambiguous.

11           THE WITNESS:   I don't remember.

12   BY MR. STRUGAR:

13     Q    Other than the written policy regarding

14   5150 and civil commitments generally, are you

15   familiar with any written Maywood-Cudahy Police

16   Department policies addressing accommodations for

17   people with mental and developmental disabilities?

18     A    I don't recall.

19     Q    We talked a few minutes ago about the --

20   you called it a briefing, is that right; is sort of

21   a daily briefing an okay way to describe it?

22     A    That's fine.

23     Q    In your time with the Maywood Police

24   Department, have you ever had any daily briefing that

25   addressed accommodations for people with

1    disabilities?

2        A    I believe so, yes.

3        Q    When was the last time?

4        A    Maybe two or three weeks ago.

5        Q    And what was the subject matter?

6        A    There was two different subjects.  It

7    started with excited delirium and people with mental

8    disabilities.  We also got into the area of 5150

9    holds as well.

10       Q    Did that briefing two or three weeks ago

11   on excited delirium and 5150 holds, did any of it

12   address the policies or procedures for providing

13   reasonable accommodations?

14       A    I don't remember whether they went over the

15   whole policies and procedures.  It was actually a

16   briefing for the shift after mine.  So I didn't stay

17   for the entire thing.  But I was there for maybe

18   20 minutes or so.  So I don't know whether they

19   covered anything or not.

20       Q    Other than two or three weeks ago, have

21   you been present for any daily briefings with the

22   Maywood Police Department relating to accommodations

23   for people with mental disabilities?

24       A    I don't remember.  Usually stuff like that

25   comes up if something happens.  So if somebody had an

```
 1    experience with someone with a mental disability, it
 2    is brought up in a briefing and we discuss it that
 3    day.
 4         Q    Other than this briefing two or three weeks
 5    ago, you don't recall any other briefings regarding
 6    people with disabilities?
 7         A    No, sir.
 8              MR. PIERCE:  Make sure if he uses the
 9    negative to make sure that that's correct.  If he
10    says no, then you say no, it's a double negative.
11    BY MR. STRUGAR:
12         Q    That's my fault in forming poor questions.
13              MR. PIERCE:  What you meant to say was
14    that's correct?
15              THE WITNESS:  Correct.
16    BY MR. STRUGAR:
17         Q    Are you familiar with the term "annual
18    refresher training"?
19         A    Yes.
20         Q    Do you get any sort of annual refresher
21    trainings with the Maywood Police Department?
22         A    I don't remember if they're every year or
23    every other year, but there is some required
24    training by POST, yes.
25         Q    In that either annual or -- I want to say
```

```
 1    his name.  I just know his gang name that they

 2    called him, Heffe.

 3         Q    I'm sorry.

 4              That was Mrs. Martinez's husband, or that was

 5    one of the individuals that you arrested was Heffe?

 6         A    Mrs. Martinez's husband.

 7         Q    And other than the Mr. Valdivia incident,

 8    prior to August 20, 2008, had you ever interviewed

 9    any of the plaintiffs at any prior time?

10         A    I don't believe so.  If I did, like a --

11    what's the daughter's name?

12         Q    Wendy or Maritza -- Maritza has the

13    developmental disability.  Wendy is the other sister.

14         A    I may have Wendy, but not at that residence.

15    At that residence, no.

16         Q    Do you have a recollection at this time of

17    interviewing Wendy Sanchez somewhere else?

18         A    No.

19              (Pause in the proceedings)

20              MR. STRUGAR:  Okay.  Back on.

21    BY MR. STRUGAR:

22         Q    Officer Serrata, you participated in

23    carrying out a search at 3589 East 54th Street on or

24    about August 20, 2008?

25         A    Yes, sir.
```

1      Q    How did it come to be that you were

2   searching the residence that day?

3      A    Dave Ishibashi had contacted me.  Usually

4   when he does search warrants in that area or he needs

5   a gang expert, he usually calls me.

6           And depending on the gang, I get

7   anything -- point out anything that's of the gang's

8   to take pictures of it or collect it as evidence.

9      Q    So it's fairly common for Dave Ishibashi to

10  contact you when he is carrying out a search in

11  Maywood?

12     A    Yes, sir.

13     Q    Prior to August 20, 2008, how many times

14  had you conducted a search with Dave Ishibashi?

15          MR. PIERCE:  I'm just going to object as

16  vague and ambiguous.

17          You can go ahead and answer.

18          Assumes facts not in evidence.

19          THE WITNESS:  Maybe four or five times,

20  possibly more.  I just can't remember for sure.

21  BY MR. STRUGAR:

22     Q    And for the August 20th search, when did

23  you receive the call from Mr. Ishibashi?

24     A    I don't remember.

25     Q    Was it a day in advance of the search, the

```
 1        A    I don't remember.

 2        Q    Were you in uniform during that search?

 3        A    I don't remember.  I'm sure I was in some

 4   type of uniform; maybe not this specific uniform,

 5   but I was in uniform.

 6        Q    When operating with this task force, do you

 7   on occasion wear a different uniform than the one you

 8   are wearing today?

 9        A    Yes.

10        Q    Can you describe that uniform for me?

11        A    Well, sometimes I will wear a polo shirt.  It's

12   a navy blue polo shirt.  It's got silk screen patches on

13   both sleeves, a badge patch on the left breast, first

14   initial and last name on the right breast, "police" in

15   maybe five- or six-inch block letters on the back.

16             I usually wear that with a pair of jeans

17   or something like that.  It also depends on what

18   we're doing.  If we're doing surveillance, I will

19   just be wearing plain clothes.

20        Q    When you arrived at the residence on

21   August 20, 2008, what's the first thing you saw?

22        A    I don't remember.

23        Q    How many task force officers were there on

24   the 20th, approximately?

25        A    I'm just guessing, but maybe --
```

```
 1              MR. PIERCE:  Don't guess.  Best estimate,
 2     if you have an estimate.  Give him a range.
 3              THE WITNESS:  Maybe five to seven.
 4     BY MR. STRUGAR:
 5         Q    That's not including yourself; correct?
 6         A    Correct.
 7         Q    And when you arrived, what's the first
 8     thing you remember -- what's the first thing you
 9     remember having happened on the August 20, 2008
10     incident?
11         A    I don't remember arriving.  I just -- I
12     remember going into the residence and looking at
13     some -- I believe there were football jerseys with
14     numbers on them and some gang paraphernalia.
15              I remember approaching the residence.  I
16     can't remember for sure if it was the 20th or the
17     26th.
18         Q    Specifically on the 20th, is it fair to
19     say you don't recall whether the search was already
20     in progress when you arrived or whether you were
21     there when they knocked on the door and first
22     entered the house?
23         A    I don't believe I was there when they first
24     knocked on the door.  I may have been present maybe
25     in the street or something, but I wasn't -- I don't
```

