# EXHIBIT C

| | | | |
|---|---|---|---|
| 1 | | A | Cal State L.A. |
| 2 | | Q | And what was that in? |
| 3 | | A | Business administration. |
| 4 | | Q | And when did you achieve that? |
| 5 | | A | 1986. |
| 6 | | Q | And what year did you graduate high school? |
| 7 | | A | 1979. |
| 8 | | Q | And when did you join the Bureau of |
| 9 | | | Investigation? |
| 10 | | A | 1999. |
| 11 | 10:32:00 | Q | Okay. |
| 12 | | | And you are still employed there; correct? |
| 13 | | A | Yes. |
| 14 | | Q | Before joining the Bureau of Investigation, |
| 15 | | | immediately prior to that, were you with Inglewood |
| 16 | | | P.D.? |
| 17 | | A | Yes. |
| 18 | | Q | What years were you with Inglewood P.D.? |
| 19 | | A | 1990 to 1999. |
| 20 | | Q | And from 1986 to 1990, what did you do? |
| 21 | | A | I had a small business. |
| 22 | | Q | What business was your small business in? |
| 23 | 10:32:30 | A | It was a medical transcribing service. |
| 24 | | Q | Not related to law enforcement in any way, |
| 25 | | | I assume. |

DAVID ISHIBASHI - 6/16/2010

```
1                   A    No.

2                   Q    Fair -- I'm sorry.  That was a poor

3          question.  But I will withdraw it.

4                        You're currently a senior investigator with

5   10:33:00   the Bureau of Investigation?

6                   A    Yes.

7                   Q    For what period of time have you been a

8   10:33:30   senior investigator?

9                   A    Approximately 2000 until now.

10                  Q    And from 1999 to 2000, what was your title?

11                  A    Investigator.

12                  Q    What was the highest rank you achieved at

13         Inglewood P.D.?

14                  A    Field training officer.

15                  Q    And why did you leave Inglewood P.D. for

16  10:34:00   the Bureau of Investigation?

17                  A    More pay and opportunity to work more

18         investigations.

19                  Q    Can you sort of describe your position and

20         your duties as a senior investigator at the Bureau of

21  10:34:30   Investigation?

22                  A    Currently I am assigned to the United

23         States Marshals Fugitive Task Force.

24                  Q    What does that work entail?

25                  A    Some of my duties are to apprehend violent
```

DAVID ISHIBASHI - 6/16/2010

1    felons and also other felonies that include firearms

2    10:35:00    and narcotics.

3    Q    What period of time have you been assigned

4    to the U.S. Marshals Fugitive Task Force?

5    A    2006 until now.

6    Q    Prior to 2006, did you have different

7    duties or were you assigned to a different task

8    force?

9    A    I was assigned to the Los Angeles Joint

10   Terrorism Task Force.  So that would be from, like,

11   2004 to 2006 maybe.  I was assigned to investigate

12   10:35:30    terrorist-related investigations.

13   Q    And did you choose to leave the J.T.T.F.

14   for the fugitive task force or were you assigned by

15   10:36:00    someone else; what happened?

16   A    It was given to me as an option.

17   Q    And why did you take that?

18   A    It was a different kind of police work.

19   Q    Working with the U.S. Marshals Fugitive

20   Task Force, where do you work out of; where are you

21   based?

22   A    312 North Spring Street, L.A., 90012.

23   10:36:30    Q    Is that the B of I's office or is that

24   something else?

25   A    No, it's across from the Roybal building.

DAVID ISHIBASHI - 6/16/2010

```
1                    Q     R-o-y-b-a-l?

2                    A     R-o-y-b-a-l.

3                          It's just a U.S. Marshals office.  It's

4    10:37:00    the base of the task force.

5                    Q     And the task force officers themselves,

6    their employer is the U.S. Government; right?

7                    A     Yes.  There are task force officers from

8    different agencies.

9                    Q     Okay.

10   10:37:30            To your knowledge what different agencies

11   are the task force officers from that are part of

12   the fugitive task force that you are assigned to?

13                   A     The U.S. Marshals, LAPD, L.A. County

14   Sheriff's, DEA, U.S. Immigration, California State

15   10:38:00    Parole, California Department of Corrections and

16   Rehabilitation, Pasadena P.D., Glendale P.D.,

17   Burbank P.D., and Inglewood P.D.

18   10:38:30            Q     The task force officers that are on your

19   team -- is it fair to say that you have sort of a

20   team on the task force, or do you work with the

21   entire task force?

22                   A     It's pretty fluid.

23                   Q     But those task force officers can come from

24   10:39:00    any of the law enforcement agencies that you just

25   named?
```

```
 1              A    That's correct.

 2              Q    Are you considered a task force officer?

 3              A    Yes.

 4              Q    Approximately how many task force officers

 5    are on the U.S. Marshals Fugitive Task Force?

 6              A    I would say -- in Los Angeles or in the

 7    10:39:30   state?

 8              Q    I'm sorry.

 9                   Yes, in Los Angeles.

10              A    I would say maybe -- I would say between

11    30 and 50.

12              Q    Okay.

13                   Would you say it's pretty fluid as to who

14    you work with on a given assignment, meaning any of

15    those 30 to 50 officers may sort of assist on any

16    given task; is that fair?

17    10:40:00   A    That's correct.

18              Q    Do you have a regular shift?

19              A    No.

20              Q    Okay.

21                   MR. LEE:  Objection.  Vague and ambiguous.

22    BY MR. STRUGAR:

23              Q    What kind of hours do you work in a week?

24              A    I believe it's called a four-ten, but I

25    would consider it a flex four-ten because of the
```

| | | | |
|---|---|---|---|
| 1 | 10:48:30 | Q | Thank you. |
| 2 | | | It sounds like the great majority of your |
| 3 | | work is in the field; is that fair to say? |
| 4 | | A | A lot of it is in the field, yes. |
| 5 | | Q | And it sounds like the request for |
| 6 | | assistance comes sometimes from local police |
| 7 | | departments to your office; is that right? |
| 8 | | A | That's correct. |
| 9 | | Q | So even though you are employed by the |
| 10 | 10:49:00 | District Attorney's Office Bureau of Investigation -- |
| 11 | | whose function I understand is to help the District |
| 12 | | Attorney's Office gather evidence for district |
| 13 | | attorneys; right? |
| 14 | | A | Some assignments are trial supports, yes; |
| 15 | | some aren't. |
| 16 | | Q | It sounds like your work with the task |
| 17 | | force isn't strictly trial support; is that right? |
| 18 | | A | That's correct. |
| 19 | | Q | Under what circumstances generally do local |
| 20 | 10:49:30 | police departments reach out to the fugitive task |
| 21 | | force for assistance in apprehending a fugitive? |
| 22 | | A | Most of the local police departments, |
| 23 | | including LAPD and sheriffs, they don't have the |
| 24 | | resources because the volume of their cases is so |
| 25 | | great that when, say, if a person who is suspected of |