1  paraphernalia on that occasion?

2      A    I can't remember.  I remember pointing out

3  gang graffiti, but it may have been the second time.

4  I'm not certain.

5      Q    When you were conducting the search of the

6  house, were the residents inside of the house at that

7  time?

8      A    I don't believe so.  The only person that

9  went in and out was -- what's the other daughter's

10  name?

11      Q    Maritza is the one with the mental

12  disability.

13      A    Maritza went in and out a few times.

14      Q    Your understanding is the family was

15  somewhere outside of the house?

16      A    Yes, sir.

17      Q    Do you remember if they were in front or

18  back?

19      A    I don't know where they were the entire

20  time because I wasn't with them the entire time.

21          But I believe they were in the driveway

22  adjacent to the house on the west side of the house

23  for part of the time.  I don't know that they were

24  there the whole time, no.

25      Q    And on that day you had occasion to observe

```
 1    Maritza Sanchez Martinez?

 2         A    Yes.

 3         Q    Was it apparent that she had some kind of

 4    mental disability?

 5         A    Yes.

 6         Q    And how was that apparent?

 7         A    When she spoke to her mother, I couldn't

 8    understand what she was saying.  She just appeared to

 9    be wandering aimlessly in the front yard.  She was

10    playing with a doorknob on one of the doors quite a

11    bit and spinning the wheels on a car, just over and

12    over, staring at the car while the wheels turned.

13         Q    Was the car a toy car?

14         A    Yes, sir.

15         Q    Did it appear that she was --

16              I know you said you couldn't understand, but

17    did it appear that she was conversing with her mother?

18         A    Yes.

19         Q    Did it appear that her mother understood

20    what she was communicating to her mother?

21         A    I don't think she -- I don't know.

22         Q    You have some past familiarity with young

23    people with autism; is that correct?

24         A    Yes.

25         Q    Can you describe that for me?
```

1      A      My ex-girlfriend was a therapist for

2   autistic children.  She actually still is.  I spent

3   time with her and some autistic kids.  She was always

4   studying.

5            So in her study, she would go over the common

6   characteristics, things that they would do, like the

7   doorknob, staring at the spinning wheel, any of the

8   symptoms or stimulations.

9            She did like flapping of her hands, even

10  stood on her toes several times while walking around

11  the front yard; that was another characteristic that

12  was brought up.

13     Q      So it's fair to say that on August 20, 2008,

14  you recall Maritza displaying characteristics that you

15  know to be associated with autism?

16     A      Yes, sir.

17     Q      Other than observing Maritza, were you apprised

18  by anyone of her disability?

19     A      No, sir.

20     Q      Did any of the task force mention it to

21  you?

22     A      No, sir.

23     Q      Did any of her family members mention it to

24  you?

25     A      No, sir.

```
 1        A    I don't believe so, but I'm not certain.

 2        Q    Did you or the task force officers seize the

 3   football jerseys you were speaking of earlier?

 4        A    I don't know.  I don't remember.  Sometimes

 5   they are seized and sometimes they just take

 6   photographs.

 7        Q    Did you seize any property that day?

 8        A    No, sir.

 9        Q    Do you know if the task force officers seized

10   any property that day?

11        A    No, sir.

12        Q    The husband/dad, the man of the house, so

13   to speak, was arrested that day; right?

14        A    I believe so, yes.

15        Q    Were any of the residents uncooperative in

16   any way during the August 20th search?

17        A    No.

18        Q    Did you have any conversations with

19   Bertha Martinez on August 20th?

20        A    No, sir.  She's a Spanish speaker.  So I

21   never spoke with her.

22        Q    Did you have any conversations through

23   anybody interpreting?

24        A    No, sir.

25        Q    On August 20, 2008, was there anyone who was
```

1     Q     When did you first encounter Bertha?

2     A     In the back patio.

3     Q     Do you remember approximately how long you

4 had been at the residence when you first encountered

5 Bertha in the rear patio?

6     A     No, but it was -- whatever the duration of

7 time was, it was toward the end.

8     Q     Do you know where she was the rest of the

9 time?

10     A     No, sir.

11     Q     When you first encountered Bertha in the

12 rear patio, what was she doing?

13     A     Sitting on a chair.

14     Q     Was anyone with her?

15     A     No, sir.

16     Q     At some point did you participate in an

17 interview with Bertha in the backyard?

18     A     I believe I may have spoken with her

19 briefly.  But I don't speak Spanish, so I couldn't

20 interview her.

21     Q     You don't speak Spanish at all?

22     A     I speak a little bit, like enough to get a

23 name and address, stuff like that.  I can understand

24 it pretty well, but not to have a conversation, no.

25     Q     To the extent you can recall it, what was

1   his face, no.

2       Q    Do you recall the substance of

3   Mr. Ishibashi's questions?

4       A    No, I wasn't there for the whole

5   interview.  I just heard him talking and the

6   translator talking in Spanish.

7       Q    Do you recall the general subject matter or

8   anything that he was asking her?