DAVID ISHIBASHI - 6/16/2010

```
 1              BY MR. STRUGAR:
 2                   Q    "I.O." means investigating officer?
 3                   A    That's correct.
 4                   Q    So how does it work; if you are the I.O. on
 5         a particular -- on an execution of a particular
 6         search warrant or a particular investigation, does
 7         that mean that you are supervising the officers at
 8         that incident?
 9                   A    To a certain extent, yes.
10   10:45:30        Q    Can you describe the extent?
11                   A    Like I would give the briefing, background
12         on the case and what the objective of the case was,
13         of a search warrant.  I would pretty much supervise
14         and be in charge of collecting evidence, seizing
15   10:46:00   evidence.
16                   Q    To the extent that someone's responsible
17         for giving out directives during the execution of a
18         search warrant on which you are the investigating
19         officer, is that the investigating officer that sort
20         of calls the shots?
21                   A    Pretty much, yes.
22                   Q    I think I'm getting a general sense of
23   10:46:30   it.  I am pretty unfamiliar with the B of I.  I am
24         familiar with other police departments generally.
25                   Can you describe what a typical week is,
```

DAVID ISHIBASHI - 6/16/2010

Page 19

1       depends.

2               Q     Who is your direct supervisor?

3               A     My direct supervisor with the task force

4       is Anthony Burke.

5               Q     And do you have a supervisor at B of I?

6               A     Yes, Richard Aloise, A-l-o-i-s-e.

7               Q     How does it work with Mr. Aloise if you

8       10:42:30   are with -- if you are assigned and based out of the

9       U.S. Marshals task force; how does that supervisor

10      relationship work?

11              A     It is basically for approving reports,

12      approving overtime.  Anything that has to do with

13      the administration for the Bureau of Investigation

14      10:43:00   goes through Rich.  Anything task-force related,

15      that goes through Anthony Burke.

16              Q     Who does Anthony Burke work for?

17              A     He is the U.S. Marshals supervising

18      inspector for the U.S. Marshals.

19              Q     Are those supervisors, Mr. Burke and

20      10:43:30   Mr. Aloise, were they your supervisors in August of

21      2008?

22              A     Tony Burke was.  Richard Aloise was not.

23              Q     Who was your supervisor at B of A in August

24      of 2008?

25              A     Brian Bennett.

DAVID ISHIBASHI - 6/16/2010

1          A      That's correct.

2          Q      Do you ask for assistance from the local

3    police department in the general course, or is it an

4    exception, or how often does it happen?

5          A      It happens 99 percent of the time.

6          Q      Is it fair to say that the Bureau of

7  10:57:30   Investigation has a policy and procedures manual

8    that governs the conduct of employees of the B.O.I.?

9          A      Yes.

10         Q      Yes, that's correct?

11         A      Yes.

12         Q      And when you are -- withdrawn.

13                And does the fugitive task force similarly

14   have a policies and procedures manual?

15         A      Yes, that's correct.

16         Q      And in your duties with the U.S. Marshals

17 10:58:00   Fugitives Task Force, are you expected to follow the

18   U.S. Marshals Task Force manual or the B.O.I. manual

19   or both; how does the interplay work with those

20   policies and procedures?

21         A      I believe there's a Memorandum of

22   Understanding.   I go by our Bureau of Investigation

23 10:58:30   policy and procedures.

24         Q      Is it your understanding that the

25   Memorandum of Understanding states that you will

DAVID TAKAHASHI - 6/16/2010

|     |            |   |                                                          |
|-----|------------|---|----------------------------------------------------------|
| 1   |            |   | follow the B.O.I. manual?                                |
| 2   |            | A | Yes, that's correct.  I believe so.                      |
| 3   |            | Q | When did you attend the police academy?                  |
| 4   | 10:59:00   | A | 1990.                                                    |
| 5   |            | Q | What police academy did you attend?                      |
| 6   |            | A | Rio Honda.                                               |
| 7   |            | Q | And that was in connection with your hiring              |
| 8   |            |   | with the Inglewood Police Department, I take it.         |
| 9   |            | A | That's correct.                                          |
| 10  |            | Q | And how long were you in the police                      |
| 11  | 10:59:30   |   | academy?                                                 |
| 12  |            | A | I believe September 1990 to February 1991.               |
| 13  |            | Q | I understand it was 20 years ago now.                    |
| 14  |            |   | Are you familiar with the term learning                  |
| 15  |            |   | disability -- I'm sorry -- "learning domain" as it       |
| 16  |            |   | relates to the police academy?                           |
| 17  | 11:00:00   | A | Yes.                                                     |
| 18  |            | Q | Is it fair to say that a learning domain is              |
| 19  |            |   | basically a subject area of study and training at the    |
| 20  |            |   | police academy?                                          |
| 21  |            | A | That's correct.                                          |
| 22  |            | Q | I understand you went to the police academy              |
| 23  |            |   | before the passage of Americans with Disabilities        |
| 24  |            |   | Act.                                                     |
| 25  |            |   | But do you recall any academy training with              |

DAVID ISHIBASHI - 6/16/2010

Page 30

1        regard to people with disabilities?

2                A    I can't recall.

3                Q    When you joined the Bureau of

4  11:00:30  Investigation in -- was it 2000?

5                A    1999.

6                Q    When you joined the Bureau of

7        Investigation in 1999, were you required to

8  11:01:00  familiarize yourself with the B.O.I.'s policies and

9        procedures?

10               A    Yes.

11               Q    And how did you do that?

12               A    Through the policy.

13               Q    You just read straight through the policy

14       manual; is that fair?

15               A    That's correct.

16               Q    At that time, in 1999, was there policies

17       or procedures regarding providing accommodations for

18  11:01:30  people with disabilities?

19               A    I don't recall.

20               Q    How about today; does the B.O.I. policies

21       and procedures manual have policies on accommodating

22       people with disabilities, if you know?

23               A    What I recall is in our use-of-force

24       policy, there is mention of taking somebody's mental

25       disabilities into consideration or somebody with

DAVID ISHIBASHI - 6/16/2010

1   11:02:00        disabilities into consideration.