9       A    No, sir.

10      Q    What were you doing when Mr. Ishibashi was

11  interviewing Ms. Martinez?

12      A    Probably -- I don't remember for certain,

13  but I would imagine looking for more gang writings in

14  that area.

15      Q    So you just happened to be in the general

16  area as he interviewed her?

17      A    Yes, sir.

18      Q    Did you encounter Maritza on August 26, 2008?

19           MR. PIERCE:  Vague and ambiguous.

20           Go ahead.

21           THE WITNESS:  Did I contact her or just see

22  her?

23           I can't -- again, I remember her walking

24  around the yard, but I don't remember if it's because

25  of the August 20th or the 28th (sic).  She may have

OFFICER ANDREW SERRATA    09/19/2010

1    been walking around both days.

2              MR. PIERCE:  You mean the 26th?

3              THE WITNESS:  Yeah, the 26th.

4    BY MR. STRUGAR:

5         Q    When you say walking around the yard, is

6    that the yard in the front of the residence?

7         A    Yes, sir.

8         Q    But you don't recall whether you saw her

9    walking around in the yard on the 20th or the 26th

10   or both days?

11        A    Correct.

12        Q    I know you don't speak Spanish.

13             But to the extent that you overheard any

14   conversations any of the task force officers had with

15   Bertha through the translator, did you hear her say

16   anything about her daughter?

17        A    No, I didn't pay attention to the

18   conversation -- I wasn't listening -- standing there

19   listening to the conversation.  I was just in the

20   area.

21        Q    You didn't ask Ms. Martinez any questions

22   that day?

23        A    Only in relation to when I called the

24   paramedics.

25        Q    And do you recall Mr. Ishibashi saying

1        A    Yes, sir.  I believe I said earlier that he

2    didn't translate, but I do believe I did ask him to ask

3    her where the gun was when we were looking for a gun that

4    day.  I believe I may have had him ask her that.

5        Q    You believe you asked Sergeant Garcia to

6    translate that question to Ms. Martinez?

7        A    Yes, sir.

8        Q    Did Ms. Martinez answer that question?

9        A    I believe so.  I don't remember what she

10   said though.

11       Q    Do you remember her telling you where a gun

12   was?

13       A    No, sir.

14       Q    Do you remember saying anything in response

15   to her answer about the gun?

16       A    No.

17       Q    Did you call her a liar?

18       A    No, sir.

19       Q    Other than using Sergeant Garcia to

20   translate the question about the gun, do you recall

21   using Sergeant Garcia to translate anything else to

22   Ms. Martinez?

23       A    No, sir.

24       Q    Do you recall using Sergeant Garcia to

25   translate anything else that day?

# EXHIBIT E

1  me know, and I'll give you that opportunity.

2       Do you understand that?

3    A    Yes.

4    Q    And after today's deposition, a copy of

5  the transcript will be sent to your lawyer, and you

6  will then be provided a transcript.  You'll then

7  have the opportunity to read the transcript and

8  make any corrections to any of your testimony at

9  that time, but any corrections you make I can

10  comment on at trial.

11       Do you understand that?

12    A    Yes, sir.

13    Q    Are you taking any medication today that

14  would affect your memory?

15    A    No.

16    Q    Do you have any medical condition that

17  would affect your ability to recall past events?

18    A    No, sir.

19    Q    Is there any reason you can think of that

20  you would not be able to testify truthfully and

21  accurately today?

22    A    No, sir.

23    Q    You said you've been deposed one other

24  time.  Was this in connection with your employment

25  with the Maywood Police Department?

1    aspect of the field training program?

2        A    Reviewing policies and completing tests.

3        Q    Were the tests designed to gauge your

4    knowledge of Maywood Police Department policies and

5    procedures?

6        A    Along with California law.

7        Q    You said that in addition to the field

8    training program you also read or reviewed the

9    policies.

10           Were those policies in a policy manual, or

11   were those on a computer, or were they in some

12   other format?

13       A    At the time they were in a binder, folder.

14       Q    And were you required to read those

15   policies in the binder, read them front to back?

16       A    Yeah.  You're supposed to have knowledge

17   of it or know what it was.

18       Q    When you joined the force in 2004, did the

19   Maywood Cudahy Police Department have a policy for

20   providing accommodations for people with

21   disabilities?

22       A    I don't remember.

23           MR. STRUGAR:   Take another five minutes.

24   Thanks.

25           (Brief recess.)

 1   disabilities.  It could be someone that may be

 2   going through a hard time and wanted to hurt

 3   themselves.

 4        Q    But in addition to that type of situation,

 5   it also addresses people with certain mental

 6   disabilities; is that correct?

 7        A    Yes, sir.

 8        Q    You said you believe you have policies

 9   just for providing accommodations generally; is

10   that right?

11        A    I don't understand what you said.

12        Q    What I'm trying to understand is, is there

13   -- my understanding of the Maywood Police

14   Department policies is there is a 5150 policy,

15   there is a deaf or hard of hearing policy.

16             What I want to know is if there are any

17   other policies I'm missing.

18             What I heard you say earlier is there is a

19   general policy of accommodations, and I'm trying to

20   figure out what you mean by that.

21        A    I don't know if there is a general policy

22   on accommodations, but as a human being you try to

23   accommodate them if they're having some issues or

24   if they need some accommodations.

25        Q    Do you know if there are any specific

1   policies other than the 5150 policy that address

2   people with mental disabilities or developmental

3   disabilities?

4       A    I don't recall.

5       Q    Back in August of 2008 were you aware of

6   any policies in place in August of 2008 that

7   specifically addressed accommodating people with

8   mental or developmental disabilities?

9       A    I don't remember.

10      Q    Are you familiar with daily briefing

11  trainings?

12      A    Yes.

13      Q    What are those?

14      A    They're usually one- to two-page training

15  bulletins that are put out by our Training

16  Division.

17      Q    And how are Maywood Police Department

18  officers or employees supposed to become familiar

19  with those one- to two-page training bulletins?