2                          Q    And can you describe how that plays into

3                  the use-of-force policy in the policy manual?

4                          A    Well, I would say that you get in different

5                  situations where you -- where we run into these

6                  situations where people have disabilities, elderly

7                  people or people with injuries or people with

8                  infants.  You just have to take all of that into

9   11:02:30        consideration into whatever operation it is you are

10                 involved in.

11                         Q    Other than the policy regarding use of

12                 force that you've just described to me, do you

13                 understand the current B of I policies and

14                 procedures manual to address people with

15  11:03:00        disabilities in any other way?

16                         A    No.

17                         Q    Am I right that the current B of I

18                 policies and procedures manual is in the state of

19                 revision?

20                         A    Yes.

21                         Q    And how does that work; are they revising

22                 policies piecemeal or is one entire revision to the

23  11:03:30        policy manual coming out; how is that revision

24                 taking place?

25                         A    They are probably going through by section

DAVID ISHIBASHI - 6/16/2010

1      and updating.  But I am not involved in that process,

2      so...

3             Q     When the B of I publishes or updates a

4      policy, is it a requirement of investigators to

5      familiarize themselves with the new policies?

6   11:04:00      A     Yes.

7             Q     So how is the existence of a new policy or

8      an updated policy communicated to you as an

9      investigator?

10            A     They updated recently our use-of-force

11     policy.  They will e-mail bulletins, updates, and we

12     get quarterly training where we'll get updates.

13            Q     Any other?

14  11:04:30      A     No.

15            Q     When an updated policy is e-mailed out to

16     investigators, what are you supposed to do?

17            A     Let's see.  What was the most recent one?

18     Was it the use-of-force policy?

19                  When you receive it through e-mail, you get

20  11:05:00   follow-up training or we get section briefings.

21     Whatever section you are assigned to, you get briefed

22     up on it.

23            Q     The section briefing that you just

24     described, is that the quarterly training or is that

25     something else?

DAVID ISHIBASHI - 6/16/2010

1           A    That's extra.

2           Q    How often does section training take place?

3           A    Probably weekly.

4    11:05:30    Q    And those section trainings, that's within

5    the Bureau of Investigation; right?  That's not

6    within the fugitive task force?

7           A    No, that's just the Bureau.  Yes, that's

8    correct.

9           Q    And are those trainings during a set time

10   or are they announced to you in some way; how are you

11   made aware of the section training?

12   11:06:00    A    I think it's pretty informal.

13          Q    So are the section trainings -- do they

14   take place in person?

15          A    Yes.

16          Q    Are you just e-mailed out there is going to

17   be a section training at this time?

18          A    Yeah, or a telephone call.

19          Q    And how long do section trainings typically

20   last?

21          A    Anywhere from 15 minutes to 30 minutes to

22   an hour.  It depends.

23          Q    You said that there was recently an update

24   11:06:30    to the use-of-force policy.

25          A    Yes.

DAVID ISHIBASHI - 6/16/2010

Page 50

| | | |
|---|---|---|
| 1 | 11:41:30 | search that would take place on the 22nd? |
| 2 | | A    Telephone call. |
| 3 | | Q    Was that from you? |
| 4 | | A    Yes, that's correct. |
| 5 | | Q    Did you ask for his presence at the |
| 6 | | execution of the search warrant? |
| 7 | | A    Yes, I did. |
| 8 | | Q    Why did you want Mr. Serrata there? |
| 9 | | A    Because of his expertise with the Maywood |
| 10 | | Locos. |
| 11 | | Q    Had you worked with Officer Serrata before? |
| 12 | 11:42:00 | A    Yes. |
| 13 | | Q    Prior to August 20, 2008, how many times |
| 14 | | had you liased or worked with Officer Serrata |
| 15 | | before? |
| 16 | | A    Three or four cases, maybe more. |
| 17 | | Q    And over what period of time were those |
| 18 | | three or four cases, maybe more? |
| 19 | 11:42:30 | A    I would say 2007 was the first, 2007 to |
| 20 | | 2008, a year -- yeah. |
| 21 | | Q    And was Officer Serrata present from the |
| 22 | | beginning of the execution of the search warrant or |
| 23 | | did he arrive after the search had already begun? |
| 24 | 11:43:00 | A    I think he was there from the beginning. |
| 25 | | Q    If you can recall, what time did you arrive |

DAVID ISHIBASHI - 6/16/2010

1          at the residence?

2               A    I would say between 4:00 and 5:00 a.m.

3               Q    And where did you meet up with the other

4          task force officers prior to executing the search

5    11:43:30   warrant?

6               A    I believe we had a briefing probably --

7          with S.E.B. probably maybe a half a mile away from

8          that location.

9               Q    Okay.

10              A    I don't recall.

11              Q    And that was all the task force officers

12         had a briefing with officers from S.E.B.?

13   11:44:00        A    Basically, yes.

14              Q    Was Officer Serrata present for that

15         briefing?

16              A    I don't recall if he was.

17              Q    We just ran over some other task officers

18         from the report.

19                   But were the S.E.B. officers somebody

20         different or were they part of the individuals listed

21         here?

22              A    No, that's a different unit.

23              Q    Okay.

24   11:44:30        I asked were any other law enforcement

25         agents present for the April 22nd search -- I'm

DAVID ISHIBASHI - 6/16/2010

Page 55

1          Q     And what did you do during the time that

2   11:49:00   S.E.B. was securing the house?

3          A     I was outside the perimeter.

4          Q     Just waiting?

5          A     Yes, that's correct.

6          Q     Did you have any contact with any of the

7   family members or the residents during that 15 or

8   20 minutes?

9          A     Maybe stood where they were being

10  detained.  But, no, I can't recall speaking to

11  anybody.

12         Q     During those 15 or 20 minutes, the period

13  11:49:30  of time that the residents were removed from the

14  house and S.E.B. rendered it safe to search, did you

15  notice that one of the residents had a mental

16  disability?

17         A     Yes.

18         Q     How did that evidence itself to you?

19         A     That was part of the intelligence I

20  11:50:00  received prior to the search warrant, that there was

21  a female with a mental disability.