20      A    They're usually emailed to everyone.  They

21  are reviewed during briefings, and oftentimes

22  they'll have a sign-off sheet indicating that you

23  reviewed the training bulletin, and that is turned

24  back in to our Training Division.

25      Q    You just referred to some kind of daily

Case 2:09-cv-06734-SJO-RC   Document 58-3   Filed 08/09/10   Page 24 of 55   Page ID
#:1368
SERGEANT FRANK GARCIA   8/6/04   Page 24

Page 41

1     training.  I'm sorry.  I don't remember the exact

2     words you used, but is that like at roll call?  The

3     individual conducting the roll call will go over

4     that daily training bulletin?  Is that a fair

5     characterization of how it works?

6          A    Yes.

7          Q    Do you remember in your six years on the

8     force any daily training bulletins regarding

9     accommodations to people with disabilities?

10         A    I remember reading a training document,

11    but I don't know if it was a training bulletin.   It

12    was a document that was provided to our roll call.

13    I remember reading it to my staff, but like I said,

14    I don't remember if it was an actual training

15    bulletin or if it was something that someone pulled

16    off of a -- the Internet and provided for our roll

17    call.

18         Q    And the training on that training document

19    was something you read to staff at the roll call?

20    You sort of conducted the training?

21         A    Yes.

22         Q    Do you recall approximately when that was?

23         A    No.

24         Q    Since you've been a sergeant?

25         A    Yes.

1   this disability?

2       A    Just her facial expressions, and when she

3   was walking.  Couldn't tell what it was, but I saw

4   something was wrong.  That's why she was allowed to

5   remain with mother and unhandcuffed.

6       Q    Prior to that incident of the report with

7   the man with the gun running into the house, had

8   you ever been present at that residence when

9   paramedics had been summoned before?

10      A    I don't recall.

11      Q    So apart from the man running into the

12  house with the gun and the vehicle in the driveway

13  with bullet holes, do you have any other

14  recollection of responding to calls for 3589 East

15  54th Street or dealing with the residents of 3589

16  East 54th Street prior to August 26, 2008?

17      A    I don't have any personal recollection of

18  responding out there, but I know that other

19  officers have responded.

20          MR. STRUGAR:  Let's take five minutes, and

21  then we'll get into the actual date.

22          (Brief recess.)

23      Q    BY MR. STRUGAR:  Sergeant Garcia, let's

24  turn our attention to the August 26, 2008 date.

25          Now, it's fair to say you were present for

1    a period of time at 3589 East 54th Street on August

2    26, 2008 while David Ishibashi and members of his

3    task force were carrying out a search warrant?

4         A    Yes.

5         Q    My understanding is that Mr. Ishibashi and

6    members of his task force carried out a previous

7    search and an arrest of one of the residents within

8    a week prior.

9              Am I right that you were not present for a

10   previous search by Mr. Ishibashi and his task force

11   prior to August 26, 2008?

12        A    You are correct.  I was not there.

13        Q    How did you come to be at the residence on

14   August 26, 2008?

15        A    I was made aware that there was a search

16   warrant that had been executed, and I responded to

17   the scene.

18        Q    Was your presence requested?

19        A    No, I don't believe so.

20        Q    How were you made aware that a search

21   warrant had been executed?

22        A    It was either by listening to the radio or

23   speaking to the dispatcher.  I don't remember.

24        Q    So why did you go to the residence?  I

25   understand you were made aware that a search

1    Dispatch in responding to a call?

2        A    Yes.

3        Q    What are those circumstances?

4        A    Exigent circumstances where you have to

5    get out of the car and you don't have time to do

6    it.

7        Q    Any other circumstances?

8        A    When you do it on the MDC because you

9    don't want to put it out over the air.

10       Q    What is the MDC?

11       A    The in-vehicle computer, Mobile Data

12   Computer.

13       Q    Am I correct that on -- in responding to

14   the call on August 26, 2008, was not exigent

15   circumstances?

16       A    You're correct.

17       Q    And was there any reason to use the MDC

18   instead of putting it out over the air?

19       A    No.

20       Q    Were you on duty at the time when you got

21   the call or when you responded to the call?

22       A    Yes.

23       Q    And were you in uniform?

24       A    Yes.

25       Q    Can you describe the uniform you were

1    utilizing on August 26, 2008?

2        A    Dark blue police uniform with Maywood

3    Cudahy patches on either shoulder, a badge over my

4    left breast, name tag over my right breast, Sam

5    Browne, dark trousers and dark boots.

6        Q    Were you in a marked vehicle that day?

7        A    Yes.

8        Q    When you first arrived at the residence,

9    what did you first see?

10       A    Maritza either sitting on the porch steps

11   or a chair in front of the residence and a male

12   U.S. marshal standing next to her.

13       Q    This is in front of the house in the gated

14   front yard area?

15       A    Yes.

16       Q    Did you see any other law enforcement

17   officers other than the U.S. marshal sitting next

18   to Maritza?

19            I'm sorry.  When you first arrived, did

20   you see any other law enforcement officers?

21       A    I don't think so.  I think Dave Ishibashi

22   walked out shortly after I arrived.

23       Q    Your understanding was that Dave Ishibashi

24   was the one serving the warrant that day?

25       A    Yes.  I don't know if I learned it from

# EXHIBIT F

1  officer by the name of Jeff Griffin?

2       A    No, sir.

3       Q    How about Hranda Vakemian, H-r-a-n-d-a

4  V-a-k-e-m-i-a-n?

5       A    No, sir.

6       Q    Wayne Montgomery?

7       A    No, sir.

8       Q    Earl Taylor?

9       A    No, sir.

10       Q    Tim Ohno, O-h-n-o?

11       A    No, sir.

12       Q    Phil Bergerson, B-e-r-g-e-r-s-o-n?

13       A    No, sir.

14       Q    Salvador Reyes?

15       A    No, sir.

16       Q    Anthony Serrata is a police officer; correct?

17       A    Yes, sir.

18       Q    Frank Garcia is a deputy officer?

19       A    Yes, sir.

20       Q    Does the Maywood Police Department have an ADA

21  coordinator?