22         Q     And where did that intelligence come from?

23         A     From the informant.

24         Q     And then, when the family came out of the

25  house and was detained out front, was it apparent

DAVID ISHIBASHI - 6/16/2010

Page 56

| | | |
|---|---|---|
| 1 | 11:50:30 | which of the individuals was the one with the mental |
| 2 | | disability? |
| 3 | | A     Yes. |
| 4 | | Q     Fair to say her mental disability is in |
| 5 | | some way obvious from looking at her? |
| 6 | | A     Yes. |
| 7 | | Q     Did she behave in any way that evidenced |
| 8 | | her mental disability during that period of time |
| 9 | | while S.E.B. rendered the house safe to search? |
| 10 | 11:51:00 | A     I don't recall specifics. |
| 11 | | Q     And during that 15- or 20-minute period of |
| 12 | | time, did you have any conversation or did any of the |
| 13 | | family members say anything to you or did you say |
| 14 | | anything to them? |
| 15 | | A     Not that I can recall, no. |
| 16 | | Q     After S.E.B. rendered the house safe to |
| 17 | | search, what happened next? |
| 18 | 11:51:30 | A     We allowed the family to go back inside the |
| 19 | | house in the living room. |
| 20 | | Q     I'm sorry. |
| 21 | | You arrived at the house between 4:00 and |
| 22 | | 5:00, you said? |
| 23 | | A     Yes. |
| 24 | | Q     And S.E.B. took about 15 to 20 minutes, did |
| 25 | | you say -- |

DAVID ISHIBASHI - 6/16/2010

Page 64

1  12:02:30    believe on Page 7 it says, "Approximately 7:00 a.m.

2             we completed our search of 3589 East 54th Street."

3                      Does that time, 7:00 a.m., sound about

4             right to you?

5                  A    That's correct.

6                  Q    During your interview with Ms. Martinez,

7  12:03:00    with Bertha, the mother, did she say anything to you

8             regarding her daughter with the disability?

9                  A    Not that I recall, no.

10                 Q    During the entirety of your interaction

11            with the family that day, did Bertha say anything to

12            you about her daughter with the disability?

13                 A    No.

14                 Q    What about Wendy; during the entirety of

15            your search that day, did Wendy say anything

16  12:03:30   regarding her sister?

17                 A    No.  But I know I asked them if the -- if

18            Bertha's daughter was okay.  That's all I recall.

19                 Q    At what point in the search did you ask if

20            Bertha's daughter was okay?

21                 A    Right away.

22                 Q    Was this still when the family was out on

23            the street?

24                 A    Yes, and when we went back inside the

25            house.

DAVID ISHIBASHI - 6/16/2010

1               Q    So twice you asked her.

2    12:04:00             Did you direct that question at Bertha?

3               A    She couldn't understand English, but I know

4    I asked the daughter, Wendy.

5               Q    And do you recall what Wendy said in

6    response to either of those questions?

7               A    Yes, she's okay.

8               Q    She said that both times?

9               A    Yes.

10             Q    Okay.

11             Other than you asking Wendy those two

12    times if her sister was okay and her implying she

13    12:04:30    was, did you have any conversations with Wendy or

14    did Wendy say anything to you about her sister that

15    day?

16               A    No, I can't recall.

17               Q    How about with Mr. Olvera; did he say

18    anything about Maritza?

19               A    No.

20               Q    Were there any physical altercations with

21    the family that day?

22               A    No.

23               Q    Any verbal altercations with the family

24    that day?

25               A    No.

DAVID ISHIBASHI - 6/16/2010

Page 66

```
 1              Q     Apart from Mr. Sanchez Lopez invoking his

 2  12:05:00  Miranda rights, were the residents of the house

 3           generally cooperative during the search?

 4              A     Yes.

 5              Q     Did you have any other interactions with

 6           any of the family members during the search that day

 7           that we haven't already discussed?

 8              A     No.

 9              Q     And after leaving at 7:00 a.m., what did

10           you do?

11              A     Probably booked the evidence.  First thing

12  12:05:30  we do is we debrief, just review.  We review how the

13           search warrant service went, if there's things we can

14           improve on, how the search went.  I believe I booked

15  12:06:00  the evidence.

16              Q     Where did the debrief take place?

17              A     I don't remember.  It was either at

18           Maywood Police Department in the parking lot or

19           where we had originally briefed up with S.E.B.

20              Q     Do you recall what you discussed at the

21           debrief; were there things you could have improved?

22              A     No, just in terms of -- normally when we

23           debrief, we talk about tactics, just general stuff.

24  12:06:30     Q     Do you recall anything, any specifics that

25           were said at the debriefing?
```

DAVID ISHIBASHI - 6/16/2010

Page 67

1          A      No.

2          Q      Fair to say the search warrant went well?

3          A      Yes.

4          Q      After you booked the evidence, what did you

5      do?

6          A      I don't remember.

7          Q      At some point that day, did you prepare the

8      report?

9          A      I probably started it, yeah.

10   12:07:00      Q      Do you recall when you finished it?

11         A      No.

12         Q      It seems to be dated at the top right of

13     the first page, August 22nd.

14               Would that be the date you finished it or

15     the date you started it?

16         A      It probably was that day.  If that's the

17     date, that's the day I wrote it.

18         Q      That's the date you completed it or the

19     date you started it?

20         A      That's the date I completed it.

21         Q      Other than this report, did you prepare any

22     other documentation regarding or in relation to the

23   12:07:30      search at the residence that day?

24         A      The search warrant return.

25         Q      What's that?

DAVID ISHIBASHI - 6/16/2010

Page 68

```
 1              A     That's the document that's returned to the

 2        Court, to the judge that approved the warrant.   That

 3        documents the property that was seized because there

 4        was property seized.

 5   12:08:00      Q     Okay.

 6                    Any other paperwork generated in relation

 7        to this search?

 8              A     No.  Part of it is the property inventory

 9        sheet, but that is part of the return.

10              Q     This report is titled at the top, "Request

11        for Investigation."

12   12:08:30      Why is it a Request for Investigation and

13        not, say, a report or something like that?

14              A     It's just a first report we use to open an

15        investigation.

16              Q     So because this was the first action taken

17        by the task force in relation to this investigation,

18        that's why it called for a Request for Investigation?

19              A     That's correct.

20                    MR. STRUGAR:  Take five minutes?

21                    MR. LEE:  Sure.

22                    (Pause in the proceedings)

23   12:09:00              (Lunch Recess)

24                       ---oOo---

25
```

DAVID ISHIBASHI - 6/16/2010

1        LOS ANGELES, CALIFORNIA; JUNE 16, 2010

2                    ---oOo---

3

4    BY MR. STRUGAR:

5        Q    Investigator Ishibashi, you understand you

6    are still under oath?