22       A    No, sir.

23       Q    Do you know if the city of Maywood has an ADA

24  coordinator?

25       A    No, sir.

1        Q     I poorly worded my question.

2              Does the city of Maywood have an ADA

3     coordinator?

4        A     No, sir.

5        Q     In the event that a Maywood police officer

6     would request an accommodation for a disability, who

7     would process or take that request?

8        A     It all would be dependent on the type of

9     disabilities you are dealing with and what you are

10    trying to accommodate.

11       Q     Okay.

12             So fair to say there is not a single point

13    person within the police department who is

14    responsible for handling accommodation requests from

15    police officers?

16       A     No.

17       Q     We spoke a little bit about the attorney

18    general investigation focusing on the Maywood Police

19    Department.

20             Do you have an understanding of when that

21    investigation began?

22             MR. PIERCE:   I object.   It's outside the

23    scope.

24             You can answer.

25             THE WITNESS:   I don't know the specifics.

1    BY MR. STRUGAR:

2        Q    Do you know when the findings were issued?

3            MR. PIERCE:  Same objection.

4            THE WITNESS:  Only when the report came out.

5    BY MR. STRUGAR:

6        Q    I'm sort of recently new to the Los Angeles

7    area.

8            When did the report come out?

9        A    I don't recall the date or a specific

10   time.  I just know that it came out sometime last

11   year.

12       Q    So fair to say it was after you at least

13   began your contract position with the Maywood Police

14   Department?

15       A    Yeah.  I was a full-time employee.

16       Q    It was after you were hired full time that

17   the report came out?

18       A    Yes.

19           MR. PIERCE:  Slow down a little bit and

20   let him finish.

21           MR. STRUGAR:  I know sometimes I drag on my

22   questions a little bit.  I apologize for that.

23   BY MR. STRUGAR:

24       Q    Did the Maywood Police Department revise

25   any policies and procedures in response to that

1    report?

2              MR. PIERCE:  Same objection.  Overbroad.

3              You can answer.

4              THE WITNESS:  Yes.

5    BY MR. STRUGAR:

6         Q    Fair to say the policies and procedures

7    overhaul that we spoke of earlier started before the

8    issuance of the report; is that fair to say?

9         A    Yes, sir.

10             MR. PIERCE:  Any questions regarding the A.G.

11   report and any modifications it might have had and any

12   response to that, just a standing objection that it is

13   outside the scope of the deposition notice.

14             MR. LEE:  I'm sorry to interrupt.  Could

15   we take a short break.

16             MR. STRUGAR:  Certainly.

17             (Pause in the proceedings)

18             MR. STRUGAR:  Back on.

19   BY MR. STRUGAR:

20        Q    Mr. Rubio, I want to talk a little bit

21   more about the Lexipol service.  I think I have a

22   general understanding.

23             Is it a fair characterization that after

24   the Maywood Police Department subscribes to the

25   Lexipol service, they provide model policies, like a

1          To your knowledge what other policies does

2    the Maywood Police Department have that specifically

3    address issues with people with disabilities?

4        A    There is none.

5          MR. PIERCE:  You mean other than what's

6    been identified in the discovery responses that you

7    can think of?

8          THE WITNESS:  Yes, sir.

9    BY MR. STRUGAR:

10       Q    Fair to say that there's no -- that's

11   already a poor phrasing of a question.

12         Is there any M.P.D. policy specifically

13   addressing accommodations for people with mental

14   disabilities?

15       A    It touches in the section of handling

16   people that fall under the categories of a 5150,

17   W & I 5150.  It talks about somebody who has the

18   inability to care for themselves or are a danger or

19   threat to others.  It talks about how to handle them

20   appropriately.

21       Q    I think I know what 5150 is.

22         If you can just explain it for me.

23       A    Welfare and Institutions Code for people

24   who are unable to care for themselves, for people

25   who are suicidal or have any or kind of mental

1  disability that they can't function and take care of

2  themself basically.

3      Q    So other than this policy that addresses the

4  procedures for 5150, are there any other M.P.D. policies

5  that deal with people with mental disabilities?

6      A    No, sir.

7      Q    This is policy 418 of the Maywood --

8           Help me out here.  Cudahy?

9      A    Yeah, Maywood Cudahy Police Department.

10     Q    -- Maywood Cudahy Police Department mental

11  illness commitments, stamped Martinez -05

12  through -07.

13          (Deposition Exhibit 2 was marked for

14      identification by the Certified Shorthand

15      Reporter and is attached hereto.)

16  BY MR. STRUGAR:

17     Q    Mr. Rubio, is this the Maywood Cudahy policy

18  that we were speaking of concerning commitments under

19  Welfare and Institutions Code 5150?

20     A    Yes, sir.

21     Q    Do you know when this policy went into

22  effect, this version of this policy?

23     A    Yes, sir.

24     Q    When was that?

25     A    8/28 of 2009.

1       A    It was sometime in 2008.  I just don't

2   remember a specific date.

3       Q    Do you remember if it was early 2008 or

4   late 2008?

5       A    To be honest with you, I don't know.

6       Q    When the policies and procedures manual is

7   updated, like it appears it was on August 28, 2009,

8   does the Maywood Police Department keep records of

9   the previous iteration of the policies and

10  procedures manual?

11      A    Yes, we do.

12      Q    And do you keep those as the custodian of

13  records?

14      A    They are on the Internet within the

15  department.

16      Q    If someone were to request a version of a

17  policy in effect on a certain day, say, May 5, 2007,

18  would someone in the Maywood Police Department be

19  able to access the version of the policies that were

20  in place on that day?