7        A    Yes.

8        Q    Before we broke, we were discussing the

9    search of 3589 East 54th Street that took place on

10   August 22, 2008.

11            I believe you said you were notified by the

12   confidential informant that a young woman with a

13   disability lived at the residence.

14       A    That's correct.

15       Q    Did the C.I. tell you that she had autism?

16       A    No.

17       Q    You just knew she had a mental disability?

18       A    Very basic, yes.

19       Q    What did you do with that information?

20       A    Just briefed S.E.B. and the team I was out

21   there with, the task force officers.

22       Q    So that was part of the briefing that took

23   place prior to the search about a half mile from the

24   house?

25       A    Yes.

DAVID ISHIBASHI - 6/16/2010

1     Q     Do you recall what was said?

2     A     Basically just a notification where he

3  passed the information -- based on the information

4  he had, about who resides at the residence and that

5  depending on that information, it becomes something

6  that you have to consider when you are making entry.

7     Q     So apart from notifying the S.E.B. and the

8  other task force officers of one of the resident's

9  disability, I meant was there anything else more

10 specific than that?

11    A     Probably the number of adults residing

12 there, male and female, any children.

13    Q     Was there anything specific with regards to

14 the young woman's disability?

15    A     No.

16    Q     If you can recall, what property was

17 seized from the house that day, other than the

18 handgun?

19    A     I believe it was ammunition.

20    Q     Anything else?

21    A     Probably clothes.  I think it was clothes.

22    Q     Do you recall what the clothes were?

23    A     No.

24    Q     Do you recall why those were seized?

25    A     Yes.

DAVID ISHIBASHI - 6/16/2010

1      the house?

2              A     It was an assault weapon.

3              Q     And did you prepare the request for a

4      warrant?

5              A     Yes.

6              Q     Do you recall who was present to serve the

7      warrant with you?

8              A     No.

9              Q     Similar to the August 22nd search, you

10     prepared a report after the August 26, 2008 search;

11     right?

12             A     That's correct.

13             Q     And that report is one of the documents you

14     read in preparation for your deposition?

15             A     That's correct.

16             MR. STRUGAR:  Let's have it introduced so

17     we have it as part of the record of the deposition.

18                   (Deposition Exhibit 2 was marked for

19                   identification by the Certified Shorthand

20                   Reporter and is attached hereto.)

21     BY MR. STRUGAR:

22             Q     Mr. Ishibashi, does what we've marked as

23     Exhibit 2 appear to be the same document that you

24     reviewed in preparation for your deposition?

25             A     That's correct.

DAVID ISHIBASHI - 6/16/2010

Page 73

1        Q    And this is the report you authored

2    regarding the August 26th search; is that correct?

3        A    That's correct.

4        Q    Here on the first page, second paragraph,

5    it seems to have a list of the law enforcement

6    officers that participated in that search on the

7    26th; is that correct?

8        A    That's correct.

9        Q    Apart from the individuals listed there, do

10   you recall any other law enforcement officers present

11   for the August 26th search?

12       A    No, I do not.

13       Q    Task Force Officer Salvador Reyes.

14            Mr. Reyes was present for the August 22nd

15   search as well?

16       A    That's correct.

17       Q    And the same for Mr. Avakemian?

18       A    Yes.

19       Q    And the same for Mr. Bergerson, Griffin

20   and Taylor?

21       A    That's correct.

22       Q    And this task force officer, Tim Ohno, he

23   wasn't there on the previous search, was he?

24       A    That's correct.

25       Q    Who is he?

DAVID ISHIBASHI - 6/16/2010

1          A    He is a parole agent.

2          Q    Also with the C.D.C.R.?

3          A    That's correct.

4          Q    And Officer Serrata from the Maywood Police

5     Department was there for the August 28th as well;

6     correct?

7          A    That's correct.

8          Q    And at some point during the search that

9     day --

10              MR. LEE:  I'm sorry.  I think you meant

11    August 26th; right?

12              MR. STRUGAR:  I'm sorry.

13    BY MR. STRUGAR:

14         Q    Serrata was there on the 26th; correct?

15         A    That's correct.

16         Q    And he was also there on the 22nd?

17         A    That's correct.

18              MR. LEE:  Thank you.

19              MR. STRUGAR:  Thank you.

20    BY MR. STRUGAR:

21         Q    Did you have a similar debrief before the

22    August 26th search?

23         A    Yes.

24         Q    Do you recall where that took place?

25         A    No.

DAVID ISHIBASHI - 6/16/2010

1       Q    Do you recall if Officer Serrata was there?

2       A    Yes, he was.

3       Q    So Officer Serrata was also present when

4    you arrived at the house that day; correct?

5       A    That's correct.

6       Q    A Sergeant Garcia from the Maywood Police

7    Department showed up sometime later during the

8    search; is that right?

9       A    Yes, that's correct.

10       Q    And he wasn't there when you initially

11    arrived at the residence to execute the search?

12       A    No, he was not.

13       Q    I'm sorry.  I screwed that question up.

14            Was Officer Garcia there when you arrived

15    to serve the search warrant?

16       A    No, not that I recall.

17       Q    And Deputy Janell -- I'm not going to be

18    able to pronounce this H-o-n-h-k-e.

19       A    Honhke.

20       Q    -- from the marshal service arrived with a

21    K-9 unit later; correct?

22       A    That's correct.

23       Q    She was also not there to serve the warrant

24    at the beginning; correct?

25       A    That's correct.

DAVID ISHIBASHI - 6/16/2010

Page 76

1          Q     And you were the investigating officer for

2     that search that day?

3          A     Yes, that's correct.

4          Q     Were you wearing the same plain clothes

5     with ballistic vests?

6          A     Yes, with police identification on it.

7     Yes.

8          Q     Approximately how long were you at the

9     residence that day?

10         A     Two-and-a-half, three hours.

11         Q     After the debrief, you traveled to the

12    residence that day?

13         A     Yes.

14         Q     Do you recall how you arrived at the

15    residence?

16         A     By vehicle.

17         Q     Was it an unmarked, sort of, sedan?

18         A     Mine was unmarked.  I believe Serrata went

19    in his police car, in his marked police vehicle.

20         Q     And what happened next after you arrived?

21         A     We walked up to the residence.  As we were

22    walking up the driveway, we saw Bertha, her daughter,

23    an adult male -- I believe Joaquen was his name --

24         Q     The cousin?

25         A     Yeah, the cousin.

1           -- near the garage area.