21      A    Yes.

22      Q    Fair to say that this policy 418 that we're

23  looking at deals specifically with procedures to be

24  followed when committing someone to a mental health

25  unit pursuant to a 5150?

1           MR. PIERCE:  Objection.  The document

2    speaks for itself.

3           You can answer.

4           THE WITNESS:  Yes.

5    BY MR. STRUGAR:

6       Q    Fair to say policy 418 doesn't address law

7    enforcement interactions with people with mental

8    health conditions that don't involve sort of

9    commitment under 5150; is that fair to say?

10          MR. PIERCE:  Same objection.

11          Go ahead and answer.

12          THE WITNESS:  I didn't hear the first part

13   of the question.  I'm sorry.  I apologize.

14          MR. STRUGAR:  Sure.

15   BY MR. STRUGAR:

16      Q    Does policy 418 address officer

17   interactions with people with mental health

18   conditions outside of the situation of committing

19   someone under 5150?

20      A    Yes, it does.

21      Q    Okay.

22          And how does it do that?

23      A    418.6, training, says,

24          "As a part of advanced officer

25          training programs, this agency will

1             endeavor to include POST-approved

2             training on interaction with mentally

3             disabled persons as provided by Penal

4             Code Section 13515.25."

5        Q     Do you know if the training evidenced in

6    418.6 has happened?

7        A     No, sir.

8        Q     You don't know or it has not?

9        A     It has not happened.

10       Q     Is that training scheduled?

11       A     No, sir, not in the immediate future.

12       Q     Were any changes made to the policies and

13   procedures manual, like it appears it was on August 28,

14   2009?

15             For instance, how are police department

16   officers -- police officers made aware of those changes?

17       A     Generally an e-mail would come out and police

18   officers have access to the department Internet; and the

19   original will be placed on the department Internet for

20   their review.

21       Q     Are police officers required to read and

22   review the entire policies and procedures manual or

23   are they cued into where the changes are made?

24       A     That's why we have daily training

25   bulletins.  Those are reflected on recent changes

1    disabilities, approximately when Maywood received

2    those alerts?

3        A    No, I don't, because it will come through

4    the e-mail.

5        Q    Are those alerts kept in the normal course?

6        A    It depends on who keeps them in the

7    e-mail.  Generally what we will do is disseminate it

8    to the sergeants and then an e-mail will say to brief

9    the officers.

10       Q    As a custodian of records, do you keep any

11   records of those alerts?

12       A    No, I don't.

13       Q    Why not?

14       A    Because those are publications that are either

15   not required by POST standards or something of that

16   nature.  We don't know if they are validated or

17   what-have-you.  We just pass it on as a form of knowledge

18   to people.

19       Q    Does the Maywood Police Department have written

20   policies regarding arrest of individuals who use

21   wheelchairs or paraplegics?

22       A    No, not that I'm aware of.

23       Q    Apart from what we've gone over regarding

24   Exhibit 2, which is policy 418, mental illness

25   commitments, apart from that document, does the M.P.D.

 1    have any written policies regarding providing

 2    accommodations for people with mental health

 3    disabilities?

 4        A    No, sir.

 5        Q    Are you familiar with what are called smart

 6    teams that the LAPD sometimes deploys to deal with

 7    people who appear to be exhibiting mental health

 8    problems?

 9        A    No, sir.

10        Q    Does the M.P.D. have any way to dispatch sort

11    of a specialized mental health team if they have an

12    encounter with a person who appears dangerous and appears

13    to have a mental health disability?

14        A    I believe in that one policy there is a hotline

15    that they utilize called the P.E.T. team, Psychological

16    Evaluation Team, and it has Los Angeles County Mental

17    Health.  They would probably call them and ask for

18    assistance through them.

19        Q    Are you aware of what assistance that

20    P.E.T., the Psychological Evaluation Team, can

21    provide?

22        A    They would go and evaluate a person for

23    5150, but they would most likely call the department

24    of mental health to see if there's any other groups

25    or any other types of teams that are out there that

1    can help accommodate if it's somebody other than a

2    mental health 5150.

3         Q    Is that process of calling mental health,

4    is that formalizing a policy or just officer common

5    sense or something else?

6         A    Officer common sense.

7         Q    And does the Maywood Police Department

8    have any written policies specifically regarding

9    accommodating people with developmental disabilities?

10        A    No.

11        Q    Do you have any knowledge of the Maywood

12   Police Department ever providing an accommodation for

13   anyone with a developmental disability?

14        A    No.

15             MR. STRUGAR:   Take five minutes.

16             (Pause in the proceedings)

17             MR. PIERCE:   Back on.

18   BY MR. STRUGAR:

19        Q    Go ahead.

20        A    I'd like to clarify.

21             A couple of questions prior to going on break,

22   you had asked about dealing with people with

23   wheelchairs.   In our handcuff policy -- I don't have the

24   handcuff policy with me -- but in our handcuff policy, it

25   does talk about dealing with disabled persons and how the

1     A     Captain Aguirre received it probably three

2  weeks ago, two or three weeks ago, and he shared it

3  with me.

4     Q     The syllabus that you described and the

5  upcoming training, are you aware of any evaluation the

6  M.P.D. has done on its own compliance with the ADA?

7     A     No.

8     Q     Are you aware of any evaluation done by the

9  city regarding M.P.D.'s compliance with the ADA?

10    A     No, sir.

11    Q     Are you aware of any self evaluation conducted

12  by the city on the city's own compliance with the ADA?

13    A     No, sir.

14    Q     I have to ask each iteration.

15          As part of your job as professional

16  services manager --

17    A     Standards manager.

18    Q     I'm sorry.

19          -- professional standards manager, you

20  have some role in investigating complaints from the

21  public; is that correct?

22    A     Yes, sir.

23    Q     How does a member of the public initiate a

24  complaint with the Maywood Police Department?

25    A     We have various ways you can initiate a

1    Q    I'm correct that you don't --

2         You are not the person most knowledgeable

3    regarding the Maywood Police Department's budget

4    expenditure; is that right?