2           Q    When you say "her daughter," it was her

3    daughter Maritza, the one with the disability;

4    correct?

5           A    That's correct.

6           Q    And were they in the backyard or were they

7    in the driveway?

8           A    They were in the driveway.

9           Q    What were they doing?

10          A    They just walked out of the garage.

11          Q    What happened next?

12          A    We contacted the mom, Bertha, and I gave

13   her a copy of the search warrant affidavit page.

14          Q    And what did she say?

15          A    She doesn't speak English.  But through a

16   Spanish interpretation, she was cooperative again.

17   I remember.

18          Q    Do you recall, when you first encountered

19   her and served her with the search warrant, who was

20   providing interpretation?

21          A    I believe it was Sal Reyes.

22          Q    What happened next?

23          A    Let me think.

24               I believe prior to the search I explained

25   why we were there, why we were back to do another

DAVID ISHIBASHI - 6/16/2010

1    search of the house.  I escorted them to the front

2    porch of the house, all three together.

3         Q    The house, if I recall correctly, has sort

4    of a gated front yard area.

5         A    Yes.  I believe it was a chain link fence.

6         Q    And so you escorted the family to the front

7    of the house inside the chain link fence?

8         A    Yes.

9         Q    And were they cooperative?

10        A    Yes.

11        Q    At that time, when you escorted the family

12   to the front porch, did Maritza seem distressed in

13   any way?

14        A    No.

15        Q    Do you recall what time you arrived at the

16   house?

17        A    Approximately 11 -- between 11:15 and

18   11:30.

19        Q    You escorted the family to the sort of

20   front yard/front porch area.

21             What happened next?

22        A    I explained that we were going to do the

23   search and we started our search.

24        Q    Was the door open; did they have to let you

25   in; how did that happen?

DAVID ISHIBASHI - 6/16/2010

Page 82

```
 1              A     It was a very low-key contact.  No guns

 2       were drawn.  We had already taken the husband into

 3       custody.  So basically we just walked down the

 4       driveway and contacted her.

 5              Q     Okay.

 6                    On Page 2 of your report, at the top

 7       there, at approximately 11:30 a.m., you -- the

 8       residence was cleared for officer safety and the

 9       search began.  Then at about ten after noon,    Deputy

10       Honhke arrived with the K-9.

11                    Is that consistent with your recollection?

12              A     Yes.

13              Q     Then the interview with Bertha began at

14       approximately 12:28; is that correct?

15              A     Yes.

16              Q     So between 11:30 and 12:20, as the

17       investigating officer supervising the search, what

18       did you do?

19              A     We were just searching.

20              Q     Were you participating opening up drawers

21       and searching or were you supervising other officers

22       doing that?

23              A     Both.

24              Q     Your report evidences that you recovered

25       one live .45 caliber bullet and one live 9 millimeter
```

DAVID ISHIBASHI - 6/16/2010

Page 84

1      at this time?

2           A    Yes.

3           Q    Still all three of them together?

4           A    I believe so, yes.

5           Q    And when you began your interview of

6      Bertha, where did that interview take place?

7           A    By the garage.

8           Q    And independent of your report, do you have

9      a recollection of that interview taking place in the

10     garage?

11          A    I just recall the cell phone incident.

12          Q    So you don't have an independent

13     recollection of where the interview with Ms. Martinez

14     took place?

15          A    In the garage, in the backyard.

16          Q    Fair to say the garage is in sort of the

17     backyard of the house?

18          A    It is.  It's on, I believe, the west side

19     of the property.  It's a detached garage in back of

20     the house.

21          Q    And that interview took place with

22     translation through Task Force Officer Reyes;

23     correct?

24          A    That's correct.

25          Q    And apart from your report, do you have an

1   independent recollection of Officer Reyes providing

2   translation?

3       A    Yes, that's correct.

4       Q    Did Officer Serrata take part in that

5   interview?

6       A    I believe he was there.

7       Q    He was there, meaning he was there in the

8   backyard area near the garage wall during the

9   interview of Ms. Martinez?

10      A    Yes, that's correct.

11      Q    Do you recall how it came to be that mom

12  was in the backyard for the interview?

13      A    No, I don't recall.  I know she was

14  initially in the front.  I was involved in the

15  search.  I don't recall how she came to the back.

16      Q    Did you request her presence in the

17  backyard?

18      A    It's possible.

19           (Interruption in the proceedings)

20           (Whereupon the record was read as

21  follows:

22           "Q    Did you request her presence in the

23  backyard?

24           "A    It's possible.")

25

DAVID ISHIBASHI - 6/16/2010

1    Officer Garcia sometime after the interview with

2    Ms. Martinez; or do you have any sense of where in

3    the time frame you encountered Sergeant Garcia?

4         A    No, I don't recall.

5         Q    When you encountered Sergeant Garcia in the

6    front yard, were Maritza and the cousin still in the

7    front yard?

8         A    Yes, I believe so.

9         Q    Was the cousin with Maritza the entire time

10   in the front yard?

11        A    I believe so.

12        MR. LEE:  I just want to object real

13   quickly.  Calls for speculation.

14        He wasn't always in the front yard.  So in

15   all fairness...

16   BY MR. STRUGAR:

17        Q    When you were in the front yard and

18   witnessed Maritza, was the cousin always with her?

19        A    I believe so, yes.

20        Q    When you interviewed Bertha, do you recall

21   what her responses were regarding the firearms?

22        A    Basically, denying knowledge.

23        Q    Was she -- apart from denying knowledge,

24   was she cooperative?

25        A    Yes, she was.

DAVID ISHIBASHI - 6/16/2010

1      A    That's correct.

2      Q    So if I understand the timeline correctly,

3   you interviewed Ms. Martinez for approximately ten

4   minutes, which would take us to about 12:40.

5           Then sometime, an hour later, the

6   paramedics were called.

7      A    That's correct.

8      Q    Was Ms. Martinez having chest pains for

9   that entire hour, or did it take the paramedics an

10  hour to arrive; what happened?

11     A    I'm not exactly sure when she started

12  complaining of chest pains.  I know she complained of

13  chest pains or at some point she declined medical

14  treatment.  I don't know at what point -- at what

15  point we contacted the paramedics because of her

16  chest pain.

17     Q    After you completed your interview with

18  Ms. Martinez at approximately ten minutes after it

19  began, was she free to go back to the front yard?

20     A    Yes.

21     Q    So it's your testimony that for

22  approximately an hour after the end of the interview,

23  Ms. Martinez remained in the backyard even though she

24  was free to go to the front yard?