5    A    Yes, sir.

6    Q    No, you are not the person most

7    knowledgeable?

8    A    That's correct.

9    Q    My bad question.

10        MR. PIERCE:  Double negative.

11        MR. STRUGAR:  Let me take a few minutes.

12        (Pause in the proceedings)

13        THE REPORTER:  You want to order a copy and

14   an ASCII; right?

15        MR. PIERCE:  Yeah.

16        THE REPORTER:  Mr. Lee, do you want to

17   order a copy or a copy and an ASCII?

18        MR. LEE:  Just a copy will be fine.

19   BY MR. STRUGAR:

20        Q    If we could look at Exhibit Number 1, the

21   deposition notice.  I think it's right in front of

22   you.  I'm looking at Page 3, Number 7.

23        Other than what we've already discussed

24   today, are you aware of any records regarding the

25   provision of reasonable accommodations with people

1   with mental and/or developmental disabilities

2   generated since 2008?

3        A     No, sir.

4              MR. STRUGAR:   That's all the questions I

5   have.

6              MR. PIERCE:   Same stip?

7              MR. STRUGAR:   Same stipulation.

8              MR. PIERCE:   Can I attach my objections?

9              MR. STRUGAR:   You want to introduce them?

10             That's fine.

11             MR. PIERCE:   I didn't do it for the

12  Maywood.

13             Can we still do that?

14             This is for the city of Maywood and this is

15  for the Maywood P.D.

16             THE REPORTER:   It will be Exhibit 5 for

17  both.

18             (Deposition Exhibit 5 was marked for

19         identification by the Certified Shorthand

20         Reporter and is attached hereto.)

21             (Whereupon the stipulation from the

22         deposition of Patricia Bravo-Valdez is included

23         as follows:

24             ("MR. STRUGAR:   Okay.

25                  I propose that the original

# EXHIBIT G

1   so forth and so on.

2       Q    Is the city council planning on providing for

3   another police force apart from the Los Angeles Sheriff's

4   Department?

5       A    No.

6       Q    Are there any plans for a sort of a regional

7   police department with other local cities?

8       A    That was the discussion that we had previously

9   with another city -- other cities in the area.  But it

10  didn't pan out.

11      Q    Do you know why it didn't pan out?

12      A    It didn't pan out because we were -- we didn't

13  have enough time to do it.  It just takes a long time to

14  do that.  And we weren't able to do that in the time that

15  our insurance was being cancelled, and we were not going

16  to have any more coverage.  We weren't able to do it.  We

17  weren't able to form that entity.  But we had been in

18  conversation with other cities in the south basin,

19  including the City of Bell.

20      Q    As part of the contract with the L.A. Sheriff's

21  Department, was there any provision that the L.A.

22  Sheriff's Department would hire the Maywood police

23  officers or anything like that?

24      A    No.

25      Q    The Maywood police officers, as far as you

                                                        55

# EXHIBIT H

Subject: Martinez v. Maywood
From: "Jonyson A. Pierce" <jpierce@bmkalaw.com>
Date: Wed, 21 Jul 2010 16:55:52 -0700
To: Matthew Strugar <Matthew.Strugar@lls.edu>
CC: Daniel Lee <dlee@lbaclaw.com>

This correspondence is written pursuant to Local Rule 7-3 in a good faith effort to informally resolve issues relating to the Maywood Defendants' contemplated motion for summary judgment and/or summary adjudication of issues.

Defendants' position is that there was no constitutional rights violation committed against Plaintiffs and, accordingly, Defendants are entitled to summary judgment against Plaintiffs' Fourteenth Amendment claim. *See, County of Sacramento v. Lewis*, 523 U.S. 883, 118 S.Ct. 1708, 1720 (1998); *Moreland v. Las Vegas Metro. Police Dep't.*, 159 F.3d, 365, 371 n. 4 (9th Cir. 1998), ("[I]t may be possible for an officer's conduct to be objectively unreasonable yet still not infringe the more demanding standard that governs substantive due process claims."); *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 690 (1978).

Moreover, the individual Defendants are entitled to qualified immunity because their conduct did not violate Plaintiffs' constitutional rights, the law was not clearly established that they should have acted differently, and a reasonable officer could have believed that his conduct did not violate Plaintiffs' constitutional rights. *See, Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151 (2001).

Next, regarding Plaintiffs' claims under the Americans with Disabilities Act (42 U.S.C. §§ 12131, et seq.), Section 504 of the Rehabilitation Act of 1974 (29 U.S.C. § 794), and related state law claims (Civil Code § 54 and Government Code § 11135), Defendants are entitled to summary judgment here because, among other reasons, there is no showing that Plaintiff Maritza Martinez was denied any services, programs, or activities by the County of Los Angeles, much less denied any of these **because of** any disability. *Weinreich v. Los Angeles County Metropolitan Transp. Authority*, 114 F.3d 976, 978 (9th Cir. 1997); *Duvall v. County of Kitsap*, 260 F.3d 1124, 1138 (9th Cir. 2001). Further, punitive damages are not available for recovery under Title II of the ADA. *See, Barnes v. Gorman*, 536 U.S. 181, 189-90 (2002).

Further, regarding Plaintiffs' state law claims, i.e., negligence, negligent infliction of emotional distress, intentional infliction of emotional distress, Civil Code § 51, etc., Defendants are immune from liability under Government Code §§ 820.2 (discretionary immunity of law enforcement) and 815.2 (immunity for public entity for discretionary acts of its employees). *See, e.g., Price v. County of San Diego*, 990 F.Supp. 1230, 1244 (S.D.Cal. 1998). Furthermore, Plaintiffs' state law claims are further barred for failure to comply with the requirements of the Tort Claims Act. *See,* California Government Code § 945.6.