25     A    As I recall, yes.

1    front of the house.

2           And then at some point later, after the

3    search had gone on for a little while, Ms. Martinez

4    was interviewed at the back of the house again; is

5    that correct?

6        A    That's correct.  I stand corrected.

7        Q    And did the cell phone incident happen

8    when you first encountered the family in the

9    driveway, or did the cell phone incident happen

10    during the interview with Ms. Martinez that happened

11    sometime later?

12        A    The later time.

13        Q    You said the interview of Ms. Martinez

14    that took place near the garage in the back, when

15    Ms. Martinez was not with her other two family

16    members, you said that interview was fairly short?

17        A    That's correct.

18        Q    What did you ask her?

19        A    I think the cell phone went off.  I can't

20    recall specific questions.  All of that is documented

21    in my report.  I don't remember any of the questions.

22        Q    Do you recall the general nature of the

23    questions?

24        A    No.

25        Q    Were the questions regarding firearms or

DAVID ISHIBASHI - 6/16/2010

Page 103

```
 1        A    No.
 2        Q    Do you recall giving Ms. Sanchez permission
 3   to go back and see her mother at any point?
 4        A    Now that you mention it, I believe I did,
 5   yes.
 6        Q    And how did that happen; did she ask to go
 7   back and see her mother and you said yes; do you have
 8   any recollection of the context of what you said to
 9   her?
10        A    I don't recall that.  It is possible it may
11   have been related to her complaint of chest pain.
12        Q    Her mother's complaint of chest pain?
13        A    That's correct.
14        Q    Did Wendy, during the entire time you were
15   at the residence that day on the 26th, did Wendy say
16   anything to you about her sister?
17        A    No, I don't recall that.  No.
18        Q    Do you recall her asking if she could
19   change her sister's clothes?
20        A    It's possible.
21        Q    Did you notice that Maritza had soiled her
22   clothing that day?
23        A    No, I did not.
24        Q    At any time on August 26, 2008, did you
25   make any statements regarding taking Maritza Martinez
```

DAVID ISHIBASHI - 6/16/2010

1    into Child Protective Services?

2        A    No, I did not.

3        Q    Did you hear any other task force officers

4    or any other law enforcement officers that day make

5    any statements about taking Ms. Maritza Martinez into

6    Child Protective Services?

7        A    No, I did not.

8        Q    I apologize if I've already asked this and

9    gotten an answer to it.

10            When Ms. Sanchez arrived with the mayor and

11   the reporter, was Sergeant Garcia still there at that

12   time?

13       A    I don't recall.

14       Q    When Ms. Sanchez arrived with the reporter

15   and the mayor, was the cousin Joaquin still there in

16   the front yard with Maritza?

17       A    I believe he was.  I don't recall.

18            MR. LEE:  Which one is it -- you don't

19   recall or --

20            THE WITNESS:  I don't recall.

21   BY MR. STRUGAR:

22       Q    When Wendy arrived with the mayor and the

23   reporter and were at the front gate, do you recall

24   Maritza still being in the front yard?

25       A    Yes.

DAVID ISHIBASHI - 6/16/2010

1        Q    And other than yourself, do you recall any

2   other task force officers being in the yard at that

3   time?

4        A    There were task force officers in the

5   front yard, that's correct.

6        Q    Do you know who any of them were?

7        A    No, I do not.

8        Q    Did Deputy Honhke and the K-9 that

9   arrived -- withdrawn.

10         The K-9 that arrived with Deputy Honhke,

11   that K-9 was trained to sniff out firearms; is that

12   right?

13        A    That's correct.

14        Q    And did Deputy Honhke and the K-9 uncover

15   any firearms or anything else?

16        A    No, no firearms.

17        Q    Did they uncover anything else?

18        A    I can't -- I don't recall.

19        Q    Apart from the two bullets that task force

20   Officer Ohno found and the cellular phone, and it

21   appears from the report a metal brush, do you recall

22   anything else seized from the home that day?

23        A    No.

24        Q    Do you recall who found the metal bore

25   brush?

1          Q     Do you recall any of the interaction

2     between Ms. Martinez and the paramedics?

3          A     No.

4          Q     Did she decline medical treatment or did

5     the paramedics decide she was okay independent of --

6          A     They decided she was stable, yes.

7               MR. LEE:  Objection.  Again, speculation.

8               You don't know exactly the reason why if

9     you weren't there.

10              MR. STRUGAR:  He said he was there.

11    BY MR. STRUGAR:

12         Q     What happened after the paramedics left?

13         A     I believe we did a walk-through with the

14    older daughter, with Wendy, ensured there was no

15    property damage, then left.

16         Q     Did you take any after photos after the

17    walk-through with Wendy?

18         A     I don't recall if there were or not.

19         Q     Your report evidences that you left a

20    little after 2:15.

21              Does that seem consistent with your

22    recollection?

23         A     That's correct.

24         Q     At any time on August 26, 2008, did you

25    understand Bertha to make any requests regarding her

DAVID ISHIBASHI - 6/16/2010

1        (Pause in the proceedings)

2        (Deposition Exhibit 3 was marked for

3    identification by the Certified Shorthand

4    Reporter and is attached hereto.)

5    BY MR. STRUGAR:

6        Q    Mr. Ishibashi, here is a copy of what we've

7    marked as Exhibit 3.

8        Mr. Ishibashi, this is a copy of your

9    interrogatory responses to interrogatories issued by

10   Bertha Martinez in this case.

11       On Page 15, the verification page, there

12   at the bottom, is that your signature?

13       A    Yes.

14       Q    Did you read and verify the answers to the

15   plaintiff's interrogatories before signing?

16       A    Yes.

17       Q    Have you seen this document before today?

18       A    Yes.

19       Q    Have you read the questions and verified

20   the responses and ensured they were correct before

21   today?

22       A    Yes.

23       Q    I have a question about interrogatory

24   Number 22, which is on Page 13.

25       Interrogatory Number 22 says, "Describe any

DAVID ISHIBASHI - 6/16/2010

Page 117

1      attempts you made to accommodate Plaintiff Maritza

2      Sanchez Martinez's disability during the August 26,

3      2008 incident."  Then there is some objecting

4      language.

5              "Defendant did not separate Maritza Sanchez

6      Martinez from family members and was allowed to be

7      together with them while the search of the premises

8      was conducted."