Even assuming that Plaintiffs are not barred from bringing their state law claims, Plaintiffs' state law claims still fail in their entirety. For example, regarding Plaintiff's negligence and negligent infliction of emotional distress claims, such claims are not cognizable under California law. *See, Munoz v. City of Union City*, 120 Cal.App.4th 1077, 1112-13 (holding that, absent specific statutory authorization, a city could not be held liable on a claim that it was "negligen[t] in the selection, training, retention, supervision, and discipline of police officers as well as the failure to enact procedures and policies guiding law enforcement officers 'in the handling of critical incidents' "); *Ess v. Eskaton Properties, Inc.*, 97 Cal. App. 4th 120, 126 (2002). Plaintiffs' Civil Code § 51 claim is also not cognizable. See, Cal. Civ. Code § 51(b); *Marina Point, Ltd. v. Wolfson*, 30 Cal.3d 721, 731 (1982).

Please contact me at your earliest convenience to further discuss these issues in hopes of avoiding a

Martinez v. Maywood

motion for summary judgment and/or adjudication.  Thank you for your attention to this matter.

8/5/2010 6:06 PM

# EXHIBIT I

JACK HORVATH   —   5/04/2010

1        A.    Yes, I am.

2        Q.    Okay.   Captain, what is your highest level

3   of education?

4        A.    I have a master's of science in criminal

5   justice.

6        Q.    When did you receive that?

7        A.    In 1991.

8        Q.    Where did you receive that?

9        A.    From California State University at Long

10   Beach.

11        Q.    Have you ever served in the military?

12        A.    No.

13        Q.    Am I correct you are currently a captain

14   for the District Attorney's office Bureau of

15   Investigation?

16        A.    Yes.

17        Q.    To the extent you can, can you describe

18   that position for me, what your duties are.

19        A.    As a captain within the Bureau of

20   Investigation, I am in charge of a division which

21   includes, depending on which division, multiple

22   investigators and investigative functions.

23             I also serve, if you will, the business

24   portion of a division and make sure that not only

25   the investigative responsibilities are met but also

JACK HORVATH   —   5/04/2010

1    the business practices are done in accordance with

2    the County's expectations.

3        Q.    Could you explain a little more about what

4    you mean by, "the business practices are done in

5    accordance with the County's expectations"?

6        A.    Certainly.    I would be in charge of

7    budgetary issues.    I would deal with personnel

8    matters within the division.

9            I would set goals, write justifications

10   for the creation of new units, do statistical

11   analysis on work product of any people assigned to

12   me.  And, depending on the complexity of cases,

13   sometimes I would be called upon to interface with

14   the investigators directly or sometimes in concert

15   with the attorneys assigned to the case.

16       Q.    How long have you been a captain within

17   the Bureau of Investigation?

18       A.    12 years.

19       Q.    Prior to that were you with the Bureau of

20   Investigation or were you somewhere else?

21       A.    I have been with the Bureau of

22   Investigations since 1981.

23       Q.    What was your title immediately prior to

24   becoming captain?

25       A.    Lieutenant.

JACK HORVATH   -   5/04/2010

1           MR. STUGAR:  Yes.  If --

2           MR. CLARK:  Of counsel, sure.

3    BY MR. STUGAR:

4       Q.   Please.

5       A.   Are you trying to figure out where we fit

6    in the law enforcement puzzle?

7       Q.   That is exactly what I am trying to figure

8    out.

9       A.   The concept of DA investigators are --

10   follows the idea that the District Attorney, as the

11   chief law enforcement officer in the county, has

12   jurisdiction countywide over all criminal

13   investigations, and at times the District Attorney

14   and his office needs to have the ability to

15   investigate matters on their own volition, and that

16   is basically why DA investigators exist.

17           So we have jurisdiction countywide.  We do

18   the bidding of the District Attorney as the District

19   Attorney sees fit.  We have both original

20   jurisdiction cases on a whole variety of matters,

21   and we also complement other law enforcement

22   agencies by assisting them in matters that they

23   either don't have the expertise or the time to

24   pursue.

25       Q.   And to the extent you know, what areas

JACK HORVATH  -  5/04/2010

Page 41

1      Q.    Okay.  Mr. Ishibashi, though, is an

2    employee of the Bureau of Investigation; correct?

3      A.    Yes, he is.

4      Q.    Does the District Attorney's office Bureau

5    of Investigation have an ADA coordinator?

6      A.    Yes.

7      Q.    Who is that?

8      A.    It is my understanding it is Denise

9    Williams.

10      Q.    Do you know what her job title is?

11      A.    No.

12          MR. CLARK:  You mean other than ADA

13    coordinator?

14          MR. STUGAR:  Well, I didn't know if that

15    was her only job title or if she had something else.

16          THE WITNESS:  I don't recall what it is,

17    but she does have another designation.

18    BY MR. STUGAR:

19      Q.    Okay.  Thank you.

20          Do you have a sense of what Ms. Williams'

21    duties are in her role as ADA coordinator for the

22    Bureau of Investigation?

23      A.    She is the officewide ADA coordinator.

24      Q.    You say, "officewide," the District

25    Attorney's office also?

JACK HORVATH  –  5/04/2010

1    Bureau has received in the last two years from

2    individuals with disabilities complaining about

3    disability discrimination?

4         A.    There were none.

5         Q.    How about in the last five years?

6         A.    There were none that I'm aware.

7         Q.    I believe that in response to the

8    plaintiff's interrogatories that you verified, it

9    was stated that the County does not have a separate

10   budget line for the Bureau of Investigation; is that

11   true?

12        A.    That's true.

13        Q.    Does the County budget separately for the

14   DA's office?

15        A.    Yes.

16        Q.    Do you know what the DA's annual budget is

17   this year?

18        A.    No.

19        Q.    Within the -- within the DA's office, does

20   the DA's office budget separately for the Bureau of

21   Investigation?

22        A.    Not that I'm aware of.

23        Q.    Are you aware if the DA's office has any

24   kind of yearly budget for accommodations for people

25   with disabilities?