9              Is that correct?

10      A    Technically, yes.

11      Q    What do you mean, "technically"?

12      A    They were in the front together on the

13      second search warrant and I was searching the house.

14      So I don't recall me separating them from each other,

15      from coming from the front to the back.

16      Q    Okay.

17      A    I don't recall how they got -- how they

18      were separated, how she got separated from the

19      daughter.

20      Q    So fair to say that when Ms. Martinez was

21      being interviewed in the back for that period of time

22      before the paramedics came, Maritza was not with

23      Bertha in the back; is that right?

24      A    That is correct.

25      Q    So to the extent that this suggests that

LOS ANGELES COUNTY DISTRICT ATTORNEY
BUREAU OF INVESTIGATION

OCT 0 1 2008

INVESTIGATOR'S REPORT                                        TC

| REPORT MADE BY:<br>D. Ishibashi #183<br>Senior Investigator | DATE:<br>08/28/2008 | CHARGE:<br>12020(a)(1) P.C.,<br>Felon in Possession of<br>a Loaded Firearm | FILE NO.<br>2008-A-2834 |
|---|---|---|---|
| SUSPECT:<br>Sanchez Lopez, Gaudencio<br>BA345534 | | COMPLAINANT: USMS<br><br>VICTIM: State of California | |

SYNOPSIS OF FACTS:

Case opened 08/22/2008.  Search warrant number 5534 served without incident at 3589 East 54th Street, Maywood, California 90270.  Evidence seized and booked under Property Number 2893.


CLOSED


DETAILS:

On August 25, 2008, at approximately 11:47 am, I obtained search warrant number 5534 for service at the home of Gaudencio Sanchez Lopez (DOB: 01/22/1962, CDL: B5217284) and his wife, Bertha Martinez Barragan (DOB: 06/28/1964, CDL: A9861510) at 3589 East 54th Street, Maywood, California 90270.

On August 26, 2008, at approximately 11:15 am, Task Force Officer (TFO) Salvador Reyes, TFO Tim Ohno, TFO Wayne Montgomery, TFO Hrand Avakemian, TFO Phil Bergerson, TFO Jeff Griffin, TFO Earl Taylor, Officer Andrew Serrata of the Maywood Police Department (MPD) and I served search warrant number 5534 at 3589 East 54th Street, Maywood, California 90270.  TFO Reyes, MPD Officer Serrata and I contacted Bertha Martinez Barragan, her daughter, Marissa Martinez (DOB: 06/22/1987) and her nephew, Goaquen Olvera (DOB: 02/08/1981) outside the garage at 3589 East 54th Street.

I identified myself as a "Police Officer" with a search warrant.  All three (3) individuals were cooperative and were detained without incident.  I gave a copy of the "Search Warrant and Affidavit" face sheet to Bertha Martinez Barragan.

| DISTRIBUTION:<br>1 - Bureau Records<br>1 - Investigator<br>1 - D.D.A.<br>1 - Control | Exhibit # 2<br>Witness: Ishibashi<br>Date: 6/16<br>Christie Leiter - CSR #10764 | REPORT APPROVAL<br>SUPV. INV. BB<br>LIEUTENANT<br>CAPTAIN<br>CHIEF |
|---|---|---|

EXHIBIT 2

2

Case No.: 2008-A-2834
Page 2

At approximately 11:30 am, we cleared 3589 East 54th Street for officer safety and rendered the property safe to search. TFO Ohno took "before" search photographs of the exterior and interior of the above-location. TFO Reyes, TFO Ohno, TFO Montgomery, TFO Avakemian, TFO Griffin, TFO Bergerson, TFO Taylor, MPD Officer Serrata and I began searching 3589 East 54th Street.

TFO Ohno recovered one (1) live .45 caliber bullet, one (1) live .9mm caliber bullet and one (1) metal bore brush with a metal rod from the dresser drawer located against the west wall of the bedroom (northeast bedroom) occupied by Gaudencio Sanchez Lopez and Bertha Martinez Barragan.

At approximately 12:10 pm, Deputy Janelle Hohnke of the United States Marshals Service (USMS) and her K-9 Tammie arrived at 3589 East 54th Street to assist.

At approximately 12:28 pm, TFO Reyes, MPD Officer Serrata and I began interviewing Bertha Martinez Barragan outside the garage of 3589 East 54th Street. She is a Spanish speaker and TFO Reyes provided Spanish interpretation. Prior to any questioning, the cellular telephone in her left rear pants' pocket activated and she retrieved it. TFO Reyes asked who the cellular telephone belonged to and she immediately replied, "it's my husbands" (previously identified as Gaudencio Sanchez Lopez).

I recovered the cellular telephone that Bertha Martinez Barragan had retrieved from her left rear pants' pocket. TFO Reyes, MPD Officer Serrata and I saw it was a black, Motorola flip-type phone. TFO Reyes, MPD Officer Serrata and I also saw the initials "MWLS" engraved in the back of the above-Motorola cellular telephone.

MPD Officer Serrata is a court certified expert on the Maywood Locos criminal street gang.

MPD Officer Serrata examined the black, Motorola cellular telephone. He opined the initials "MWLS" engraved in the back were consistent with graffiti commonly associated with the Maywood Locos criminal street gang. MPD Officer Serrata also opined that the black, Motorola cellular telephone with the initials "MWLS" engraved on the back were an indication of Gaudencio Sanchez Lopez' affiliation with the Maywood Locos.

At approximately 12:50 pm, USMS Deputy Hohnke and K-9 Tammie completed their search of 3589 East 54th Street.

The .45 caliber bullet, .9mm caliber bullet and metal bore brush and black, Motorola cellular telephone were seized as evidence. All the above-contraband was seized and booked as evidence at the Los Angeles County District Attorney's Office Bureau of Investigation Evidence Facility under Property Number 2893.

At approximately 1:45 pm, Los Angeles County Paramedics (Engine 163) arrived at 3589 East 54th Street. Bertha Martinez Barragan was complaining of chest pain and was examined by Paramedics. She was allowed to remain at 3589 East 54th Street once Paramedics rendered her condition stable.

323

Case No.: 2008-A-2834
Page 3

At approximately 2:00 pm, we completed our search of 3589 East 54th Street, Maywood, California 90270. At approximately 2:15 pm, TFO Ohno, Wendy Luengas (DOB: 07/12/1983, CDL: A7390651) and I walked through the above-property which checked for any damage. Wendy Luengas was identified as the daughter of Gaudencio Sanchez Lopez and Bertha Martinez Barragan.

**CLOSED**

324